UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| RONNIE LEE BOWLING, | ) | |
| | ) | |
| Petitioner, | ) | Civil No. 03-28-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM** |
| GLENN HAEBERLIN, Warden, | ) | **OPINION & ORDER** |
| | ) | |
| Respondent. | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

Almost two decades ago, a Kentucky jury convicted Petitioner Ronnie Lee Bowling of murdering Ronald Smith and Marvin Hensley and sentenced him to death.  Bowling's petition for the writ of habeas corpus, R. 1, now challenges that conviction.  Bowling alleges numerous errors in both his trial and his direct appeal.  And he seeks to supplement those allegations through motions for evidentiary hearings, R. 118, R. 188, additional discovery, R. 120, and funds for a brain MRI and neuropsychological evaluation under 18 U.S.C. § 3599(f), R. 166.  The Court separated Bowling's habeas claims into those that were associated with the evidentiary motions and those that were not.  *See* R. 190.  A previous Memorandum Opinion and Order addressed the thirty-seven claims that were not related to those evidentiary motions.  *See* R. 245.  This Memorandum Opinion and Order addresses the twenty-three remaining claims and their related evidentiary motions.  On all twenty-three, Bowling is not entitled to habeas relief.  Nor is he entitled the additional evidence he seeks.

The Court recognizes that this opinion, like its predecessor, R. 245, is lengthy.  But its length is warranted.  The Court's paramount duty is to fully consider the merits of the

petition.  *Cf. Chaney v. Brown*, 712 F.2d 441, 443 (10th Cir. 1983) (declaring that the court's overriding concern was "to give due consideration to the merits of the appeal").  And where a petitioner such as Bowling asks numerous questions of the process that has sentenced him to death, numerous answers must be given.  Admittedly, the Court could have batted away many of the frivolous issues with nary a word.  But doing so would contravene the federal courts' long held recognition that special attention is warranted in capital cases, "[g]iven that the imposition of death by public authority is so profoundly different from all other penalties," *Lockett v. Ohio*, 438 U.S. 586, 605 (1978) (Plurality Opinion of Burger, C.J.). The Court therefore feels an obligation—not just to Bowling, but to all those affected by this case—to thoroughly address each issue raised before the ultimate punishment is given.

# TABLE OF CONTENTS

**BACKGROUND** ................................................................................. 5

**DISCUSSION** ................................................................................. 11

**I.**   **Ineffective Assistance of Counsel (Claims 48, 50)** .................................. 11

    *A.* *Randy Harris (Claim 48)*.................................................................. 13
    *B.* *April Lunsford (Claim 50)* ............................................................. 19

**II.**   **Juror Voir Dire and Challenges (Claims 2, 15, 67)**............................... 26

    *A.* *For-Cause Challenges (Claim 2)* ..................................................... 26
        1.   The Seven Jurors Who Deliberated and Delivered the Verdict ........................ 26
            a.   Susie Edwards................................................................. 29
            b.   Nannette Johnson ............................................................. 30
            c.   Pamela Childress.............................................................. 31
            d.   Cleda Creech................................................................... 34
            e.   Diana Greer .................................................................... 35
            f.   Rosalitta Gregory ............................................................ 36
            g.   Doug Dixon .................................................................... 37
        2.   The Eleven Jurors Who Did Not Deliberate and Deliver the Verdict ............... 43
    *B.* *Voir Dire Questioning (Claim 15)* .................................................... 45
    *C.* *Ineffective Assistance of Counsel Regarding Juror Ena Siner (Claim 67)*............. 50

**III.**   **Pretrial Disclosures (Claim 13)** ..................................................... 56

    *A.* *Photograph of the Revolver*............................................................. 59
    *B.* *Sergeant Bickerstaff's Report*.......................................................... 61
    **C.** *Ora Lee Isaacs' Incomplete Initial Statement* ...................................... 63

**IV.**   **Fundamentally Unfair Evidence (Claims 3, 20)** ................................... 64

    *A.* *Evidence of the Mt. Vernon Shooting (Claim 3)* ................................... 66
    *B.* *Improper Opinion Testimony (Claim 20)*........................................... 71
        1.   Officer Phelps's Testimony Regarding Holster ................................... 72
        2.   Officer Phelps's Testimony Regarding Tire Track ............................... 74
        3.   Ed Bowling's Testimony ............................................................. 75
        4.   Warren Mitchell's Testimony....................................................... 77
        5.   Ronnie Freels and Jeffrey Scott Doyle's Testimony .......................... 78
        6.   R.J. Elkins and David Gross's Testimony ....................................... 81

**V.**   **Comparative Bullet Lead Analysis (Claims 51, 52, 2nd Amend. to Petition, 3rd Amend to Petition)**........................................................................... 83

    *A.* *CBLA Evidence as Brady Violation and Grounds for Vacating Death Sentence (Claim 52, 2nd Amend. Petition, 3rd Amend. Petition)*................................. 83

3

    *B. Ineffective Assistance for Failure To Secure Expert To Challenge Bullet Lead Testimony (Claim 51)* ............................................................................................ 92

**VI.**   **Testimony of Timothy Lyle Chappell (Claims 18, 19, 45, 46, 47)** ........................... 97

    *A. Suppression of Chappell's Testimony Under Massiah (Claim 19)* ........................ 98
    *B. Brady and Giglio Evidence (Claims 18, 45)* ....................................................... 100
       1.  Chappell's Criminal and Psychiatric Records (Claim 18) ............................. 100
       2.  Chappell's Federal and State Charges (Claim 45) ......................................... 102
    *C. Ineffective Assistance of Counsel (Claims 46, 47)* ............................................... 110
       1.  Failure to Investigate Chappell (Claim 46) ................................................... 110
       2.  Failure to Investigate and Call Gilbert Jones (Claim 47) ............................... 112

**VII.** **Bowling's Alleged Brain Damage (Claims 53, 54, 55, 57, 58, 59, 60, 61)** .............. 117

    *A. Ineffective Assistance of Counsel (Claims 53, 55, 58, 59, 61)* ............................... 117
       1.  Investigating, Securing, and Presenting Expert Testimony Regarding Bowling's Alleged Brain Damage (Claims 53, 58, 59) ........................................................... 118
     a.  Deficient Performance .................................................................................. 120
     b.  Prejudice ...................................................................................................... 125
       2.  Trial Court's Assignment of a KCPC Expert (Claim 55) .............................. 130
       3.  Direct Appeal (Claim 61) ............................................................................. 133
    *B. Trial Court Rulings (Claims 54, 57, 60)* ............................................................. 140
       1.  Granting Funds for a Psychiatrist and Denying Funds for a Neuropsychologist (Claim 57) ............................................................................................................ 140
       2.  Denying Funds for an Independent Expert Witness (Claim 54) ..................... 143
       3.  Ordering KCPC's "Neutral" Evaluation (Claim 60) ..................................... 143

**VIII.**    **Victim Impact Testimony (Claim 4)** .................................................... 145

**IX.**   **Cumulative Prejudice Analysis** .......................................................................... 155

**X.**    **Evidentiary Motions** ......................................................................................... 161

    *A. Motions Mooted by Cullen v. Pinholster* ............................................................. 162
    *B. Burden for Motions* ........................................................................................... 165
    *C. Showing of Facts that Would Entitle Bowling to Relief* ......................................... 166
       1.  Motions for Evidentiary Hearings (Amends. to Petition, Claim 61) ............... 167
       2.  Motion for Additional Discovery (Claims 3, 13, 19, 20, 45, 46) ................... 168

**CONCLUSION** ........................................................................................................ 172

## BACKGROUND

The Kentucky Supreme Court capably states the facts of the case at 942 S.W.2d 293, but the Court will briefly summarize them here.

On January 20, 1989, Ronald Smith worked his usual midnight to 8:00 a.m. shift at the Jones Chevron station in London, Kentucky.  Smith had $200 in the cash register when he started his shift, and he usually worked alone until 6:30 a.m.  Around 5:30 a.m., two customers noticed that the gas pumps were not working.  They went inside and found Smith lying facedown on the floor—dead.  The cash register reflected $354 in sales over the course of the night, with a "no sale" indicated at 5:21 a.m., but the register was empty except for coins.  Smith had been shot six times: three times in the back of the head, twice in the back, and once in the chest.

A month later, on February 22, 1989, Marvin Hensley opened his gas station one-and-a-half miles north of London around 6:00 a.m.  One customer bought five dollars of gas from him at 6:15 a.m.  But when another customer entered the station at 7:00 a.m., he found Hensley dead on the floor.  Hensley, who was also a minister at a church in Mt. Vernon, had suffered three gunshot wounds to the back of his head, one to his ear, one to the back of his neck, and one to his hand.  Again, the station's cash register was empty except for coins.

The Smith and Hensley murders received extensive attention in the local news, and gas station operators began to take additional security precautions.  One such operator was Ricky Smith (no relation to Ronald), who owned and operated a Sunoco station on U.S. Highway 25 in Rockcastle County, Kentucky.  On February 25, 1989, Smith opened his station around 6:00 a.m.  Not long afterward, Ronnie Lee Bowling entered the station. Bowling told Smith he was looking for a job, but kept his hands in his pockets and asked

Smith if the station ever had two employees on duty at the same time.  Smith also recalled that Bowling looked out the station window, up and down the highway in both directions.

Smith told Bowling that the station was not hiring, and Bowling turned to leave.  But as Bowling exited, he pulled out a revolver and started firing at Smith.  Reacting quickly, Smith dove behind a wall and metal desk and pulled out his own gun.  When he realized Bowling was out of rounds, Smith returned fire through the wall.  Smith's gunfire sent Bowling running out of the station, into his car, and south down Highway 25.

Smith called the Kentucky State Police, told them what happened, and gave them a description of Bowling.  State Police Troopers Allen Lewis and Danny Alton quickly intercepted Bowling's car and began pursuing it.  When Lewis switched on his blue lights, Bowling accelerated.  The pursuit continued for more than thirty miles, and, according to Lewis, frequently exceeded speeds of 100 miles per hour.  By the time Bowling stopped at an area near his residence, eight to ten other police cars were involved in the chase.  The police arrested Bowling and noticed that he was bleeding from his head.

During the chase, police observed Bowling throw two brown objects out of his car near the nine-mile marker of Kentucky Highway 472.  When police returned to this location, they found a pair of brown gloves.  State police troopers searching the entire route of the chase made an even more important discovery—near the area where the chase began, they found a .38-caliber revolver.  Ricky Smith identified the gun as similar to the one Bowling brandished at the Sunoco station.

When the police arrested Bowling, he told them that he entered Ricky Smith's gas station to look for a job.  According to Bowling, Smith lost his temper during the conversation and began shooting.  Bowling claimed that he never had a gun at the gas station

6

and that he did not throw anything out of his car while fleeing from the police.  Bowling also denied ever owning a handgun.  When Bowling gave his initial statement to the police, he was bleeding because one of Smith's shots had grazed the side of his head.

Bowling's trial lasted from September 21 to October 9, 1992.  At the trial, a Kentucky State Police forensic scientist presented evidence of tests that analyzed the lands and grooves of the .38-caliber revolver that police found on the side of the road and the bullets found at the crime scenes.  These tests revealed that one of the bullets that killed Ronald Smith and four of the bullets that killed Marvin Hensley matched the handgun found on the side of the road. Bullets found at the third crime scene, Ricky Smith's Sunoco station, were too badly warped for the forensic scientist to conclusively tie them to the .38-caliber revolver.  The bullets were, however, the type that a .38-caliber revolver could have fired.

The Kentucky State Police also sent the bullets to the FBI for additional testing. Donald Havekost, an FBI forensic scientist, conducted a comparative metallurgical analysis of the lead in the bullets through a process known as comparative bullet lead analysis (CBLA).  From this analysis, he linked bullets that killed Hensley and Smith and bullets from Ricky Smith's Sunoco station with each other and with bullets found in an ammunition box at Bowling's home.

A federal prisoner named Timothy Chappell also testified at Bowling's trial. Chappell was detained in the Laurel County Jail at the same time as Bowling, and he testified that Bowling confessed the two murders to him.  According to Chappell, Bowling said he was sorry about shooting Hensley because he did not know that Hensley was a preacher. Bowling also said he had killed both men because a service station attendant had once made a pass at his wife and all service station attendants were the same.

Another witness at Bowling's trial was his ex-wife, Ora Lee Isaacs. Isaacs was married to Bowling at the time of the crimes, but the two divorced before trial. She identified the gun found by the side of the road as belonging to Bowling, and testified that Bowling left home around 5:30 a.m. and returned around 7:30 a.m. on the mornings of the crimes.

To rebut this testimony, Bowling called various members of his family as witnesses. Bowling's father, Ledford, testified that he owned both a .38-caliber handgun and the ammunition that the police found in Bowling's mobile home. Bowling's aunt and uncle testified that Bowling was with them in Indiana on the day of Ronald Smith's murder. And according to Bowling's younger sister and one of her friends, Bowling's car was parked in front of his trailer with frost on the windshield around 7:15 a.m. on the morning of the Hensley murder.

Bowling also called April Lunsford as a witness. Lunsford testified that she spent the night before the Hensley murder with Bowling at the Kozy Motel, and that Bowling left her the next morning around 7:00 a.m. She produced a registration card from the motel for that evening. The card had been filled out by Bowling's cousin, who worked at the motel.

After deliberating for one day, the jury found Bowling guilty of murder, first-degree burglary, and first-degree robbery for both the Smith and Hensley killings. After hearing additional evidence in the penalty phase, the jury returned a sentence of death for each of the murders and gave Bowling a twenty-year sentence for each burglary and robbery conviction. The trial judge formally sentenced Bowling and entered judgment on December 4, 1992. Bowling then filed a direct appeal of his conviction, which the Kentucky Supreme Court rejected on the merits on June 19, 1997. *Bowling v. Commonwealth*, 942 S.W.2d 293 (Ky.

1997).  The U.S. Supreme Court declined to hear his appeal a few months later.  522 U.S. 986 (1997).

In 1998, Bowling filed a collateral attack on his conviction under Kentucky Rule of Criminal Procedure 11.42 in Laurel Circuit Court, alleging, among other things, ineffective assistance of counsel.  The Laurel Circuit Court denied his claims, and the Kentucky Supreme Court affirmed that judgment.  *Bowling v. Commonwealth*, 80 S.W.3d 405 (Ky. 2002).  Bowling also filed a motion for a new trial in Laurel Circuit Court, primarily alleging juror misconduct.  Again, the Laurel Circuit Court denied that motion, and again, the Kentucky Supreme Court affirmed.  *Bowling v. Commonwealth*, 168 S.W.3d 2 (Ky. 2006). And in 2005, Bowling filed another motion for a new trial, challenging the testimony of Donald Havekost.  The Laurel Circuit Court denied that motion, and the Kentucky Supreme Court affirmed.  *Bowling v. Commonwealth*, No. 2006-SC-000034-MR, 2008 WL 4291670 (Ky. Sept. 18, 2008).

Bowling also sought collateral review in the federal courts.  He filed a habeas petition alleging sixty-eight grounds for relief on January 15, 2003.  In 2007, he amended that petition with three additional claims.  R. 81.  The district court initially dismissed the petition on exhaustion grounds, and Bowling appealed that ruling. R. 12; R. 17; R. 18.  The Sixth Circuit reversed and remanded, holding that Bowling had exhausted his state-court remedies. *Bowling v. Haeberline*, 246 F. App'x 303, 307 (6th Cir. 2007).  After the case was transferred to the undersigned, the Court ordered supplemental briefing.  R. 190.  Bowling's petition is now ripe for decision on the merits.

Because Bowling filed his habeas petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254(d), applies to his claims.  That statute allows

9

the Court to grant Bowling relief only if the Kentucky Supreme Court violated clearly established federal law or made an unreasonable determination of the facts.  Bowling filed a motion to declare § 2254(d) unconstitutional, R. 155, which the Court denied, R. 211.

## DISCUSSION

### I.   Ineffective Assistance of Counsel (Claims 48, 50)

The Sixth Amendment guarantees a defendant "the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  In applying the Sixth Amendment, the Supreme Court has long held "that 'the right to counsel is the right to the effective assistance of counsel.'"  *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771, n.14 (1970)).  State habeas petitioners claiming ineffective assistance of counsel normally face two substantial burdens.

First, petitioners must establish that they received ineffective assistance of counsel.  That requires demonstrating "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense."  *Strickland*, 466 U.S. at 687.  To qualify as deficient, counsel's performance must fall "below an objective standard of reasonableness" measured "under prevailing professional norms."  *Id.* at 688.  The Supreme Court has repeatedly admonished lower courts that the performance inquiry "must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance."  *Id.* at 689; *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009); *Premo v. Moore*, 131 S. Ct. 733, 739 (2011).  The high court has also continuously stressed that reviewing courts must resist "the distorting effects of hindsight" by "evaluat[ing] the conduct from counsel's perspective at the time."  *Strickland*, 466 U.S. at 689; *Bell v. Cone*, 535 U.S. 685, 702 (2002); *Harrington v. Richter*, 131 S. Ct. 770, 789 (2011).  The prejudice inquiry must assess whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  And

"[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Second, where the state court addressed a federal constitutional claim on its merits, § 2254(d) requires petitioners to prove the state court's application of *Strickland* was objectively unreasonable. *Richter*, 131 S. Ct. at 785 ("A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself."). For the performance inquiry, this creates a "doubly deferential judicial review." *Mirzayance*, 556 U.S. at 123. The Court takes "a highly deferential look at counsel's performance through the deferential lens of § 2254(d)." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (internal quotation marks and citation omitted). So § 2254(d) review of the performance prong asks "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 131 S. Ct. at 788.

Similarly, the state court's determination that a defendant did not suffer any prejudice must be "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (Opinion of O'Connor, J.). While this review is not doubly deferential like the performance inquiry, it still requires petitioners to prove that the "state court has *unreasonably* determined that prejudice is lacking." *Pinholster*, 131 S. Ct. at 1411. Finally, in instances where the state court applies one prong of the *Strickland* test but not the other, the Court reviews the adjudicated prong under § 2254(d) and reviews the "unadjudicated prong" *de novo*. *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012).

Bowling makes a number of ineffective assistance claims and sub-claims. However, many of them relate to the same underlying substantive issue as other claims, such as Bowling's alleged brain damage, *see* Section VII *infra*, or Timothy Chappell's testimony, *see*

Section VI *infra*.  The Court therefore addresses Bowling's two freestanding ineffective assistance claims here, and reviews the other ineffective assistance claims along with their related claims.

### A.    Randy Harris (Claim 48)

In order to tie Bowling to the gun used in the Smith and Hensley murders, the prosecution presented evidence of Bowling's attempted robbery at the Rockcastle Sunoco. *See* 17 T.E. 2549–55.  According to Ricky Smith's testimony, Bowling entered the Sunoco at approximately 6:00 a.m., which corresponded with the previous murders' timeframe.  19 T.E. 2768.  Bowling inquired about a job and started to leave when Smith told him to come back in the spring.  *Id.* at 2771–73.  But Bowling stopped at the door, pulled a pistol from his jacket, and emptied six rounds into the store wall as Smith ducked behind the counter.  *Id.* at 2774–75.  Smith drew his own pistol, which he carried out of fear from the previous murders, and returned fire.  Bowling dashed out of the store and raced off in a late model green sedan.  *Id.* at 2775–76, 2907.  Smith then called the police to relay a description of the car that allowed state troopers to intercept Bowling and eventually apprehend him.  *Id.* at 2776. According to the prosecution, Bowling committed all three murders in the same fashion:  He would drive to an isolated gas station in the early morning hours, make sure that nobody else was present, shoot the attendant, and then leave with the loot in his late model green car.  *See* 24 T.E. 3582–87 (casting Ricky Smith's testimony as illustrating how the two prior murders occurred).

Bowling countered with his own theory of the case.  He called many witnesses to testify in support of his defense, but Randy Harris was not one of them.  At the time of Bowling's trial, Harris was living in Virginia and working for the Piston Coal Company.

Rule 11.42 H'rg Video, Disc 3, 17:33:49–17:34:11.   When Bowling's defense team contacted him about testifying at trial he declined, saying he was unable to take time off of work.  *Id.* at 17:33:49–17:34:11.  However, Harris claims he would have appeared to testify if he had been subpoenaed.  *See id.* at 17:34:11–17:34:535, 17:36:31–17:36:50.  Defense counsel drafted a motion to secure Harris's presence under the Uniform Act to Secure the Attendance of Witnesses From Within or Without a State in Criminal Proceedings, *see* KRS §§ 421.230- to .270; Va. Code An. § 19.2-272 to -282.  But counsel never filed it.  *See* Rule 11.42 H'rg Video, Disc 3, 21:17:19–21:22:26.

Had Harris appeared, he would have testified as follows: On the morning Ronald Smith was murdered in the Jones Chevron robbery, Harris pulled into the station's parking lot to buy cigarettes.  *Id.* at 17:27:57–17:28:07.  But after he pulled in, he realized that he still had half a pack and decided to buy them later.  *Id.* at 17:28:08–17:28:09.  As he started to leave, he saw a man run out of the store and jump into an "old green car."  *Id.* at 17:28:20–17:28:24.  Thinking that the man was probably just running to get out of the morning chill, Harris pulled out onto the state highway heading east.  *Id.* at 17:28:25–34, 17:30:15–17:30:25.  When he stopped at a red light, the same green car pulled up in the lane next to him.  *Id.* at 17:30:25–17:30:54.  Harris "glanced" over at the man in the green car next to him, the light changed, and both cars drove off.  *Id.* at 17:30:26–17:31:08.  Several days later, the newspaper reported that the cash register in the Jones Chevron was last used at 5:21 a.m.  Remembering the time on his car's clock, Harris realized that he had pulled into the station parking lot only a minute or two after the robbery occurred.  *Id.* at 17:27:39–17:27:47; 17:31:09–17:31:45.  Harris called the police station to report what he saw, but gave the police a false name.  *See id.* at 17:41:430–17:43:18.  Later, when Harris was in the Laurel

14

County Jail on an unrelated charge, he saw Bowling and concluded Bowling was not the man he saw that morning. *Id.* at 17:34:54–17:36:31.

Bowling claims that defense counsel's failure to file a motion to subpoena Harris was ineffective assistance of counsel. R. 1 at 227–38. He asserts that the motion would have succeeded and that Harris would have appeared. *Id.* at 229–34. And he further asserts that if Harris had testified, he would have strengthened the alibi witnesses who testified that Bowling was in Indiana the day of Smith's murder. *Id.* at 229.

To succeed on an ineffective assistance claim, Bowling must show that his counsel's performance was deficient and that counsel's error prejudiced the defense. *Strickland*, 466 U.S. at 687; *see also* Section I *supra*. At the post-conviction hearing, Bowling asked his trial counsel about the drafted-but-unfiled motion to subpoena Harris. But Bowling never asked why the motion was not filed. *See* Rule 11.42 H'rg Video, Disc 3, 21:17:18–21:22:26. And Bowing offers no evidence or theory that suggests counsel failed to file the motion by mistake, accident, or absentmindedness. R. 1 at 229–38. Thus, the Court must "strongly presume[]" that Bowling's counsel made this decision "in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690; *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect." (citing *Strickland*, 466 U.S. at 690)). Moreover, the Kentucky Supreme Court found counsel's failure to call Harris was neither deficient nor prejudicial. *See Bowling*, 80 S.W.3d at 417–18. Accordingly, the Court reviews its decision under § 2254(d), with double deference on the deficiency prong and standard deference on the prejudice prong. *See Pinholster*, 131 S. Ct. at 1403; *see also* Section I *supra*.

Deciding which witnesses to call is a strategic matter. *Boykin v. Webb,* 541 F.3d 638, 649 (6th Cir. 2008). Accordingly, courts owe counsel a wide degree of deference to decide which witnesses to present in making their case. *See id.* ("The decision not to call a particular witness is typically a question of trial strategy that appellate courts are ill-suited to second-guess." (quoting *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998))). Here, there was good reason not to subpoena Harris. The defense presented several theories about other possible killers. *See* R. 245 at 87–88. There were two common threads running through those alternate theories. First, the defense presented evidence that the real killer drove a pickup truck, not a green sedan like Bowling's. Several witnesses testified to seeing suspicious behavior by individuals driving a pickup truck. *See* 22 T.E. 3328–29 (testimony of defense witness Donald Creech that he saw a truck enter the Jones Chevron station shortly before Ronald Smith's murder); 18 T.E. 2701–11 (defense cross examination of David Gross revealing that Hensley had refused to give money to an unidentified young man in a pickup truck). And the police discovered a partial tire print from a pickup—not a car—pulling away from the scene of Marvin Hensley's murder. *See* 21 T.E. 3082–85 (testimony of defense witness Jeffrey Scott Doyle that the tire mark found at Hensley's station was likely left by a truck tire). Second, several witnesses testified that they saw two men acting suspiciously at both the Jones Chevron station and Hensley's station shortly before each murder. *See* 22 T.E. 3344–47 (testimony of defense witness Philip Jackson that two "rough[-]looking guys" visited Hensley's station several days before he was killed); *see* 22 T.E. 3330–32 (testimony of defense witness Edward Eugene Herren that Herren observed two men in the Jones Chevron before the murder discussing Ronnie Smith in a threatening manner). The defense's

closing argument emphasized these alternate theories, especially the evidence that a truck was involved in the murders. *See* 24 T.E. 3527–33.

Harris's testimony would have contradicted both of those common threads. He testified that he saw one man, not two, leave the station and enter a green car, not a truck. *See* Rule 11.42 H'rg Video, Disc 3, 17:28:20–17:30:30. Thus, it was perfectly reasonable for Bowling's attorney to withhold testimony that contradicted the defense theory. *See, e.g., Jackson v. Bradshaw*, 681 F.3d 753, 773 (6th Cir. 2012) (holding that it was not ineffective counsel to abstain from presenting "testimony [that] would have contradicted trial counsel's mitigation strategy"). Moreover, even in hindsight, counsel's decision looks wise. Defense counsel's closing argument painted the prosecution as so "desperate" to secure a conviction that they were willing to present any possible evidence, regardless of its credibility. *See* 24 T.E. 3558–59. Committing the same sin that counsel accused the prosecution of committing would have diminished both the power of the defense's closing argument and defense counsel's credibility. Thus, defense counsel's decision to present fewer theories for the sake of persuasive consistency was well within the "wide latitude" defense counsel has "in deciding how best to represent a client." *Gentry*, 540 U.S. at 5–6.

Moreover, Harris's testimony would have done more than just undermine the defense's other theories. It would have also partially inculpated Bowling. Harris testified that the man he saw run out of the station jumped in an "old green car." *See* Rule 11.42 H'rg Video, Disc 3, 17:28:20–17:28:24. That description matches Bowling's car. *See* 19 T.E. 2907. So, unlike the 'other killer' theories that defense counsel did present, Harris's testimony could have been turned against Bowling. Withholding evidence that not only undermines other defense arguments, but also "might well have backfired" is a legitimate

exercise of counsel's discretion.  *Gentry*, 540 U.S. at 7.  What's more, there was ample reason to believe that Harris testimony offered little reward to justify the risk of backfire. Harris got only an obscured glimpse of the driver in the green car.  *See* Rule 11.42 H'rg Video, Disc 3, 17:28:25–17:31:08 (testifying that Harris only "glanced over" at the other driver and that the driver's forehead was obscured by his toboggan and hair).  And the prosecution could have impeached Harris's credibility with his prior felony conviction for forgery and the fact he originally gave police a false name in reporting the incident.  *See id.* at 17:36:48–17:43:18.

The potential drawbacks of calling Harris to the stand justify counsel's decision on habeas review.  Collectively, they show that counsel's decision was well within the "wide latitude" afforded by the first layer of *Strickland* deference.  466 U.S. at 689.  Individually, they provide numerous "reasonable argument[s] that counsel satisfied *Strickland*'s deferential standard" under the second layer of § 2254(d) deference.  *Richter*, 131 S. Ct. at 788.

Additionally, Bowling fails to show that the Kentucky Supreme Court "*unreasonably* determined that prejudice is lacking."  *Pinholster*, 131 S. Ct. at 1411.  Not only was Harris a risk on the stand, s*ee supra*, the state court concluded that it was "speculative" whether he would have appeared in court.  *Bowling*, 80 S.W.3d at 418.  In combination, a highly problematic witness who may not have even testified does not present a "reasonable probability of a different outcome."  *Strickland*, 466 U.S. at 695.  So it was not "objectively unreasonable" for the state court to come to that conclusion.  *Williams*, 529 U.S. at 409. Thus, Bowling's claim fails.

### B.      April Lunsford (Claim 50)

One of the witnesses that Bowling's trial counsel did call was April Lunsford.  *See* 22 T.E. 3305.  On direct examination, Lunsford testified as follows: She had an affair with Ronnie Bowling.  *Id.* at 3307–09.  During their affair, they had several trysts at the Kozy Motel.  *Id.* at 3308–09.  On a Wednesday morning, which may have been the morning of Marvin Hensley's murder though Lunsford could not verify the date, Bowling was in a room with her at the Kozy Motel.  *See id.* at 3310–12 (testifying that Lunsford and Bowling checked out around 7:30 a.m.); 18 T.E. 2609–10 (testimony of prosecution witness Ed Bowling that Hensley was killed between 6:00 and 7:00 a.m.).

On cross examination, the prosecutor elicited two facts from Lunsford that form the bases of Bowling's current ineffectiveness claim.  First, Lunsford acknowledged that the Bourbon County Deputy Sheriff arrested her the Saturday before she testified at Bowling's trial.  *See* 22 T.E. 3323.  Defense counsel objected to the question as irrelevant but was overruled.  *See id.* at 3323–24.  The prosecutor never asked her what she was arrested for.  *See id.* at 3323–27.  Instead, he used it to set up the second major revelation.  John Bowling, Ronnie's brother, had been in the car with Lunsford when the police arrested her.  *Id.* at 3324.  And during the arrest, the deputy sheriff found a note in Lunsford's purse reading: "you are being watched by a .38 special, thank you, John Bowling."  *Id.* at 3325.  Lunsford claimed that she had written the note at John's request, saying it was for "[p]ersonal reasons" without elaborating."  *Id.*  Lunsford offered to rewrite the note in court to demonstrate that it was her handwriting.  *Id.*  But the prosecutor did not take her up on the offer.

Defense counsel proceeded to redirect examination without asking for a recess or a continuance.  *Id.* at 3326.  On redirect, counsel asked Lunsford two questions.  First, he

19

asked her why she wrote the note.  *Id.*  Lunsford admitted that she and John Bowling were romantically involved.  *Id.*  She explained that John had asked her to write the note because they were leaving for a motel and "the pole light was out, out back."  *Id.*  Neither attorney clarified whether she meant the light pole behind John Bowling's house or Lunsford's house. Second, defense counsel asked if John Bowling was divorced, and she said that he was.  *Id.* at 3326–27.  Defense counsel never asked Lunsford about her arrest.

Bowling claims that defense counsel was ineffective in both preparing to present Lunsford and in the process of questioning her.  R. 1 at 242.[1]  He argues that defense counsel should have been aware of Lunsford's arrest before calling her to testify.  *See id.* at 242–43. And in the alternative, he asserts that counsel should have moved for a continuance after the prosecutor's cross examination in order to investigate her arrest.  *See id* at 243.  Bowling also claims that if defense counsel had sought a continuance, he would have learned that Lunsford wrote the note because her home had been burglarized.  *Id.* at 243–44.  He concludes that these alleged errors prejudiced his defense because they allowed the prosecutor to impeach Lunsford, and she was part of his alibi defense.  *Id.* at 244–45.[2]

---

[1] Bowling also claims that police officers involved in Bowling's case attempted to intimidate Lunsford.  *See* R. 1 at 245–46; R. 159 at 213.  Bowling offers no evidence in support of this claim other than the affidavit of Valerie Bryan, which contains hearsay statements from Lunsford.  *See* R. 1 at 245–46 (quoting 4 Supp. T.R. for Rule 11.42 Appeal 452).  Since the Federal Rules of Evidence apply to habeas corpus proceedings, *see* Fed. R. Evid. 1101, Advisory Committee's Note to Subdivision (e), the Court cannot consider it under Fed. R. Evid. 802.

[2] In his reply brief, R. 159, Bowling offers the additional theory that the note was somehow used as evidence of Bowling's future dangerousness and cites to studies of penalty phase deliberations.  *See id.* at 213–14 & nn.712–14.  Bowling did not present this theory this in his initial brief, *see* R. 1 at 242–46, so this argument is waived, see *Sailing v. Budget Rent-A-Car Sys., Inc.*, 672 F.3d 442, 444 (6th Cir. 2012) ("Arguments raised only in reply, and not in the

To succeed on his ineffective assistance claim, Bowling must carry the burden of showing that his counsel's performance was deficient and that it prejudiced his defense. *See Strickland*, 466 U.S. at 687; *see also* Section I *supra*. Because the Kentucky Supreme Court held that counsel provided "reasonably effective assistance," *Bowling*, 80 S.W.3d at 418, the Court applies "doubly deferential judicial review" to counsel's performance. *Mirzayance*, 556 U.S. at 123; *see also* Section I *supra*.

As an initial matter, Bowling never establishes that trial counsel was unaware of Lunsford's arrest or was somehow surprised by the prosecution's questions. Bowling has the burden to establish that trial counsel actually committed the "identified acts or omissions" in question. *Strickland*, 466 U.S. at 690. But Bowling simply asserts that defense counsel did not investigate Lunsford's arrest and the note in her purse. *See* R. 1 at 242–43 (asserting that counsel did not investigate, with no citation to the record or other evidence); R. 159 at 216–17 (same). The record suggests the opposite, especially in light of *Strickland*'s "strong presumption" that counsel acted based on "reasonable professional judgment." 466 U.S. at 589–90. The way that defense counsel coaxed Lunsford into explaining the note implies that trial counsel knew why she wrote the note. *See* 22 T.E. 3326 ("Just go ahead and tell the jury why you wrote that note?"). Accordingly, Bowling has not carried his initial burden of establishing that the act or omission in question actually occurred.

Even assuming that counsel did not investigate Lunsford's arrest and the note, Bowling has not established deficient performance. Under the first level of *Strickland*

---

original pleadings, are not properly raised before the district court . . . ." (quoting *Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 275 (6th Cir. 2010)).

deference, Bowling offers no evidence that defense counsel's investigation of Lunsford was unreasonable "under prevailing professional norms." *Strickland*, 466 U.S. at 688.  Lunsford was arrested on a Saturday, twelve days into Bowling's trial.  *Compare* 22 T.E. 3223 (arrest on Saturday, October 3, 1992), *with* R. 1 at 4 (start of trial on September 21, 1992).  So there was no way that defense counsel could have discovered Lunsford's arrest during pretrial investigation.  And once trial started, it was imminently reasonable for counsel to focus on the task at hand rather than monitoring the police blotter to see if one of the defense witnesses had been arrested.  *Cf. United States v. Roane*, 378 F.3d 382, 410 (4th Cir. 2004) (holding that "a criminal defense lawyer possesses a duty to conduct a *pretrial* investigation" (emphasis added)).   Given that counsel's pretrial investigation was reasonable under *Strickland*, the state court's decision was certainly not unreasonable when viewed "through the 'deferential lens of § 2254(d).'" *Pinholster*, 131 S. Ct. at 1403 (quoting *Mirzayance*, 556 U.S. at 121 n.2).

Even though defense counsel was likely surprised by the revelation of Lunsford's arrest, counsel's decision to not request a continuance "was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688.  Deciding how to respond to a prosecution's impeachment of a defense witness is "undoubtedly a matter of trial strategy." *Johnson v. United States*, 47 F.3d 1169, at *2 (6th Cir. 1995) (unpublished table decision).  Accordingly, under the first level of *Strickland* deference the Court "must indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance" and resist "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689; *see* Section I *supra*.

Given the circumstances that trial counsel faced when the prosecutor's cross examination ended, proceeding straight to redirect was a reasonable decision.  *See*

*Strickland*, 466 U.S. at 689; *see also* Section I *supra*.  First, the prosecution did not ask what Lunsford was arrested for, or ask any more questions about her arrest.  22 T.E. 3323–26.  So there was no indication from the prosecutor's questioning that the fact she was arrested was of any great importance to the prosecution.  Second, requesting a continuance would likely have drawn the jury's attention to the fact that Lunsford was arrested while cavorting with John Bowling.  Requesting a continuance would have given the jury the impression that the prosecution's impeachment of Lunsford was unexpected and highly damaging to her credibility.  Why else would an attorney request a continuance?  Counsel instead chose to diffuse the issue by avoiding it altogether, rather than being hoisted on the petard of his own continuance.  *Cf. Hough v. Anderson*, 272 F.3d 878, 896 (7th Cir. 2001) (explaining that attorneys often "walk a fine line" between "monitor[ing] the prosecutor's questions closely" for objectionable content and "not appearing so protective . . . as to arouse the suspicion of the jury").  That decision was within the "wide latitude" owed to counsel under *Strickland*.  *Gentry*, 540 U.S. at 5.  And if counsel's performance fell within the initial level of *Strickland* deference, then the state court's decision was not unreasonable under the second level of § 2254(d) deference.  *See Pinholster*, 131 S. Ct. at 1403.

Likewise, defense counsel's questioning of Lunsford about the note found in her purse was not ineffective assistance of counsel.  Under the first level of *Strickland* deference, counsel's investigation and questioning were both reasonable.  Since the police found the note on the night they arrested Lunsford, there was no way that counsel could have discovered the note during pretrial investigation.  *See supra*.  And while counsel's questions about the note on redirect may not have been as illuminating as Bowling would have liked, *see* R. 1 at 244, counsel did rehabilitate Lunsford, *see* 22 T.E. 3326–27.  Counsel established

that Lunsford wrote the note, not John Bowling, and that she did it because John "asked" her on account of "the pole light [being] out." *Id.* at 3326.  Those questions established the true origin of the note.   Bowling never shows why more was necessary.   Also, additional questions, or calling John Bowling to the stand, *see* R. 159 at 216, would have emphasized, among other things, the fact that Lunsford had an ongoing affair with the defendant's brother.   Trial counsel could have therefore reasonably determined that a short clarifying question was the best way to explain the note in order to minimize the damage to Lunsford's credibility.   After all, good trial lawyers try to minimize their witnesses' faults—moral and otherwise—to boost their credibility with jurors.   They do not dwell on them and cause the jury to do the same.   Similarly, at the second level of § 2254(d) deference, the state court reasonably determined that Bowling's argument "set[s] the bar for effective assistance of counsel too high."  *Bowling*, 80 S.W.3d at 418.

What's more, Bowling has not shown that counsel's alleged mistakes prejudiced his defense.   Lunsford was part of Bowling's alibi defense.  *See* R. 1 at 244.   That defense included the testimony of the Kozy Motel clerk and motel records showing that Bowling was registered with the motel on the morning of Hensley's murder.  *Id.*  Bowling argues that if counsel had taken the proper steps to rehabilitate Lunsford, there is a "reasonable probability" of a different outcome, at least for the Hensley charge.  R. 1 at 244.  Essentially, Bowling claims that there is a "reasonable probability" that explaining away Lunsford's note and arrest was the difference in whether the jury believed her.   That is akin to asserting that there is a reasonable probability that Pickett's charge would have succeeded, if only the color guard had held the flag.   *See* Pickett's Charge: Eyewitness Accounts at the Battle of Gettysburg 207 (Richard Rollins ed. 1994).

First, Bowling does not point out anything that counsel could have done to counter the most devastating impeachment of Lunsford—her affair with John Bowling.  22 T.E. 3325–27.  Lunsford admitted that she was romantically involved with the defendant's brother while the trial was going on.  *Id.*  She also conceded that she "might" have caused John's divorce.  *Id.* at 3327.  Moreover, she said the defendant, whom she had also had an affair with, was "special."  *Id.* at 3316.  And described the Bowling family as being "[g]reat people" who were "very special" to her.  *Id.*  So, even if counsel had done a better job of explaining away the note and the arrest, there was no explaining away the evidence that Lunsford was not an impartial witness.

Second, Bowling's argument casts Lunsford's testimony as the proverbial straw, claiming that a proper rehabilitation would have allowed her testimony to break the camel's back.  But his assertion necessarily assumes that the jury was willing to accept the other alibi defense evidence.  *See* R. 1 at 244.  And the jury's verdict proves that was not the case.  The fact that the jury found Bowling guilty of murdering Marvin Hensley in spite of the Kozy Motel evidence shows that they did not accept it.  As defense counsel pointed out, the motel clerk was a far more credible witness than Lunsford.  24 T.E. 3554.  So it is not "reasonably likely" that Lunsford's more problematic testimony, *see supra*, would have made a difference in the jury's verdict.  *See Strickland*, 466 U.S. at 490.  Thus, Bowling's claim fails.[3]

_____

[3] Bowling also argues that the state habeas court improperly disallowed John Bowling's testimony about Lunsford's note and denied Bowling's request for a continuance in order to have Lunsford testify about alleged intimidation by two state police officers. *See* R. 1 at 245–46.  The Court does not consider these arguments because "federal habeas corpus relief does not lie for errors of state law." *Estelle*, 502 U.S. at 67 (1991).

## II.      Juror Voir Dire and Challenges (Claims 2, 15, 67)

### A.      *For-Cause Challenges (Claim 2)*

Bowling claims that the trial court's failure to strike eighteen potential jurors for cause violated his Fourteenth Amendment right to an impartial jury.  *See* R. 1 at 57–68; R. 159 at 52–90.  The Kentucky Supreme Court denied his claim on direct appeal.  *See Bowling*, 942 S.W.2d at 299–300.  Accordingly, the Court applies § 2254(d) deference when reviewing the state court's decision.  *See Richter*, 131 S. Ct. at 785–86.  Furthermore, of the eighteen potential jurors that Bowling singles out, only seven actually took part in the deliberation and delivery of the verdict.  *Compare* R. 1 at 58–63 (listing eighteen jurors), *with* 24 T.E. 3612–13 (listing only seven of those jurors in the roll call after the verdict).  Jurors who deliberated and delivered the verdict raise different issues than jurors who were dismissed before deliberation or potential jurors who were never empaneled.  *See* Section II.A.2 *infra*.  Accordingly, the Court analyzes Bowling's claim in terms of deliberating and non-deliberating jurors.  Ultimately neither group warrants reversal of Bowling's conviction.

### 1.      The Seven Jurors Who Deliberated and Delivered the Verdict

The seven jurors who deliberated and delivered the verdict require individual analysis.  Bowling faces an uphill battle in making these challenges.  The Supreme Court has repeatedly stressed deference for two of the decisions made here: the trial court's voir dire rulings and the state court's constitutional ruling under § 2254(d).  In combination, these two teachings create something akin to the "doubly deferential" review applied under *Strickland*.  *Cf. Pinholster*, 131 S. Ct. at 1403 (explaining that lower courts applying *Strickland*'s "highly deferential look at counsel's performance" must do so "through the deferential lens of Section 2254(d)" (quotes and internal quotation marks omitted)).

26

First, federal courts reviewing defendants' challenges to voir dire must defer to the judgment of the trial court. The Supreme Court has "repeatedly emphasized" that the process of jury selection falls "particularly within the province of the trial judge." *Skilling v. United States*, 130 S. Ct. 2896, 2917–18 (2010) (quotation omitted) (collecting various cases, including federal habeas and death penalty cases); *see also Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981) (declaring that trial judges have "ample discretion in determining how best to conduct the *voir dire*"). Even in death penalty cases, trial courts receive "special deference" because they actually observe jurors. *Patton v. Yount*, 467 U.S. 1025, 1038 (1984); *Wainwright v. Witt*, 469 U.S. 412, 426 (1985); *see also Morgan v. Illinois*, 504 U.S. 719, 730 (1992) (stressing that "[t]he adequacy of *voir dire* is not easily the subject of appellate review"); *Uttecht v. Brown*, 551 U.S. 1, 9 (2007) (stressing "critical importance" of trial court's ability "to assess the demeanor of the venire"). Consequently, the Supreme Court has admonished the lower courts to "respect the limited role of federal habeas relief in this area." *Uttecht*, 551 U.S. at 10. The Court must therefore give due weight to the trial court's judgment of each juror's qualification.

Second, § 2254(d) builds on the deference owed to the trial judge by requiring the Court to judge the Kentucky Supreme Court's affirmation through a "deferential lens." *Pinholster*, 131 S. Ct. 1403 (quotation omitted). The Sixth Circuit has recently reiterated that federal courts applying § 2254(d) review must tether their judgment to the Supreme Court's holdings in the relevant area of law. *See Jackson v. Houk*, 687 F.3d 723, 737–38 (6th Cir. 2012) (denying petitioner's challenge to voir dire for lack of Supreme Court precedent "governing th[e] issue" petitioner raised). Here, the Supreme Court's decision in *Wainwright v. Witt*, 469 U.S. at 423, provides the general rule. *Witt* clarified the standard for determining

27

whether a juror is sufficiently partial to be excused for cause.  The Justices held that jurors may be excluded for cause where their personal "views would prevent or substantially impair the performance of [their] duties as a juror in accordance with [their] instructions and [their] oath."  *Id.* at 424.  That is a broad standard.  And under § 2254(d) state courts should be granted relatively substantial leeway in applying it.  *See Richter*, 131 S. Ct. at 786 ("The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." (quotation omitted)).

Additionally, there is not a single Supreme Court decision overturning a trial court's judgment that a particular juror was qualified.  *Witt* and most of the other death penalty voir dire cases involved defendants challenging the trial court's decision to *dismiss* jurors for cause due to their hesitance in applying the death penalty.  *See Witt*, 469 U.S. 412 (defendant claimed several jurors were improperly excluded for their opposition to capital punishment); *Uttecht*, 551 U.S. 1 (defendant claimed one juror was improperly excluded based on several statements indicating he would hesitate in applying the death penalty); *Gray v. Mississippi*, 481 U.S. 648, 656 (1987) (defendant claimed that juror with "conscientious scruples against the death penalty" was wrongly excluded); *Lockhart v. McCree*, 476 U.S. 162, 174 (1986) (defendant claimed that "death qualification" excluded jurors so as to make voir dire and petit jury unacceptably partial).  Further, when the Kentucky Supreme Court made its decision, the only Supreme Court case holding that a trial court mistakenly included potentially biased jurors was *Morgan v. Illinois*, 504 U.S. 719.  *See* Note, *Defendants's Right to Strike Automatic Death Penalty Jurors*, 106 Harv. L. Rev. 183, 183 (1992) (explaining that *Morgan* was the first Supreme Court case extending *Witherspoon*'s reasoning to give the defense a "right to question and dismiss [] jurors").  And *Morgan* did not overturn a trial

28

court's ruling with respect to a particular juror.  Rather, the Supreme Court ruled that a trial court must allow a defendant to ask whether a potential juror "will automatically vote for the death penalty in every case."  *Morgan*, 504 U.S. at 729.  So the Supreme Court's cases illustrate when a juror *may* be stricken, but not when jurors *must* be stricken.  Consequently, lower courts addressing the latter situation have more latitude in applying the Supreme Court's precedent than courts addressing the former situation.  *Cf. Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) (explaining that the meaning of general rules "must emerge in application over the course of time").

Together, the Supreme Court's precedents counsel special deference.  The *Witt* standard was formulated broadly to grant trial courts the deference needed to make the nuanced credibility judgments that voir dire requires.  469 U.S. at 428 & n.10.  Using *Witt*'s holding to make exacting demands of voir dire would thus not only contravene § 2254(d), it would undermine the trial court's more reliable judgment of juror qualification.  And this deference is crucial to more than just obtaining the most accurate judgment in a given case.  Deference here "preserve[s] a trial court's integrity as a court of law, instead of as an 'entrance gate' for fact collecting subject to appellate review."  *Id.* at 428 n.10.  And in the habeas context, it also preserves comity and federalism in the method of review.  *Id.*

### a.    Susie Edwards

Bowling claims that the trial court should have excused Susie Edwards for cause because she knew Marvin Hensley before he was murdered.  *See* R. 1 at 60; R. 159 at 61.  But Edwards knew him only from brief exchanges when she shopped at his gas station "every now and then."  12 T.E. at 1714.  She did not know him personally.  *See id.*  Edwards stressed that she took the presumption of innocence very seriously, and nothing in her

questioning suggested she would be unfair to Bowling.  *See id.* at 1715–18.  The trial court reasonably determined that she was not "substantially impaired," *Witt*, 469 U.S. at 434, because she expressed no hesitations regarding her limited contact with Hensley.  *See* 12 T.E. 1713–16.  Moreover, Bowling cites no case law, from the Supreme Court or otherwise, that such inconsequential contact renders an individual "substantially impaired" as a juror.  *See* R. 1 at 60; R. 159 at 61.  Consequently, the Kentucky Supreme Court's decision did not unreasonably apply the Supreme Court's clearly established law.  *See Jackson*, 687 F.3d at 729, 737–38.  Thus, Bowling's challenge to Susie Edwards's admission fails.

### b.    Nannette Johnson

Bowling challenges the trial court's refusal to strike Nannette Johnson because Johnson's former supervisor, Lucy Smith, was Ronald Smith's sister.  *See* R. 1 at 60; R. 159 at 61.  But Johnson made it clear that her contact with Lucy Smith was minimal.  Johnson no longer worked with Smith at the time of trial, *see* 8 T.E. 1159, and at the time of the murders she and Smith worked on different shifts, *see id.* at 1163.  Moreover, she had no contact with Smith outside of work, never discussed the case with Smith, and felt no special connection to the case.  *See id.* at 1159–66.  Johnson also indicated that she would dutifully hold the prosecution to its burden of proof and consider all the punishment options.  *See id.* at 1166–81.  The thorough questioning on the topic allowed the trial court to reasonably determine that Johnson was not "substantially impaired."  *Witt*, 469 U.S. at 434.  Moreover, Bowling cites no Supreme Court case holding that a court must declare a juror "substantially impaired" where none of the juror's answers indicate that she has feelings that would impact her ability to serve as a juror.  *See* R. 1 at 60; R. 159 at 61.  Consequently, the Kentucky Supreme Court's decision did not unreasonably apply the Supreme Court's clearly

established law.  *See Jackson*, 687 F.3d at 729, 737–38.  Thus, Bowling's challenge to Nannette Johnson's admission fails.

### c.  Pamela Childress

Bowling claims that the trial court should have excluded Pamela Childress[4] because she did not understand how the presumption of innocence and reasonable doubt standard functioned.  *See* R. 1 at 62; R. 159 at 68–80.  Childress initially struggled to understand the questions that the attorneys and the court asked her about reasonable doubt, but eventually applied the standard correctly.  14 T.E. 2060–70.  She stated that she believed in the presumption of innocence.  *Id.* at 2060.  She then answered that Bowling was innocent at the beginning of trial.  *Id.*  Next, the court asked her some hypothetical questions which themselves were confusing, and Childress initially struggled.  She appears to have struggled with exactly what "beyond a reasonable doubt" meant and how the standard worked during a criminal trial.  *See id.* at 2065–67 ("I'm confused about reasonable and beyond reasonable.").  However, she worked through her confusion and once she understood the hypothetical questions, *see id.* at 2069, she properly applied the presumption of innocence and the reasonable doubt burden.  *See id.* at 2069–70.

The trial court's ruling was proper under the Supreme Court's decision in *Gray v. Mississippi*, 481 U.S. 648.  There, the Justices found the juror qualified, even though her voir dire was "somewhat confused," because she "ultimately stated that she could consider the death penalty in an appropriate case."  *Id.* at 653; *id.* at 669 (Powell, J., concurring in part

---

[4] Both Bowling and the Commonwealth refer to Childress as "Paula."  *See* R. 1 at 62; R. 114 at 40; R. 159 at 68.  However, the only Childress on the transcript is listed as "Pamela."  *See, e.g.,* 24 T.E. 3612.

and concurring in the judgment) (describing juror as being "at times confused by the inartful *voir dire* questioning" but finding her qualified because she "finally stated explicitly that she would carry out her duty as a juror"). Bowling fails to cite a Supreme Court case holding that would render *Gray* inapplicable or otherwise suggests that jurors who are initially confused by voir dire questions must be stricken for cause. *See* R. 1 at 62; R 159 at 68–80. The trial court's decision to credit Childress's ultimate response, a response based on a clear understanding of the questions, was a reasonable application of *Gray*. If anything, the trial judge risked running afoul of *Gray* if he had stricken Childress for cause.

The only case that Bowling does cite is the Sixth Circuit's decision in *Franklin v. Anderson*, 434 F.3d 412 (6th Cir. 2006). *See* R. 159 at 73–79. But *Franklin* dealt with a pre-AEDPA habeas petition, *see* 434 F.3d at 417, and so the Sixth Circuit did not apply the stricter "clearly established law" requirement of § 2254(d). *See Williams*, 529 U.S. at 408–10. Moreover, Childress's voir dire was different than in *Franklin*. The juror in *Franklin* had the presumption of innocence explained to her three times, and "somewhat reluctantly" agreed to the court's instructions. 434 F.3d at 427. But the juror "five times gave the definite impression that she could not faithfully apply the law concerning the burden of proof." *Id.* Even after the trial judge's attempts to rehabilitate her, the juror still "insisted with her last statement that the defendant had to be proven innocent." *Id.* at 428. Here, by contrast, Childress never displayed the recalcitrance of the juror in *Franklin*, only confusion about the questions. *Compare Franklin*, 434 F.3d 427–28 (five statements, despite rehabilitation by trial judge, that "insisted . . . defendant had to be proven innocent"), *with* 14 T.E. 2060–70 (repeatedly expressing confusion or indecisiveness before questions were

clarified, and then properly applying reasonable doubt). Confusion about the question is not a "view[] on capital punishment." *Witt*, 469 U.S. at 424.

On a cold record, almost twenty years after voir dire, the Court cannot say that the trial court was mistaken. Only the trial court was there to observe Childress's demeanor as she struggled with the questions initially and then answered them correctly after she understood them. *See Uttecht*, 551 U.S. at 9. Moreover, her candor in a difficult situation was refreshing. Casebooks dedicate entire sections to explaining the concept of reasonable doubt and the mechanics of burdens of proof. *See, e.g.*, Ronald Jay Allen et. al, Criminal Procedure: Adjudication and Right to Counsel 1391–93 (2011); David Alan Sklansky, *Burdens, Presumptions, and Judicial Notice*, *in* Evidence: Cases, Commentary, and Problems 707, 707–30 (2nd ed. 2008). Given this, a lay person's initial confusion is understandable. She worked through the confusion—whether created by her or the hypotheticals—and came to a point where it appeared she fully understood the burden of proof. And the trial court's determination in that regard is entitled to a "presumption of correctness." *Witt*, 469 U.S. at 424–34 (applying the pre-AEDPA version of § 2254(d)); *see also Uttecht*, 551 U.S. at 9–10 (confirming deference to the trial court judgment and that AEDPA "provide[d] additional and binding, directions to accord deference"). The Kentucky Supreme Court's holding that the trial court properly exercised its discretion, *Bowling*, 942 S.W.2d at 300, therefore deserves "the benefit of the doubt" under § 2254(d). *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Thus, Bowling's challenge to Pamela Childress's admission fails.

### d.    Cleda Creech

Bowling claims that the trial court should have struck Cleda Creech for cause because she displayed an inability to consider the entire range of possible punishments.  *See* R. 1 at 62–63; R. 159 at 80.  Creech initially answered that nothing in her "background or beliefs" prevented her from recommending any punishment available and that she would "consider the total range of punishment."  5 T.E. 745.  When defense counsel asked her if she "would lean toward imposing the death penalty" in a "double murder" case, she replied that she "probably could, [but] can't say positively."  *Id.* at 756.  First, the uncertainty that she expressed in qualifying her answer showed that he was not partial under the *Witt* standard.  *See Gray*, 481 U.S. at 652 (holding that jurors are not "impaired" under *Witt* simply because they express "conscientious scruples against capital punishment" or "any degree of uncertainty in the ability to cast" a vote for the death penalty).  Second, indicating that she could "lean in that direction" was perfectly permissible.  *See McCree*, 476 U.S. at 177–78 (holding that the fact "all individual jurors" are "predisposed towards one result or another" does not render them unacceptably partial); *see also* Section II.A.1.f *infra* (applying *McCree* to Juror Gregory).  *Witt* does not forbid jurors with strong beliefs about the death penalty, let alone a belief that you "probably could" impose the death penalty for a double murder, from serving as jurors in capital cases.  *See McCree*, 476 at 176.  Thus, cause did not exist to strike Creech because her subsequent answers indicated that she could put her personal views aside and "conscientiously obey the law."  *Id.*; *see also* 5 T.E. 759–65.

Bowling also argues that the trial court should have struck Creech for initially saying she could not consider "20 years" for the murder of two people.  5 T.E. 757; *see* R. 1 at 62; R. 159 at 80.  Creech, however, did not understand the "20 years" question.  *See* 5 T.E. 758–

59 ("I guess I misunderstood . . . ."). When the trial court clarified the question, she agreed that she could consider the full range as the law required. *See id.* at 758–60. And, contrary to Bowling's assertion, *see* R. 159 at 80, there was nothing wrong with the trial court rehabilitating Creech. *See, e.g., Franklin*, 434 F.3d at 428 (noting appreciation for the trial judge's "attempts to rehabilitate this juror"). Clearing a juror's confusion and crediting her ultimate answer is a reasonable application of the Supreme Court's decision in *Gray*. *See* Section II.A.1.c *supra* (citing *Gray*, 481 U.S. at 653). Indeed, it is something trial courts do every day—help potential jurors understand their role and how the court system works.

Read in context, Creech's answers indicate that she was able and willing to thoughtfully and fairly apply the law to Bowling's case. The trial court therefore reasonably determined that she was not "substantially impaired," *Witt*, 469 U.S. at 434, because her problematic answers resulted from confusion. *See* 5 T.E. 757–60; *see also* Section II.A.1.c *supra* (explaining that the Supreme Court has not held that initial confusion requires a juror be struck for cause (citing *Gray*, 481 U.S. at 653)). And Bowling offers no support for his challenge to Creech other than a citation to the state court's dissent. *See* R. 159 at 80 & n.303. Thus, Bowling's challenge to Creech's admission fails.

### e.    Diana Greer

Bowling challenges the trial court's refusal to strike Diana Greer because she initially claimed to be living in Knox County instead of Laurel County. *See* R. 1 at 63; R. 159 at 81. Bowling was tried in Laurel Circuit Court. *See Bowling*, 942 S.W.2d at 297. In voir dire, Greer indicated that she had lived in Laurel County, moved to Knox County, and then moved back to Laurel County. *See* 6 T.E. 870–71. But her residence is of no concern for a federal habeas court. The Sixth Amendment's Vicinage Clause, which requires that jurors come

35

from "the State and district wherein the crime shall have been committed," U.S. Const. amend. VI, has not been applied to the states. *See Hall v. McKee*, No. 1:05-cv-142, 2008 WL 1808810, at *2 (W.D. Mich. Apr. 21, 2008); Wayne R. LaFave et al., 1 <u>Criminal Procedure</u> § 2.6(b) (3d ed. 2007). And the Sixth Circuit has held that the Clause applies only to federal criminal trials. *Caudill v. Scott*, 857 F.2d 344, 345 (6th Cir. 1988) (dismissing habeas petition brought on similar theory). Consequently, Greer's residence does not affect any of Bowling's federal rights and therefore cannot be the basis for a federal habeas claim. *See Wilson v. Corcoran*, 131 S. Ct. 13, 16 (2010). Thus, Bowling's challenge to Diana Greer's admission fails.

### f.      Rosalitta Gregory

Bowling challenges the trial court's refusal to strike Rosalitta Gregory because she "said she probably would lean toward" imposing death "in a double murder case." R. 1 at 63; R. 159 at 81–82. Defense counsel asked Gregory if she would "lean, automatically toward the imposition of the death penalty" for "double murder." 8 T.E. 1147. Gregory responded that, "It would all according – – probably." *Id.* Defense counsel asked her to confirm that answer. But she equivocated, "Well, it'd be all according to what you – – however you are instructed, you know." *Id.* Counsel went to the well a third time, asking if she would "automatically" apply the death penalty for multiple murders. Gregory responded in rapid fire, "No, no, no, no, no." *Id.* at 1148.

The trial court reasonably determined that her answers qualified her under the *Witt* standard. In *McCree*, the Supreme Court acknowledged that "all individuals" are "predisposed to one result or another." 476 U.S. at 177. The high court went on to explain that the question is whether the juror can put aside that predisposition, even a very strong

36

one, to follow their oath. *See id.* at 177–78 (collecting previous cases holding the same). Gregory did just that. Her initial answer indicated her predisposition. But as one would expect from a conscientious juror, a moment's reflection helped her put aside that initial impulse and put her oath as a juror first. *See* 8 T.E. 1147–48. Her series of answers thus illustrated her ability to conscientiously apply the law to the facts at hand. *Cf. McCree*, 476 U.S. at 178 (confirming that "an impartial *jury* consists of nothing more than "*jurors* who will conscientiously apply the law and find the facts" (quoting *Witt*, 469 U.S. at 423)); *Gray*, 481 U.S. at 653 (finding a juror was eligible to serve where she "ultimately stated that she could consider the death penalty in an appropriate case"). Moreover, the trial court witnessed Gregory's answers firsthand and observed the demeanor she displayed. *See Uttecht*, 512 U.S. at 9.

Finally, the Kentucky Supreme Court's affirmation of the trial court's ruling deserves its own level of deference. *See Pinholster*, 131 S. Ct. 1403. Bowling fails to cite a Supreme Court case holding that a "lean" in one direction or another, requires a for-cause strike even if the juror is rehabilitated. *See* R. 1 at 63; R. 159 at 81–82. The Court cannot stretch the high court's holdings as far as Bowling's argument requires. *See Jackson*, 687 F.3d at 729, 737–38. Thus, Bowling's challenge to Rosalitta Gregory's admission fails.

### g.    Doug Dixon

Bowling's last challenge is to the admission of Doug Dixon. *See* R. 1 at 63; R. 159 at 83–90. While the other jurors that Bowling singles out were challenged for cause, defense counsel did not move to strike Dixon for cause after questioning. *See* 13 T.E. 1904. The Warden argues, without explanation, that Bowling has failed to preserve this claim. *See* R. 114 at 43. However, the Kentucky Supreme Court apparently dealt with the claim when it

opened its opinion by declaring that it had "carefully reviewed all issues both preserved and unpreserved" and was "affirming the judgment of conviction." *Bowling*, 942 S.W.2d at 297. Additionally, when the Kentucky Supreme Court addressed Bowling's juror challenge, it explained that it was addressing the "eighteen jurors" that Bowling was challenging. *See id.* at 299. Bowling's claim is therefore properly before the Court.

At trial, defense counsel wisely did not object to Dixon. Dixon professed a strong belief in the presumption of innocence. *See* 13 T.E. 1874. And throughout his voir dire, Dixon expressed reservation about convicting anyone without eyewitness testimony. *See, e.g.*, 13 T.E. 1874 ("I mean you've got to have a[n] eye witness; you innocent until proven guilty."); *id.* at 1876 ("I mean if you ain't got no eye witness how can you call a person guilty?"); *id.* at 1884 ("Because, like I said, if they got – – they have to have eye witness before you can [find them guilty.]") *id.* at 1891 (when asked "would you not always require an eye witness testimony?" replying "Most cases, yeah, I would."). This drew many questions from the prosecutor, who immediately became concerned because he lacked an eyewitness to either of the murders. *See id.* at 1886–91. And the prosecutor's questions drew many objections from defense counsel. *See id.* at 1888, 1890.

Dixon said he was willing to consider the full range of punishments as a juror if he heard eyewitness testimony. *See id.* at 1880–83. Playing off of this, defense counsel asked him if he would "automatically" give the death penalty for a double murder with an eyewitness. *Id.* at 1896. Dixon said he "shore [sic] could." *Id.* Unlike Gregory, neither attorney asked a question that allowed Dixon a chance to qualify his answer. *Compare* 13 T.E. 1896–98 (confirming automatic death penalty for multiple murders with an eye witness

38

then moving on), *with* 8 T.E. 1147–48 (correcting initial answer that she would "lean" toward death sentence in a "double murder").

While the other jurors that Bowling singles out were challenged for cause, defense counsel did not move to strike Dixon for cause after questioning. *See* 13 T.E. 1904. Based on Dixon's voir dire, this was obviously a wise tactical move. Bowling, however, seizes on this and argues that this means the trial court did not make a finding that warrants deference. *See* R. 159 at 89. Bowling's argument creates illogical results. In his lights, a trial court gets deference when a defendant objects and the trial court rules. But if a defendant finds a juror perfectly acceptable—as Dixon appeared—and does not object, he believes that no deference is warranted. This would create a perverse reality where a trial court's decision to keep an un-objected to juror receives no deference. Obviously, that is not the law.

Also, the trial court did make a finding as to Dixon. Under Kentucky law, "[t]he principal purpose of voir dire is . . . to enable the trial judge to determine actual bias." *Shegog v. Commonwealth*, 142 S.W.3d 101, 110 (Ky. 2004) (quotation omitted). And *Witt* explicitly held that a trial court need not make formal written findings to receive deference from a federal habeas court. *See* 469 U.S. at 430. As in *Witt*, Dixon was "questioned in the presence of both counsel and the judge." *Id.* After questioning and without objection, the trial court determined that Dixon was "still a potential juror in this case." 13 T.E. 1904. Given the trial court's own extensive questioning of Dixon, that approval amounted to a determination that Dixon was not biased. *See id.* at 1899–1904; *see also id.* at 1907 (indicating that the court's own questioning was "to satisfy myself in regards" to Dixon). Thus, the trial court's determination still deserves deference. *See Uttecht*, 521 U.S. at 9.

The trial court reasonably determined that Dixon was not "substantially impaired," *Witt*, 469 U.S. at 434, because his problematic answers had no bearing on Bowling's own case. Dixon ultimately indicated that he could consider the full range of punishments if there was no eyewitness to the murders. *See* 13 T.E. 1897. And before that, all of his answers could only be considered pro-defense. While Bowling strains to characterize Ricky Smith as an eyewitness, R. 159 at 87–88, Smith was not. Moreover, the prosecution never presented Ricky Smith or anyone as an eyewitness to either Hensley or Smith's murders. In fact, the prosecutor's opening statement explicitly said there were no eyewitnesses to the Smith and Hensley murders. 17 T.E. 2552–53 (explaining that police found no eyewitnesses to give them a suspect before Bowling). And Dixon's answers made it clear that he only considered someone an eyewitness if they saw the murder itself, not if they saw acts linking the defendant to circumstantial evidence. *See* 13 T.E. 1896–97 (clarifying that the eyewitness saw "that [the defendant] did it"), 1900–04 (making clear that Dixon did not consider links to circumstantial evidence to be an "eye witness"). In fact, the concern in voir dire was that Dixon might hold the lack of an eyeball witness against the prosecution, not the defense. *See id.* at 1876–77, 1886–94.

Nothing in the Supreme Court's precedents indicates that the *Witt* standard required the trial court to dismiss Dixon for cause. Bowling relies heavily on *Uttecht*. *See* R. 159 at 53 & n.243, 87 & n.326. But *Uttecht* was decided more than ten years after the state court's decision. *Compare Bowling*, 942 S.W.2d 293 (decided April 24, 1997), *with Uttecht*, 551 U.S. 1 (decided June 4, 2007). So it does not apply to the state court's decision. *See Williams*, 529 U.S. at 412 (holding that § 2254(d) limits federal courts "to the holdings . . . of [the Supreme] Court's decisions *as of the time of the relevant state-court decision*"

(emphasis added)).   What's more, *Uttecht* actually supports the trial court's ruling.   In *Uttecht*, the defendant appealed the trial judge's ruling to strike "Juror Z" for cause.   551 U.S. at 13–15.   While Juror Z could apply the death penalty in some hypothetical circumstances, he could not do so if life without parole was an option.   *See id.* at 15.   And it just so happened that life without parole was an option in *Uttecht*.   *Id.*   The trial court dismissed him and the Supreme Court of Washington affirmed that dismissal.   *See id.* at 15–16.   It reasoned that Juror Z's willingness to apply the death penalty in other situations did not affect whether he was "substantially impaired" in the case at bar.   *See id.* at 15–17.   The Supreme Court affirmed that ruling.   *See id.* at 17–20.

Bowling's case parallels *Uttecht*.   Here Dixon was willing to automatically apply the death penalty in a case unlike Bowling's, while Juror Z was willing to apply the death penalty in a case unlike *Uttecht*.   Neither jurors' answer to hypothetical questions spoke to their ability to consider the death penalty fairly in the particular case at bar.   *See Jackson*, 687 F.3d at 739 (a juror answering that there were cases in which the juror would automatically apply the death penalty did not disqualify him because he indicated a willingness to follow the judge's instructions, and he did not think the death penalty was "right for every case"); *United States v. Wilson*, 493 F. Supp. 2d 453, 457 (E.D.N.Y. 2006) (holding that a juror's answer to an "extreme hypothetical case" did not show impermissible bias in favor of the death penalty).   Additionally, as in *Uttecht*, Bowling's failure to object "and the trial court's [retention of Dixon] support the conclusion that the interested parties present in the courtroom all felt that [retaining Dixon] was appropriate under the *Witherspoon–Witt* rule."   551 U.S. at 18.   And, given the deference owed to trial judge's

41

"superior position to determine the demeanor and qualifications of a potential juror," the Court cannot say that he erred.  *Id.* at 22.

Moreover, regardless of whether the trial court deserved deference, the Kentucky Supreme Court's decision was not "objectively unreasonable" under § 2254(d).  *See Williams*, 529 U.S. at 409.  First, as the Court just explained, the Supreme Court's decision in *Uttecht* is inapplicable under § 2254(d) and actually supports the state court's opinion. The fact that *Uttecht* affirmed logic very similar to the Kentucky Supreme Court's demonstrates a "possibility" that "fairminded jurists" would uphold the state court's decision. *Richter*, 131 S. Ct. at 786.

Second, the state court reasonably applied existing Supreme Court precedent.  The controlling Supreme Court decision at the time of Bowling's trial was *Morgan v. Illinois*. *See* Section II.A.1 *supra* (citing *Morgan*, 504 U.S. 719; *Defendants's Right to Strike*, 106 Harv. L. Rev. at 183).  Like all Supreme Court's decisions regarding voir dire questioning, *Morgan*'s holding was "narrow."  *Jackson*, 687 F.3d at 737.  All *Morgan* held was that defendants must be allowed to ask whether jurors "will automatically vote for the death penalty in *every* case."  504 U.S. at 729 (emphasis added).  Thus, even if the Court were to extend *Morgan*'s rule to create an affirmative obligation for trial courts to, *sua sponte*, strike jurors for cause, it would not apply here.  *Morgan* found that jurors are not qualified if they would automatically apply the death penalty in "every case."  *Id.*  Dixon did not have that level of bias.  *See supra* (citing 13 T.E. 1887–94).  Nor did he have any "automatic" bias that applied in Bowling's actual case.  *See id.*

Finally, the Court cannot say that the state court unreasonably applied the general *Witt* standard.  As the Court already explained, *Witt*'s standard is broad, and thus warrants

deference to case-by-case determinations.  *See* Section II.A.1 *supra* (citing *Richter*, 131 S. Ct. at 786).  The Kentucky Supreme Court duly reviewed the trial court's ruling on each juror, and found that its "careful and detailed inquiries along with the juror's definite responses served to eradicate any possible prejudice." *Bowling*, 942 S.W.2d at 300. Applying § 2554(d) deference "demands that state-court decisions be given the benefit of the doubt." *Visciotti*, 537 U.S. at 24.  Denying that benefit here would fail to "respect the limited role of federal habeas relief in this area." *Uttecht*, 551 U.S. at 10.  Thus, Bowling's challenge to Doug Dixon's admission fails.

### 2.  The Eleven Jurors Who Did Not Deliberate and Deliver the Verdict

Eleven of the potential jurors that Bowling lists did not participate in the jury verdict. To wit: Nellie Cole, Linda Booher, Rebecca Jones, Donnie Smith, Tom Smith, Bernie Brown, Colleen Vires, Carson Mullins, Ruth Harris, Terry Smallwood, and Nola Jones were either struck by peremptory challenge or dismissed before deliberations began.  *See* 24 T.E. 3599 (dismissing alternates), 3612–13 (roll call of jurors delivering the verdict).   Any potential bias that they may have does not justify habeas relief here.

Individuals who do not actually sit on the jury that renders a verdict have no impact on a defendant's right to an impartial jury.  *See Ross v. Oklahoma*, 487 U.S. 81, 85 (1988) (holding that "[a]ny claim that the jury was not impartial" rests "on the jurors who ultimately sat"); *Morgan*, 504 U.S. at 726 (requiring that a claim show that a biased juror "is empaneled and the death sentence is imposed"); *see also Skilling*, 130 S. Ct. at 2923 & n.31 (holding that defendant was not deprived of "any constitutional right" where no partial juror sat on the jury (quotation and alterations omitted)).  So Bowling cannot claim a violation of his jury trial or fair trial rights based on these eleven non-jurors.

Nevertheless, Bowling argues that the trial court's failure to strike these non-jurors violated due process by interfering with his right to peremptory challenges. He points out that in Kentucky, a court's failure to strike a juror for cause requires automatic reversal if the defendant exhausted all her peremptory challenges. *See* R. 159 at 54–55 (citing *Shane v. Commonwealth*, 243 S.W.3d 336 (Ky. 2007)). Relying on dicta from *Ross*, Bowling then argues that the trial court violated federal due process by overruling his for-cause challenges and thereby impairing his right to peremptory challenges. *See* R. 159 at 54 (citing *Ross*, 487 U.S. at 92). The *Ross* Court did note that "the 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive that which state law provides." *Ross*, 487 U.S. at 89. But *Ross* did not hold that the federal Due Process Clause is violated whenever a defendant does not receive his full slate of peremptory rights under state law. *See id.* at 91 & n.4. And in *Rivera v. Illinois*, 556 U.S. 148 (2009), the Supreme Court unanimously rejected a defendant's claim that "the deprivation of a state-provided peremptory challenge requires reversal as a matter of federal law." *Id.* at 160. Because peremptory challenges are a product of state statutes, "the mistaken denial of a state-provided peremptory challenge does not, without more, violate the Federal Constitution." *Id.* at 158. It was "not constitutionally significant" that the trial court's ruling was "at odds with state law." *Id.* at 159–60. The federal Due Process Clause "safeguards not the meticulous observance of state procedural prescriptions, but 'the fundamental elements of fairness in a criminal trial.'" *Id.* at 158 (quoting *Spencer v. Texas*, 385 U.S. 554, 563–64 (1967)).

And Bowling has not shown that the trial court's ruling on these eleven non-jurors rendered his trial fundamentally unfair. He has not argued or proved that "that the trial judge repeatedly or deliberately misapplied the law or acted in an arbitrary or irrational manner."

44

*Id.* at 160 (citing *United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000); *Ross*, 487 U.S. at 91 & n.5). Nor has he shown that the trial court's "ruling result[ed] in the seating of any juror who should have been dismissed for cause." *Martinez-Salazar*, 528 U.S. at 316 (citing *Ross*, 487 U.S. at 85). Thus, Bowling's claim fails as to the eleven non-jurors.

### B. Voir Dire Questioning (Claim 15)

During voir dire, the trial court sustained the prosecution's objections to various defense questions. Bowling claims that several of these limitations on voir dire violated his constitutional rights. *See* R. 1 at 118–20; R. 159 at 159–61. The Kentucky Supreme Court summarily denied his claim on direct appeal. *See Bowling*, 942 S.W.2d at 307 (listing the claim as alleged error "g"). Accordingly, the Court applies § 2254(d) deference to the state court's decision. *See Richter*, 131 S. Ct. at 784; *see also* R. 245 at 25–26 & n. 4. Applying that deferential standard here requires appreciating that "[t]he holdings of the Supreme Court governing questions a defendant's counsel is constitutionally entitled to ask of potentially biased jurors are narrow." *Jackson*, 687 F.3d at 737.

First, none of these individuals actually sat on the jury. Bowling singles out the questioning of Carson Mullins, Larry Parmon, Ruth Harris, James Gilbert, Terry Smallwood, Toms Smith, Bennie Brown, and Mary Rush. *See* R. 1 at 118. But none of them sat on the jury that deliberated and delivered the verdict in Bowling's trial. *Compare id.* (listing eight challenged individuals), *with* 24 T.E. 3612–13 (listing twelve jurors who delivered verdict, all of whom are different). Consequently, the trial court's rulings cannot have violated Bowling's Sixth or Eighth Amendment rights. *See* Section II.A.2 *supra* (citing *Morgan*, 504 U.S. at 726; *Skilling* 130 S. Ct. at 2923 & n.23).

45

Second, Bowling fails to demonstrate that the federal Constitution entitles him to any of the voir dire questions he now claims were wrongly denied. *Morgan* held only that "general questions of fairness and impartiality" are insufficient in capital case voir dire. 504 U.S. at 735. All that *Morgan* required is that the trial court allow a defendant "to ascertain whether his prospective jurors . . . had predetermined . . . whether to impose the death penalty." *Id.* at 736. Bowling was not denied that opportunity with any of the eight jurors he singles out.

Most of the questions Bowling takes issue with were unnecessary inquiries into the potential jurors' personal attitudes about the death penalty. Defense counsel had no right to ask Carson Mullins "what kind of case" he personally thought might be "appropriate" for the death penalty. 6 T.E. 785; *see* R. 1 at 118. Nor did counsel have the right to ask Terry Smallwood about any hypothetical situations he was "aware of" where the death penalty "automatically ought to fit." 11 T.E. 1625; *see also* R. 1 at 118. These questions were open-ended hypotheticals that required the individuals to contemplate whether there were any cases they could conceive of that fit the questions' descriptions. And the questions required them to answer without the benefit of an instruction on the law. Consequently they did not speak to whether the potential juror would be substantially impaired in Bowling's actual case. *See Jackson*, 687 F.3d at 739 (juror answering "I think so" after being asked "if there were circumstances in which he would 'automatically' impose the death penalty" did not implicate defendant's rights where the juror was willing to follow the judge's instructions and it was not established that those circumstances applied to the trial); *Wilson*, 493 F. Supp. 2d at 457 (holding that a juror's answer to an "extreme hypothetical case" did not show

impermissible bias in favor of the death penalty); *see also* Section II.A.1.g *supra* (explaining that Dixon's answers to hypotheticals do not impact his qualification for Bowling's case).

Similarly, the defense had no right to ask Mary Rush or Bennie Brown if they personally favored the death penalty or why they did. *See* R. 1 at 118; *see also* 17 T.E. 2458 (Rush); 13 T.E. 1852 (Brown). All that matters is how they would act when charged with an oath to apply the law faithfully to the facts. *See Witt*, 469 U.S. at 424; *see also McCree*, 476 U.S. at 177 (holding that jurors with personal predisposition favoring the death penalty do not violate the impartial jury guarantee). And the trial court permitted questioning of both jurors on that issue. *See* 17 T.E. 2460–64 (Rush); 13 T.E. 1857–60 (Brown). Also the defense did not need to ask Tom Smith whether he personally thought the death penalty was "being used enough" or "too much." 12 T.E. 1822; *see also* R. 1 at 118. General questions about a juror's personal attitudes on "the criminal justice system" are "of no constitutional concern." *United States v. Guzman*, 450 F.3d 627, 630 (6th Cir. 2006) (citing *Morgan*, 504 U.S. at 719).

The other questions Bowling claims should have been permitted also fall outside the limited range of constitutionally required queries. There was no need to ask Larry Parmon about what aggravating circumstances would personally matter to him. *See* R. 1 at 118; 7 T.E. 1020–21 (asking what aggravating factors would matter to Parmon in the abstract without reference to statutory factors). The trial court allowed both sides to question Parmon on the relevant issue: his ability to consider whatever factors his oath charged him with considering. *Cf. Dennis v. Mitchell*, 354 F.3d 511, 523 (6th Cir. 2003) (applying the same logic to the trial court's ruling that "specific mitigating factors shouldn't be delved into"

because "[t]he significant part is will they [the jurors] listen to what the mitigating factors are and will they consider them" (quotation omitted)).

The trial court was not obligated to permit questioning of Ruth Harris about whether she would require Bowling to take the stand. *See* R. 1 at 118; 10 T.E. 1397–99. The questioning was unnecessary because of the trial "court's voir dire questions and jury instructions about the presumption of innocence and its instruction that no inference whatever may be drawn from the election of the defendant not to testify." *United States v. Aloi*, 9 F.3d 438, 441 (6th Cir. 1993) (quotation marks omitted); *see* 10 T.E. 1386–99 (specific voir dire questioning of Harris on presumption of innocence); 24 T.E. 3522–23 (jury instruction on reasonable doubt and Bowling's right not to testify before closing arguments).

The trial court also acted within its discretion by forbidding a question to James Gilbert about whether he would need to see evidence dissuading him that Hensley and Smith were not murdered during the course of a robbery. *See* R. 1 at 118; 11 T.E. 1545–46. First, the trial court sustained the objection because the question violated the parties' agreement to segregate voir dire questions into pretrial publicity and general fitness for the case. *Id.* at 1547. Defense counsel would have likely been allowed to ask the question again in the second phase of questioning. Second, the trial judge instructed and questioned Gilbert on applying the presumption of innocence and the reasonable doubt standard. That exchange answered the concerns that defense counsel's earlier question raised. *Compare id.* at 1548–52 (establishing that Gilbert would apply the beyond a reasonable doubt standard), *with Irvin v. Dowd*, 366 U.S. 717, 722–23 (1961) (explaining that juror impartiality is not based on

48

"be[ing] totally ignorant of the facts and issues involved" but about setting aside any bias as to the accused's guilt or innocence).

Finally, even if the trial court did improperly limit defense counsel's voir dire questions, Bowling has not alleged any prejudice that would warrant reversal. Since none of the eight potential jurors actually sat and delivered the verdict at trial, there is no "risk that [biased] jurors may have been empaneled in this case." *Morgan*, 504 U.S. at 736 (overturning conviction because of the risk that biased jurors actually delivered the verdict); *see also Rivera*, 556 U.S. at 158 (holding that no federal constitutional issue exists where the defendant fails to establish that the state violated a specific constitutional right or deprived him of "the fundamental elements of fairness in a criminal trial" (quotation omitted)). And, just as with Claim 2, Bowling's theory that the trial court's rulings "deprived him [of] the right [to] exercise peremptories intelligently," R. 159 at 161, does not raise a federal Due Process Clause issue, *see* Section II.A.2 *supra* (citing *Rivera*, 556 U.S. at 158–60; *Martinez-Salazar*, 528 U.S. at 316; *Ross*, 487 U.S. at 91 & n. 5).

Under § 2254, "federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice system, and not as a means of error correction." *Jackson*, 87 F.3d at 729 (quoting *Greene v. Fisher*, 132 S. Ct. 38, 43 (2011)). No such malfunction occurred in Bowling's case. He fails to show that *Morgan* requires any of the voir dire questions at issue, or that the trial court's rulings caused any federally cognizable prejudice. So there is certainly a "possibility" that "fairminded jurists" would find the state court's decision correct. *Richter*, 131 S. Ct. at 786. Thus, Bowling's claim fails.

## C.    *Ineffective Assistance of Counsel Regarding Juror Ena Siner (Claim 67)*

Bowling claims ineffective assistance based on trial counsel's "failure to move to strike juror Ena Siner."  R. 1 at 306.  Bowling's argument focuses on one exchange and ignores the remainder of the voir dire.  Defense counsel gave Siner a hypothetical in which a defendant had been found guilty of intentionally murdering two individuals.  *See* 16 T.E. 2406.  Counsel asked Siner if she would "lean automatically toward the imposition of a death penalty in that situation?"  *Id.*  Siner responded, "If they were intentional, yes."  *Id.* at 2407.

Like a single stroke on a canvas, or one mosaic tile on a wall, that answer was a small part of a larger picture.  During voir dire, both the trial judge and the attorneys asked prospective jurors about their ability to serve as a juror and their views on the death penalty.  The trial judge began Siner's questioning, asking about her ability to follow her general duties as a juror.  Siner promised to base her decision on "the evidence that's presented in the courtroom" and the judge's "instructions as to the law."  16 T.E. 2393.  She confirmed her ability to make good on that promise by properly applying the reasonable doubt standard to the trial court's hypotheticals questions in voir dire.  *See id.* at 2396–99.

When the prosecutor questioned Siner, she expressed misgivings about imposing the death penalty.  The prosecutor asked if she would "give consideration, very serious thoughts to each alternative . . . punishment before deciding on the one [she] felt was most appropriate under the circumstances?"  16 T.E. 2402–03.  To which Siner responded, "Yes, I would.  I - - that's very serious.  Yes, I would, I'd have to."  *Id.* at 2403.  The prosecutor then asked if she would "fix a punishment at death if [she] felt that it was appropriate?"  *Id.*  And Siner replied, "I would consider it, but I'd be awfully, you know, it's very serious."  *Id.*

Then the defense had its turn.  Defense counsel gave Siner a hypothetical in which a defendant had been found guilty of intentionally murdering two individuals.  *See* 16 T.E. 2406.  Counsel asked Siner if she would "lean automatically toward the imposition of a death penalty in that situation?"  *Id.*  Siner responded, "If they were intentional, yes."  *Id.* at 2407. Counsel then clarified her answer, asking again if she "would lean automatically towards that?"  *Id.*  Siner affirmed her previous answer, saying, "Yes.  I don't think you have the right to take a life."  *Id.*  Counsel followed up with another hypothetical in which the judge gave the jury "a pretty good range of punishments [to] choose from."  *Id.*  He asked Siner if there were a punishment that she "would automatically go to and exclude all others?"  *Id.*  Siner simply replied, "No." *Id.*  After several more questions, the trial judge approved Siner as a potential juror in the case without objection from the prosecutor or defense counsel.  *Id.* at 2408–09.

Bowling now claims that trial counsel's failure to move to strike Siner deprived him of his right to effective assistance of counsel.  R. 1 at 306–08; R. 159 at 280–85.  To succeed on an ineffectiveness claim, Bowling must show both deficient performance and prejudice to his defense.  *Strickland*, 466 U.S. at 687; *see also* Section I *supra*.  And because the Kentucky Supreme Court held that there was "no ineffective assistance of counsel on this issue," *Bowling*, 80 S.W.3d at 419, the Court must review its decision deferentially.  The Court assesses the performance determination under "doubly deferential judicial review" and the prejudice determination under standard § 2254(d) deference.  *Pinholster*, 131 S. Ct. at 1403 (quotation omitted); *see also* Section I *supra*.  Here, Bowling has shown neither deficient performance nor prejudice because his underlying claim is baseless.  The gist of Bowling's claim is that trial counsel should have struck Siner because "she would lean

51

towards imposing a death sentence for intentional murder." R. 159 at 280. And, Bowling asserts, Siner's proclivity for imposing the death penalty violated his "right to a jury who would give equal consideration" to all possible punishments. R. 1 at 308. Neither assertion has merit.

The Supreme Court has long recognized that, when it comes to imposing or withholding the death penalty, "all individual jurors are to some extent predisposed towards one result or another." *McCree*, 476 U.S. at 177. The question is therefore not how an individual personally feels about the death penalty, but whether a juror's personal beliefs are so strong that they "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 424 (internal citations omitted); *see also Sheppard v. Bagley*, 657 F.3d 338, 347 (6th Cir. 2011). So long as a juror "will conscientiously apply the law and find the facts," it is of no consequence whether that juror is generally slanted toward or against imposing a death sentence. *McCree*, 476 U.S. at 178 (internal quote marks omitted) (quoting *Witt*, 469 U.S. at 423); *see also Gray*, 481 U.S. at 652–53.

When viewed as a whole, Siner's answers show that she was the kind of conscientious juror that the Supreme Court endorsed in *Witt* and *McCree*. Her answers were not the responses of someone who would "automatically vote for the death penalty irrespective of the facts or the trial court's instructions of law." *Morgan*, 504 U.S. at 726. Rather, when first asked about the death penalty, she hesitated at the gravity of the decision. *See* 16 T.E. 2402–03. But she understood she would have to follow the law and follow her oath in that regard. *See id.* (citing 16 T.E. 2403). That is exactly the kind of juror the Supreme Court has repeatedly held to be acceptable. *See McCree*, 476 U.S. at 178 (holding

that a juror who generally favors the death penalty is still "impartial" under the Sixth Amendment if she "will conscientiously apply the law and find the facts" (quoting *Witt*, 469 U.S. at 423)).  Throughout the questioning discussed above, Siner demonstrated that she was impartial and open to considering all penalties.  *See Sheppard*, 657 F.3d at 347.

Nevertheless, Bowling asserts that counsel should have moved to strike Shiner for cause.  Even accepting Bowling's characterization of Siner's bias, there was no cause to strike her under the authorities Bowling cites.  Bowling mainly relies on the Supreme Court's decision in *Morgan v. Illinois*, 504 U.S. 719.  He cites *Morgan* for the proposition that "a juror who would automatically impose capital punishment violates the due process guarantee to an impartial and indifferent jury."  R. 1 at 307 (citing *Morgan*, 504 U.S. 719).  But *Morgan*'s holding was not as sweeping as Bowling claims.  In *Morgan*, the Supreme Court held that a "defendant is entitled to challenge for cause and have removed on the ground of bias a prospective *juror who will automatically vote for the death penalty irrespective of the facts or the trial court's instructions of law*."  *Morgan*, 504 U.S. at 726 (emphasis added). As discussed above, this simply was not Siner's attitude.  Siner was open to all penalties and repeatedly demonstrated this throughout the questioning.   And her single answer to a hypothetical demonstrates nothing more than the fact that, in certain situations, she would lean towards imposing the death penalty.  Of course, these types of inclinations are perfectly acceptable.  *See McCree*, 476 U.S. at 177–78; *Witt*, 469 U.S. at 423–24.  So, even taken on its face, Bowling's claim does not make out a basis for striking Siner for cause.  And if there was no basis for a for-cause challenge, deciding to refrain from making such a motion was not deficient performance.  *Cf. Mirzayance*, 556 U.S. at 125 (holding that counsel did not

53

perform deficiently where "there was almost no chance" of winning the abandoned argument).

In addition, Bowling's focus on Siner's answer to one question violates his own assertion that a court must consider "the totality of the juror's *voir dire* statements." R. 159 at 284. Read in context, the statements that Bowling singles out are of no special significance. First, it was defense counsel who initially raised the issue of "automatically" applying the death penalty through a leading question. Counsel asked Siner if she would "lean automatically toward the imposition of a death penalty in that situation?" 16 T.E. 2406. There is no great significance to the fact that Siner did not quibble with what the word "automatically" meant and simply answered, "If they were intentional, yes." *Id.* at 2407. Bowling's assertion that her affirmative response to this leading question "revealed her true feelings on the issue," R. 1 at 308, ignores his own emphasis on "the totality of the juror's *voir dire* statements." R. 159 at 284. Second, Siner's initial statements about the death penalty displayed hesitation, not enthusiasm. *See* 16 T.E. 2402–03. And because those misgivings were not prompted by a leading question like her answers to defense counsel were, they are more probative of her personal views. *Cf. Sheppard*, 657 F.3d at 347 (affirming trial court's ruling that a juror's first statements were more probative than later responses to more directed questions).

Third, the "doubly deferential" lens of habeas resolves any doubts about defense counsel's performance. *Pinholster*, 131 S. Ct. at 1403. The record reveals that defense counsel, along with the trial judge and the prosecutor, conducted a serious and thorough voir dire. *Compare* 24 T.E. 2386–408 (asking numerous questions of Siner before defense counsel declined a motion to strike), *with Tinsley v. Million*, 399 F.3d 796, 804–05 (6th Cir.

2005) (finding that counsel's decision not to exercise conventional peremptory challenges, after an active voir dire where both attorneys and the judge questioned jurors about their ability to be fair, was a reasonable strategic decision).   And in conducting that voir dire, Bowling's counsel was not shy about challenging jurors for cause.   *See* R. 1 at 58–63 (listing sixteen for-cause challenges that defense counsel made but the trial court denied).   But counsel did not challenge Siner, most likely because of her misgivings about the death penalty.   That decision is entitled to deference, especially given the fact that defense counsel was able to observe Siner's demeanor in a way the Court cannot.   *See Keith v. Mitchell*, 455 F.3d 662, 677 (6th Cir. 2006) (stressing that "defense counsel observed the demeanor of the potential jurors [and] actively questioned all the prospective jurors").   On the facts before it, the Court cannot say counsel's voir dire of Siner fell outside "the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 689.

Fourth, Bowling fails to show that counsel's failure to move to strike Siner for cause prejudiced his defense.   Because Siner was not biased under *Witt*, *see* Section II.C *supra*, her presence on the jury did not prejudice Bowling.   *See Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2001) ("Because [the] claim of ineffective assistance of counsel is founded upon a claim that counsel failed to strike a biased juror, [the claimant] must show that the juror was actually biased against him."); *Tinsley*, 399 F.3d at 805 (citing *Miller*, 269 F.3d at 616; *Hughes v. United States*, 258 F.3d 453, 458 (6th Cir. 2001)).   Therefore, Bowling can establish prejudice only by demonstrating "that a different set of unbiased jurors would have had a 'reasonable probability' of a different result." *Keith*, 455 F.3d at 677.   And Bowling fails to identify a qualified juror who would have created a "reasonable probability" of a different outcome at trial had he or she taken Siner's place.   *See* R. 1 at 306–08; R. 159 at

280–85. Accordingly, Bowling has not demonstrated that the state court's conclusion was "necessarily unreasonable." *See Pinholster*, 131 S. Ct. at 1403.

Finally, Bowling argues in passing that his counsel should have exercised a peremptory strike on Siner. But he never explains how using a peremptory strike for Siner would have created a "reasonable probability" of a different result. *See* R. 1 at 306–07. As with his for-cause theory, Bowling fails to articulate any cognizable prejudice from his counsel's decision to withhold a peremptory challenge to Siner. *See supra* (citing *Miller*, 269 F.3d at 616; *Tinsley*, 399 F.3d at 805; *Keith*, 455 F.3d at 677; *McQueen*, 99 F.3d at 1320–21). Thus, Bowling's claim fails.

## III.    Pretrial Disclosures (Claim 13)

Bowling claims that the prosecution deprived him of due process of law by providing him with discovery that was either: late, incorrect, or incomplete. R. 1 at 109–12; R. 159 at 151–53. These three pieces of discovery are: (1) a photograph showing Bowling in the trailer with a revolver on the bathroom sink; (2) Sergeant Bickerstaff's hand-written police report, which, unlike the typewritten version, correctly listed the serial number of the .38 revolver; and (3) Ora Lee Isaacs' initial (but incomplete) statement inculpating Bowling. *See* R. 1 at 109–12. The Kentucky Supreme Court's decision did not directly address this claim. *See Bowling*, 942 S.W.2d 293; R. 159 at 154. Consequently, the Court addresses his claim *de novo*. *See Amos v. Renico*, 683 F.3d 720, 731 (6th Cir. 2012) (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)). Of course, the Court's review does not extend to violations of state discovery rules. *See Lorraine v. Coyle,* 291 F.3d 416, 441 (6th Cir. 2002) ("First, assuming that the prosecutor did violate Ohio Crim. R. 16, such a claim is not

56

cognizable on habeas, because it is not a constitutional violation."); *see also Warlick v. Romanowski*, 367 F. App'x 634, 639 (6th Cir. 2010) (citing *Colston v. Burke,* 37 Fed. App'x 122, 125 (6th Cir. 2002) (holding that a violation of a state discovery order is not a cognizable habeas claim)).  To succeed under *de novo* review, Bowling must demonstrate that the prosecution's delayed disclosure violated his constitutional rights.

Because there is no "general constitutional right to discovery in a criminal case," *Lorraine*, 291 F.3d at 441 (quoting *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988)), Bowling's claim rests on the *Brady* doctrine.  *See O'Hara v. Brigano*, 499 F.3d 492, 500–03 (6th Cir. 2007) (applying *Brady v. Maryland*, 373 U.S. 83, 87 (1963), to state habeas petitioner's challenge to prosecution's delayed disclosure at trial).  Here, that requires proving more than just Brady's three traditional prongs of: (1) favorability to the accused, (2) suppression by the state, and (3) ensuing prejudice.  *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  As explained below, Bowling must show that the delay itself resulted in prejudice.

But as an initial matter, none of the evidence that Bowling singles out meets the first prong of the *Brady* test: favorability to the accused.  Evidence is "favorable to the accused, either because it is exculpatory, or because it is impeaching."  *Strickler*, 527 U.S. at 281–82.  The photograph of the revolver, *see* Section III.A *infra*, was inculpatory.  Bowling never alleges that the picture exculpated him or that it could have impeached a prosecution witness.  Quite the contrary, Bowling's entire argument relies on the "damaging" effects of the photograph.  R. 159 at 154.  He never claims that it was in anyway "favorable."  *Strickler*, 527 U.S. at 281.  Also, the serial number on Sergeant Bickerstaff's handwritten report, *see* Section III.B *infra*, matched the number on the revolver that the state troopers found by the

roadside. *See* 19 T.E. 2852–53. So Bickerstaff's report bolstered the credibility of the government's investigation, making it neutral evidence for Bowling at best and inculpatory evidence at worst. And there is no constitutional obligation to disclose "neutral" evidence. *Farrell v. United States*, 162 F. App'x 419, 424 (6th Cir. 2006). Similarly, Ora Lee's prior statement, and the information Bowling claims the prosecution "sandbagged," *see* Section III.C *infra*, were neither exculpatory nor impeachment evidence. Rather, they were inculpatory. Consequently, none of the evidence at issue qualifies as "favorable," *Strickler*, 527 U.S. at 281, so the prosecution had no constitutional obligation to disclose it. *See Farrell*, 162 F. App'x at 424. And if there is no constitutional obligation to disclose any of the evidence at issue, there can be no *Brady* violation. Thus, Bowling's claim fails.

And even if there was a duty to disclose this evidence, Bowling must still establish prejudice under the third *Brady* prong. Because he alleges delay and not outright suppression, Bowling must prove that "the delay itself cause[d] prejudice." *O'Hara*, 499 F.3d at 503. That requires—at the very least—showing that timely disclosure by the prosecution "would have made relevant witnesses available or added something to the defense." *United States v. King*, 127 F.3d 483, 487 (6th Cir. 1997) (articulating what is required for showing "actual prejudice" in the analogous context of continuances); *see also United States v. Crossley*, 224 F.3d 847, 854–55 (6th Cir. 2000); *Farrell*, 162 F. App'x at 424 (requiring the defendant to show "what he would have done differently had he been given more time to address this evidence, or that, had the evidence been given to him earlier, a reasonable probability exists that the result of his trial would have been different"). Once Bowling identifies the extra evidence that earlier disclosure would have added, the question becomes whether it "undermine[s] confidence in the verdict." *Kyles v. Whitley*, 514 U.S.

419, 435 (1995).  Of course, if Bowling shows improper delay in more than one of his sub-claims, the Court must consider them cumulatively.  *See Johnson v. Bell*, 525 F.3d 466, 475 (6th Cir. 2008).  But if he does not first show that evidence or arguments were lost in the delay, then there is no possible effect to consider.  The Court addresses each sub-claim in turn.

### A.     Photograph of the Revolver

The week before the trial, the prosecution obtained a picture from Ora Lee Isaacs showing Bowling in the trailer with a revolver sitting on a sink in the bathroom.  4 T.E. 568–69.  The prosecution obtained the photo from Ora Lee on "late Tuesday," *id.* at 569, though the parties disagree on just how "late" it was, *see* R. 114 at 76; R. 159 at 153.   The prosecution delivered photocopies of the photograph to the defendant on Friday "rather than try to put them in the mail Wednesday."  4 T.E. 569.  Bowling moved for a continuance to investigate the photograph, *see id.* at 567–68, but the trial court denied it.   *Id.* at 570.  Bowling now claims that the prosecutor's "last minute" disclosure and the trial court's ruling "prejudiced Bowling's ability to develop and present his defense or even a different defense."  R. 159 at 154.  The state trial court's ruling did not prejudice Bowling, *see* R. 245 at 61, nor did the prosecution's delay.

Bowling fails to explain how he could have developed, improved, or otherwise varied his defense if he had been given more time with the photograph.  He asserts that he had built his defense on the theory that "the gun linked to the murder was not his gun or was not the one used in the murders."  R. 159 at 154.  And he concludes that the picture prejudiced him because it was "extremely damaging" to his underlying theory and was disclosed "too late to change defense strategies [or] to adequately investigate."  *Id.*  But Bowling cannot claim

"prejudice" in the constitutional sense simply because the timing of the evidence worked to his disadvantage.  *See Taylor v. Illinois*, 484 U.S. 400, 415 (1988) (desire to "obtain a tactical advantage" is not sufficient to claim constitutional violation); *see also Medina v. California*, 505 U.S. 437, 451 (1992) (holding that due process does not require a procedure simply because it "produce[s] results more favorable to the accused" (citing *Patterson v. New York*, 432 U.S. 197, 208 (1977))).   True constitutional "prejudice" comes where either the prosecutor's delay or the trial court's ruling impinged on Bowling's Sixth Amendment right "to provide the jury with [] evidence."  *Williams*, 529 U.S. at 393 (Opinion of Stevens, J.); *see also Montgomery v. Bobby*, 654 F.3d 668, 679 (6th Cir. 2011) (holding that prejudice is measured by "consider[ing] *all* the relevant evidence that the jury would have had before it" (quoting *Wong v. Belmontes*, 130 S. Ct. 383, 386 (2009))). And Bowling never explains what witnesses, questions, theories, or other evidence he could have presented to the jury if a continuance had been granted.   Thus, he has not made the basic showing necessary to establish "prejudice."  *See King*, 127 F.3d at 487.   Moreover, because he fails to make that initial showing, he also fails to demonstrate that the evidence at issue would have impacted the jury's verdict.  *See Kyles*, 514 U.S. at 435.

In addition to Bowling's general failure to demonstrate prejudice, the record reveals good reasons to conclude that the late disclosure of the photograph did not prejudice Bowling.  Contrary to Bowling's characterization, he did not receive the photograph on "the eve of trial."  R. 1 at 110.  He received it on Friday, September 18, 1992.  *See* 4 T.E. 569. Jury selection began on Monday, September 21, and lasted through Friday, September 25. *See id.* at 528; 17 T.E. 2519.   Both sides gave their opening statements on Monday, September 28, *see id.* at 2548, 2564, and the prosecution did not present the photographic

evidence until Thursday, October 1.   21 T.E. 3160 (confirming date as October 1); *id.* at 3199–201 (introducing photograph).   This was more than enough time to prepare for what was a relatively minor piece of evidence in the prosecution's case.   Contrary to Bowling's description, the photograph did not show him "holding a gun."   R. 159 at 151, 154.   The photograph actually showed him crouching inside his trailer with the revolver on the sink in the background.   *See* 4 T.E. 568–69.   So it was just circumstantial evidence showing that Bowling—like many Americans—had a revolver in his home.   This is not the proverbial smoking gun that Bowling makes it out to be.   Additionally, both the prosecution's and the defense's basic theories hinged on whether Bowling owned the revolver used in the crimes. S*ee* R. 159 at 154–55.   So Bowling should have been ready to rebut circumstantial evidence that he owned a .38 revolver.

And he was.   Bowling called Ledford Bowling to testify that the gun belonged to him and not Bowling.   *See* 22 T.E. 3236.   So Bowling countered the photograph presented by the prosecution with his own theory of why the gun was in the trailer.   *See* R. 245 at 61.   The fact that he was able to marshal evidence countering the photograph, coupled with his inability— even today—to identify any additional evidence he did not have time to investigate, demonstrates that he had sufficient time.   Thus, Bowling's sub-claim would fail even if there were a constitutional obligation to provide this evidence.

### B.   Sergeant Bickerstaff's Report

After the Kentucky State Troopers discovered the .38 revolver by the side of the highway, Sergeant Biggerstaff wrote a report memorializing their discovery of the weapon. *See* 19 T.E. 2850.   The prosecution provided the defense with a typewritten copy of Sergeant Biggerstaff's handwritten report.   *See* R. 114 at 78; R. 159 at 156.   Sergeant Biggerstaff did

not review or sign off on the typewritten version, *see id.* at 2852–53, and no photocopy of the original was included in the disclosure.  *See* R. 114 at 78; R. 159 at 156.  At trial, defense counsel questioned Sergeant Biggerstaff about the typewritten version of the report, which listed the serial number on the gun as "103756."  19 T.E. 2852.  That number did not match the serial number of the revolver that the prosecution entered into evidence.  *See id.* at 2852–53.  But Sergeant Biggerstaff corrected defense counsel, pointing out that the handwritten version of his report listed the same serial number as the gun entered into evidence: "C87956."  *Id.*  Bowling claims that the prosecution's failure to provide the handwritten versions of the reports by Sergeant Biggerstaff and twelve other officers prejudiced Bowling's defense.  Specifically, he claims that the prosecution "caused defense counsel to pursue a line of cross-examination of Sergeant Biggerstaff based on an error in the typed report."  R. 159 at 156.  And, Bowling asserts, defense counsel would have avoided that mistake if the prosecution had produced the handwritten report.  *See id.*

Bowling never demonstrates prejudice.  He offers no explanation of how defense counsel would have cross examined Sergeant Biggerstaff more effectively if the prosecution had disclosed the handwritten report.  *See* R. 1 at 110–11; R. 159 at 156.  To be sure, defense counsel probably would have caught the typographical error and not asked Sergeant Biggerstaff about the serial numbers.  But merely refraining from asking questions based on the typewritten report's errors would not have helped Bowling in any appreciable way.  And Bowling never explains how trial counsel could have used the handwritten report to either effectively impeach Sergeant Biggerstaff or otherwise establish facts favorable to the defense. Accordingly, Bowling has not made the initial showing necessary to establish prejudice.  Moreover, there is no evidence the prosecution acted in bad faith—just the

opposite: they attempted to produce the notes in an easy to read fashion.  *See King*, 127 F.3d at 487; *see also Drake v. Superintendent, Trumbull Corr. Inst.*, 106 F.3d 400, 1997 WL 14422, at *6 (6th Cir. 1997) ("The fact that the detective's [handwritten] notes were not provided does not rise to a constitutional level here, where there is no showing that the government acted with deliberateness or bad faith, nor that the statement was material or exculpatory." (citing *United States v. Calhoun*, 542 F.2d 1094, 1103–04 (9th Cir. 1976))). Thus, Bowling's sub-claim fails.


### C.        *Ora Lee Isaacs' Incomplete Initial Statement*

The prosecution also provided the defense with an unsigned statement from Oral Lee Isaacs that she gave to investigators on the day Bowling was arrested.  *See* 1 T.R. 86.  Her statement, which was one paragraph with a "refused to sign" disclaimer, contained her account of the evening and early morning as well her recollection of certain property that Bowling owned.  *See id.*  Bowling faults the prosecution for providing him with the statement because it did not include many of the facts that Oral Lee would testify to at trial. Specifically, the written statement "did not mention anything about Bowling owning a pistol, buying a pistol and holster from Lee Evans, living on food stamps, or why they kept the drapes shut."  R. 1 at 111.  Bowling accuses the prosecution of "sandbagg[ing] information it had gathered from one or more interviews with Ora Less Isaacs."  R. 1 at 112.  But he does not provide any evidence for his accusation other than the fact that the prosecutor used "leading questions" at trial to draw out information not contained in the disclosed statement. *See id.* at 111–12.

Bowling again fails to allege true "prejudice."  Ora Lee made the written statement on February 25, 1989; the day Bowling was arrested.  *See* 1 T.R. 86.  The fact that the prosecution learned more facts through investigation and used them to question Ora Lee does not prove bad faith.  *Cf. United States v. Kuehne*, 547 F.3d 667, 692 (6th Cir. 2008) (acknowledging that leading questions can have legitimate purposes and motivations). Consequently, the Sixth Circuit's holding in *United States v. King*, 521 F.2d 356 (1975), governs the Court's disposal of this claim.  In *King*, the court held that prosecutors did not violate the defendant's constitutional rights by disclosing an "incomplete summary of statements made by government agents before trial."  *Id.* at 358.  Here, as in *King*, "[t]here [i]s no evidence that the government acted in bad faith in providing incomplete summaries, and [Bowling] was not entitled to rely upon the fact that the statements could not be changed or supplemented at trial."  *Id.*  Moreover, even if there had been bad faith, Bowling never makes the initial showing necessary to show prejudice.  *Compare* R. 1 at 111–12 (offering no theory as to how Bowling's defense would have changed), *and* R. 159 at 157 (same), *with* ; *see O'Hara*, 499 F.3d at 503 (requiring defendant to show that his defense "was prejudiced by the prosecution's delayed disclosure").  Thus, Bowling's sub-claim fails.

A defendant claiming that the prosecution deprived him of due process through improper pretrial disclosure carries a "high burden."  *Condon v. Wolfe*, 310 F. App'x 807, 815 (6th Cir. 2009).  And Bowling has not met it.  None of his sub-claims demonstrates how the defense could have made a stronger showing with more timely or comprehensive pretrial discovery.  So, even if the Court considers them collectively, Bowling's sub-claims do not establish "prejudice."  Thus, Bowling's claim fails.

## IV.    Fundamentally Unfair Evidence (Claims 3, 20)

Bowling claims that numerous witnesses gave testimony that was "fundamentally unfair" under the Due Process Clause. Claim 3 challenges Ricky Smith's testimony regarding Bowling's attempted murder at the Rockcastle Sunoco Station. *See* R. 1 at 68–79; R. 159 at 90–100. And Claim 20 targets seven other witnesses' testimony. *See* R. 1 at 128–33; R. 159 at 168–72.

State court decisions that determine the admissibility of evidence by applying widely recognized principles of evidence law do not implicate the federal Due Process Clause. The Supreme Court has been cognizant that allowing federal courts to second guess state evidentiary rulings in the name of Due Process would invade the province of state courts and legislatures. *See Perry v. New Hampshire*, 132 S. Ct. 716, 723 (2012) ("[S]tate and federal statutes and rules [should] ordinarily govern the admissibility of evidence."); *see also Dowling v. United States*, 493 U.S. 342, 352 (1990) (citing *United States v. Lovasco*, 431 U.S. 783, 790 (1977) (explaining that bare due process challenges give federal judges too much power in the field of evidence law)). The high court has therefore "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling*, 493 U.S. at 352. So the term "fundamentally unfair" does not mean run-of-the-mine prejudice. It is a term of art indicating a "*type* of evidence [that] is so extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Dowling*, 493 U.S. at 352 (emphasis added) (quoting *Lovasco*, 431 U.S. at 790). Alleging a violation of state law is not enough. A Due Process challenge will succeed only where a species of evidence "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency." *Lovasco*, 431 U.S. at 790 (internal quotation marks and citations omitted); *see also Perry*, 132 S. Ct. at 723 (citing *Napue v.*

*Illinois,* 360 U.S. 264, 269 (1959) (holding that the prosecution's "knowin[g] use [of] false evidence" violates "any concept of ordered liberty")).  In short, Bowling cannot use the Due Process Clause to second guess the wisdom of state law evidentiary rulings.  *Perry*, 132 S. Ct. at 723; *Henness v. Bagley*, 644 F.3d 308, 326 (6th Cir. 2011) (state court evidentiary rulings are "generally not cognizable in federal habeas corpus" (citing *Bey v. Bagley*, 500 F.3d 514, 519–20 (6th Cir. 2007))).

### A.    *Evidence of the Mt. Vernon Shooting (Claim 3)*

Over Bowling's objection, Ricky Smith testified about his encounter with Bowling at the Sunoco Station in Rockcastle.  The state court's opinion describes his testimony in detail. *See Bowling*, 942 S.W.2d at 300–01.  Three days after the Hensley murder, Bowling arrived at the Sunoco Station in the early morning hours, acted suspiciously, shot at Smith six times, and then fled.  19 T.E. 2768–2805.  On direct appeal, Bowling challenged the introduction of this evidence.  He claims that its admission violated his rights under Kentucky Rule 404, which governs the admission of character evidence and evidence of "other crimes, wrongs, or acts," Ky. R. Evid. 404.  *See* Appellant's Br. at 33–42, *Bowling v. Commonwealth*, 80 S.W.3d 405 (Ky. 2002) (No. 98-SC-759), App'x of App. R. 982–991.  And—in the final sentence of a ten-page argument—Bowling added that "the complained of testimony and evidence denied Ronnie his rights under the 6th and 14th Amends., U.S. Const., §2, 11, Ky. Const."  *Id.* at Appellant's Br. 42, App'x of App. R. 991.  The Kentucky Supreme Court denied his claim, holding that the evidence was more probative than prejudicial under Kentucky Rule 404(b).  *See Bowling*, 942 S.W.2d at 300–01.

Bowling claims that the state court's decision should not receive deference under § 2254(d) because it only mentioned state law.  *See* R. 159 at 99–100.  The Supreme Court

will hear argument on this issue next term.  *See Cavazos v. Williams*, 132 S. Ct. 1088 (2012)

(granting certiorari on the question "[w]hether a habeas petitioner's claim has been

'adjudicated on the merits' for purposes of 28 U.S.C. § 2254(d) where the state court denied

relief in an explained decision but did not expressly acknowledge a federal-law basis for the

claim").  While it appears that § 2254(d) deference should apply, *see Brown v. Bobby*, 656

F.3d 325, 329–31 (6th Cir. 2011), it is of no moment here.  Bowling's claim fails under any

standard of review for two reasons: (1) the admission of the evidence was not

"fundamentally unfair" and (2) Bowling has not demonstrated prejudice.

   ***Fundamental Unfairness:***  Bowling's claim falls well outside the "very narrowly"

defined categories of evidence that violate the Due Process Clause.  *Dowling*, 493 U.S. at

352.  Bowling relies heavily on the Supreme Court's decision in *Dowling*.  In Dowling,

however, there was reason for the Supreme Court to be concerned: The evidence that was

introduced involved prior acquitted conduct.  Ultimately, the Supreme Court found no error

because while the evidence was problematic, the trial court provided a limiting instruction.

*Id.* at 346.  Moreover, the Justices turned away the due process claim because "it is

acceptable to deal with [such evidence] through nonconstitutional sources like the Federal

Rules of Evidence."  *Id.* at 352.

   First, like in *Dowling*, the Kentucky Supreme Court found that Ricky Smith's

testimony was permissible under Kentucky evidentiary law.  That determination is not

reviewable.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (stressing that "federal

habeas corpus relief does not lie for errors of state law" (quoting *Lewis v. Jeffers*, 497 U.S.

764, 780 (1990))).  Second, Bowling cannot make out a due process claim.  The Supreme

Court expressed concern in *Dowling* because the testimony introduced at Dowling's bank

robbery trial had already been presented in his earlier, unrelated burglary trial; a trial where Dowling was acquitted. Dowling's argument raised three concerns for the Supreme Court: (1) as evidence "relat[ed] to acquitted conduct," it was arguably "inherently unreliable"; (2) excluding the prior evidence seemed to promote the goal of consistent jury verdicts; and (3) allowing acquitted conduct evidence potentially "contravene[d] a tradition that the government may not force a person acquitted in one trial to defend against the same accusation in a subsequent proceeding." *Dowling*, 493 U.S. at 353-354. These three features allowed the Third Circuit to draw a categorical line between acquitted conduct evidence and standard evidence of prior bad acts and declare the former fundamentally unfair. *See United States v. Dowling*, 855 F.2d 114, 120–22 (3d Cir. 1988) (citation omitted). While the Supreme Court ultimately rejected that conclusion, the Justices did note that special "circumstances like those involved here ha[ve] the potential to prejudice the jury or *unfairly force* the defendant to *spend time and money relitigating* matters considered at the first trial." *Dowling*, 493 U.S. at 352 (emphasis added). So there were concerns about the testimony in *Dowling* that at least raised the question of whether it was categorically distinct from normal "other acts" evidence.

But those concerns are absent in Bowling's case. Ricky Smith's testimony about Rockcastle did not have the same reliability concerns because it had not been considered and discredited by a previous jury. Similarly, because Bowling had not been tried and acquitted of the Rockcastle shooting, there was no previous verdict to contradict or prior testimony to re-litigate. (Indeed, Bowling was later tried and convicted for shooting at Ricky Smith. *See Bowling v. Commonwealth*, 2012 WL 95425 (Ky. App. 2012)).

Bowling offers no other basis to categorically distinguish Ricky Smith's trial from run-of-the-mill evidence of prior bad acts. Instead, he simply argues that Smith's testimony was unduly prejudicial. *See* R. 159 at 90–100. Without that categorical distinction, Bowling has not made a cognizable fundamental fairness challenge. *See* Section IV *supra* (collecting Supreme Court decisions reserving the Due Process Clause for evidence that falls outside the bounds of normal evidentiary rules). In fact, by treating *Dowling* as if it requires a court to engage in Rule 404-style balancing whenever a defendant alleges a due process violation, *see* R. 159 at 91, Bowling contradicts *Dowling*'s basic teaching: the Due Process Clause should have "limited operation" in the field of evidence law. *Dowling*, 493 U.S. at 352; *see also Perry*, 132 S. Ct. at 723. Consequently, Bowling's claim does not allege a true due process violation. It simply seeks to relitigate the state court's evidentiary ruling. And such claims are not cognizable on federal habeas. *See* Section IV *supra* (citing *Henness*, 644 F.3d at 326; *Bey*, 500 F.3d at 519–20).

**Prejudice:** Bowling also fails to carry his burden in making a due process challenge: proving prejudice. In the abstract, a habeas petitioner does not bear the burden of demonstrating prejudice. *See O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). But where prejudice is an element of the alleged constitutional violation, such as ineffective assistance of counsel, the petitioner assumes the burden of demonstrating prejudice. *See* Section I *supra* (citing *Strickland*, 466 U.S. at 687). Such is the case with a "fundamental fairness" challenge. A petitioner must demonstrate that "the evidence admitted . . . was *so unfairly prejudicial* that 'it offends [a] principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Bey*, 500 F.3d at 521 (quoting *Egelhoff*, 518 U.S. at 43). Thus, in addition to showing that the evidence at issue falls into a categorically

69

unfair species of evidence, *see* Section IV *supra* (collecting Supreme Court cases), Bowling

must show that the evidence here unfairly prejudiced him.

       The key here is that prejudice only matters if it is *unfair* prejudice; mere disadvantage

is not enough.  *See Bey*, 500 F.3d at 521; *see also Medina*, 505 U.S. at 451 (holding that

fundamental fairness analysis does not turn on whether a rule "produce[s] results more

favorable to the accused" (citation omitted)).  Using evidence to draw acceptable inferences

of a defendant's guilt may be prejudicial to the defendant's case, but it is not fundamentally

unfair to the defendant.  *See Bey*, 500 F.3d at 522.  Here, the Kentucky Supreme Court

concluded that the jury could draw legitimate inferences based on their belief that Bowling

was guilty of attempted murder in the Rockcastle shooting.  *See Bowling*, 942 S.W.2d at 301;

*Bowling*, 80 S.W.3d at 413–14.  The jurors could use his guilt to infer that the gun found by

the roadside and later linked to the other murders was Bowling's.  *See Bowling*, 942 S.W.2d

at 301.  And under Kentucky Rule 404(b) they could use the similarities between the

Rockcastle shooting and the murders to infer that Bowling was the perpetrator of the string

of related crimes.  *See id.* (reasoning that both the forensic and chemical evidence connecting

the guns and the manner of the three shootings made the Rockcastle evidence "highly

probative" under Ky. R. Evid. 404(b)); *Bowling*, 80 S.W.3d at 413–14.

       Initially, Bowling speculates that the jurors based their verdict on "uncharged

criminal conduct."  R. 159 at 94.  The Supreme Court has rebuffed such speculation about

the jury's "hypothetical analysis" in reaching a decision.  *Donnelly v. DeChristoforo*, 416

U.S. 637, 644 (1974).  Next, Bowling tries to distinguish the Rockcastle shooting from the

Smith and Hensley murders.  *See* R. 159 at 96–98.  But the minor distinctions he makes do

not overcome the striking similarities.  From Smith's murder to Bowling's arrest, these were

the only three shootings in the neighboring counties that took place at a gas station, in the early morning hours, with bullets tied to the .38 revolver in question. *See Bowling*, 942 S.W.2d at 301. The Rockcastle evidence was therefore "highly probative" of Bowling's guilt in the Smith and Hensley murders. *Compare Bowling*, 842 S.W.2d at 301 (finding evidence "highly probative" to Bowling's guilt), *with Dowling*, 493 U.S. at 353 (admitting evidence that was only "circumstantially valuable in proving [the defendant's] guilt"). So the inferences that the jury drew from the Rockcastle evidence were not fundamentally unfair. *See Bey*, 500 F.3d at 522–23 (holding that the admission of "other acts" evidence in similar circumstances did not violate the Due Process Clause). Finally, Bowling argues that the trial court confused the jury by instructing them to not draw any inferences of guilt based on the Rockcastle shooting itself. *See* R. 159 at 92. Instead, Bowling asserts, the trial court should have instructed the jurors to draw limited inferences under Kentucky Rule 404(b). *Id.* This novel theory, perhaps the first ever to claim that a jury instruction prejudiced a defendant by not allowing the jury to make *additional* incriminating inferences, has no support in law. Thus, under any standard of review, Bowling's claim fails.

### B.    *Improper Opinion Testimony (Claim 20)*

Bowling claims that his trial violated due process because several witnesses gave "improper opinion evidence." *See* R. 1 at 128–33; *see also* R. 159 at 168–72. In effect, Bowling's claim is really seven sub-claims. He believes that the trial court should have excluded: (1) testimony from Officer Johnny Phelps about how the .38 revolver linked to the murders fit in a holster found in Bowling's trailer; (2) testimony from Officer Phelps about a tire track left outside Marvin Hensley's station; (3) expert testimony by Coroner Ed Bowling

71

about where Marvin Hensley was shot; (4) expert testimony from crime lab examiner Warren Mitchell about firearms; (5) the prosecutor's characterization of Ronnie Freels and Jeffrey Scott Doyle's expert testimony; (6) testimony from R.J. Elkins describing suspicious behavior by Bowling at Hensley's station a week before the murder; and (7) similar descriptive testimony from David Gross. *See* R. 1 at 129–32.

### 1.     Officer Phelps's Testimony Regarding Holster

Bowling challenges Officer Phelps's testimony that the .38 revolver found along the highway "fits perfectly" into the holster police found in Bowling's trailer, 20 T.E. 2982. *See* R. 1 at 129; R. 159 at 169–72.  At trial, the prosecution asked for Officer Phelps's opinion based on his personal experience dealing with guns and holsters as a police officer. *See* 20 T.E. 2981–82.  Officer Phelps testified that the holster conformed to the revolver's shape "like a hand fitting in a glove." *Id.* at 2982.  He never claimed that only one revolver could fit into the holster or that he based his opinion on any scientific technique. *See id.* at 2981– 84.

The main thrust of Bowling's argument comes from his mischaracterization of the facts.  He claims that Officer Phelps was not an expert "in the field of holster wearmarks science."  R. 159 at 170.  Bowling goes on to assert that the testimony prejudiced him because Officer Phelps testified "that this certain gun uniquely matched the wear marks on this certain holster."  R. 159 at 171.  But the prosecution never presented Officer Phelps as a forensic expert, and Officer Phelps never claimed that the murder weapon was the only possible match to the holster. *See* 20 T.E. 2981–84.  If either attorney had asked Officer Phelps whether a .38 revolver of a similar make and model with a similar deformity would fit as snugly, he almost certainly would have answered "Yes."  Thus, the record demonstrates

that there was nothing false or unfair, let alone "fundamentally unfair," about Officer Phelps's testimony.

Bowling also fails to show that Officer Phelps's testimony falls into a category of evidence that strikes "at the base of our civil and political institutions." *Lovasco*, 431 U.S. at 790 (internal quotation marks and citations omitted). The Kentucky Supreme Court upheld the admission of Officer Phelps's testimony evidence under Kentucky Rule of Evidence 702. *Bowling*, 942 S.W.2d at 305. The state court reasoned that Officer Phelps's experience as an officer gave him greater knowledge of the "unique characteristics of handguns and holsters" than many of the jurors probably had. *Id.* That logic parallels the reasoning federal courts have employed in similar cases under the Federal Rules of Evidence. In the Sixth Circuit, "courts have permitted law enforcement officers to testify about" specialized knowledge they have gained working in law enforcement "as long as the testimony is relevant and reliable." *United States v. Kelsor*, 665 F.3d 684, 698 (6th Cir. 2011) (citing *United States v. Johnson*, 488 F.3d 690, 697–98 (6th Cir. 2007) and *United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004)); *see also United States v. Ayala-Pizarro*, 407 F.3d 25, 27 (1st Cir. 2005) (allowing officer to testify, based on his "previous seizures of heroin at drug points[, that] heroin was typically packed in aluminum decks"); *United States v. Maher,* 454 F.3d 13, 23–24 (1st Cir. 2006) (allowing an officer to testify that certain Post-It notes were probably drug orders). Evidence that falls within the ambit of statutory evidence rules should be dealt with under those rules, not the Due Process Clause. *See* Section IV *supra*. Consequently, Officer Phelps's testimony does not fall into the "very narrowly" drawn category of evidence that violates due process itself. *Dowling*, 493 U.S. at 352. Thus, Bowling's sub-claim fails.

### 2.    Officer Phelps's Testimony Regarding Tire Track

Bowling also criticizes Officer Phelps's testimony for assuming Bowling's guilt. While on the stand, Officer Phelps testified about a "tire impression" found outside Marvin Hensley's station.  20 T.E. 2980.  On cross examination, defense counsel raised the issue of the tire track.  *See id.* at 3002.  Officer Phelps dismissed its importance, asserting that it "wasn't left behind at the time of the murder."  *Id.* at 3003.  When defense counsel asked him how he knew that, he replied that "[i]t didn't match Mr. Bowling's vehicle."  *Id.*  Defense counsel did not object and the trial judge did not admonish the jury to disregard Officer Phelps's answer.  *See id.*  Neither the prosecution nor the defense mentioned Officer Phelps's statement again.  *See* 24 T.E. 3526–98.  Bowling now claims that Officer Phelps's testimony violated due process by usurping the jury's role as the ultimate arbiter of guilt and innocence. *See* R. 1 at 129–30.

Again, Bowling fails to demonstrate that Officer Phelps's testimony fell within the limited category of "fundamentally unfair" evidence.  *Dowling*, 493 U.S. at 353.  First, Officer Phelps made a single conclusory statement that neither the prosecution nor the defense ever mentioned again.  *See* 24 T.E. 3526–98.  His testimony had neither the persuasive power nor the prominence at trial necessary to rise to the level of fundamental unfairness.  *Cf. Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (holding that a defendant's trial can only become fundamentally unfair where the prosecution's impropriety is "so pronounced and persistent that it permeates the entire atmosphere of the trial"). Second, defense counsel vigorously contested Officer Phelps's conclusion—that Bowling was guilty—throughout the trial.  *Compare Cannon v. Mullin*, 383 F.3d 1152, 1160 (10th Cir. 2004) (holding that "improper opinion testimony," which defense counsel failed to

object to, was harmless error because defense counsel strongly contested that opinion later), *with* 24 T.E. 3526–64 (vigorously arguing that Bowling was not guilty).  Finally, even if Officer Phelps's testimony was improper under Kentucky Rule 702, *see* R. 1 at 129, it does not follow that his testimony was "fundamentally unfair."  Bowling's argument is nothing more than a claim that the Kentucky Supreme Court misapplied its rule governing expert opinion testimony.  *See id.* (citing Ky. R. Evid. 702; *Berry v. Detroit*, 25 F.3d 1342 (6th Cir. 1994); *Daubert v. Merrell Dow*, 509 U.S. 579 (1993); *United States v. Clifford*, 543 F. Supp. 424, 430 (1982)).  Such an argument does not allege "fundamental unfairness" under the Due Process Clause and is not cognizable on federal habeas.  *See* Section IV *supra* (collecting Supreme Court and Sixth Circuit cases).  Thus, Bowling's sub-claim fails.

### 3.     Ed Bowling's Testimony

Bowling claims that Laurel County Coroner Ed Bowling (no relation) offered improper opinion testimony outside his area of expertise.  *See* R. 1 at 130.  At trial, Ed Bowling testified that, as a state certified coroner, he was qualified as an expert in determining "cause and location" of death.  *See* 17 TE. 2599.  The prosecution then asked him to determine, based on his expert assessment of both crime scenes, how the victims died. Ed Bowling concluded that Ronald Smith "received the [fatal] gunshot wounds in my opinion, right where he was laying."  18 T.E. 2608.  He also testified that Marvin Hensley's fatal shot came while Hensley was "lying" down next to the station's floor safe.  *See id.* at 2612.  Defense counsel objected to both opinions on the grounds that Ed Bowling was not qualified to make such determinations.  *See id.* at 2606–07, 2612.  The prosecution also called Dr. John Hunsacker, a forensic pathologist.  *See id.* at 2725.  Hunsacker testified that Smith died from six gunshot wounds, three to the back of the head, two in the back of the

spine, and one through his arm and into his torso. *See id.* at 2736–40. Bowling claims that

Ed Bowling and Hunsacker disagreed about whether Smith was shot while lying face down

on the floor. *See* R. 1 at 130. He then uses that alleged contradiction to assert that Ed

Bowling's "'non-expert testimony' was an effort by the prosecutor to portray Bowling in the

worst possible light." R. 1 at 130.

First, Bowling offers no support for his claim that the prosecution acted in bad faith.

Nothing in the record indicates that the prosecutor introduced Ed Bowling's testimony in

order "to portray Bowling in the worst possible light." R. 1 at 130. Ed Bowling had

nineteen years of experience as a coroner, was certified by the state of Kentucky to

investigate causes of death, and took yearly continuing education courses to maintain his

certification. *See* 17 T.E. 2599. The fact that he may have disagreed with Dr. Hunsacker's

conclusions about the position of Smith's body, *see* R. 1 at 130, does not invalidate those

credentials. And the only other basis for Bowling's assertion is his citation of two civil cases

that did not even involve testimony about a body. *See* R. 1 at 130 (citing *Columbia Gas v.

Tindall*, 440 S.W.2d 785 (Ky. 1969) (expert testimony on "natural-gas matters"); *Berry v.

Detroit*, 25 F.3d 1342 (6th Cir. 1994) (expert testimony regarding police procedures and

training)).

Second, even if Dr. Hunsaker's testimony revealed Ed Bowling's "lack of expertise,"

Bowling has not alleged a due process violation. *See* R. 1 at 130. Like his challenge to

Officer Phelps's testimony about the tire track, *see* Section IV.B.2 *supra*, Bowling's claim is

nothing more than an argument that the state court misapplied its expert testimony rule.

*Compare* R. 130 (citing cases applying Ky. R. Evid. 702 and Fed. R. Evid. 702), *with

Lovasco*, 431 U.S. at 790 (requiring the evidence to "violate[] those fundamental conceptions

76

of justice which lie at the base of our civil and political institutions" (internal quotation marks omitted)).  And the Due Process Clause is not a backstop for second-guessing state law evidentiary rulings.  *See* Section IV *supra*.  Thus, Bowling's sub-claim fails.

### 4.   Warren Mitchell's Testimony

Bowling claims that Warren Mitchell's testimony, which presented the results of various tests he conducted on the revolver and gloves found along the road, also violated due process.  *See* R. 1 at 130–31.  Warren Mitchell was the firearms examiner for the Kentucky State Police Forensic Laboratory.  *See* 20 T.E. 3045.  At the time of Bowling's trial, he had more than thirteen years of experience in forensic examination with extensive training in various federal and state programs.  *See id.* at 3045–46.  On direct examination, he testified about his analysis of the "land and groove markings" made by the barrel of the .38 revolver police found by the highway.  *See id.* at 3048–51.  Mitchell concluded that they matched the markings found on bullets recovered from Smith and Hensley's bodies.  *See id.*  The use of land and groove analysis is a recognized method of ballistics analysis.  *See United States v. Williams*, 506 F.3d 151, 158–59 (2d Cir. 2007).  Mitchell then explained the three tests he conducted to determine whether the gloves found by the highway contained gun powder residue.  *See* 20 T.E. 3052.  He explained that through visual examination and chemical testing, he found that the gloves contained lead residue, but not any of the nitrites found in gun powder.  *See id.* at 3052–53.  Mitchell also explained similarities he found between the casings found in the revolver's chamber and the casings found in the box of bullets in Bowling's trailer.  *See id.* at 3053–56.

Bowling simply asserts that Mitchell "appeared to have little more than superficial knowledge about the subject matter."  R. 1 at 131.  He cites no authority supporting his

allegation.  And the record testimony that Bowling cites reveals that Mitchell was forthright about areas he was not qualified to speak on.  *See* 21 T.E. 3061–68.  The fact that Mitchell was not familiar with the economics of gun manufacturing, *see id.* at 3065–66, does not bear on his qualifications to offer a forensic opinion.  And even if Mitchell had only a "superficial knowledge," R. 1 at 131, Bowling still makes the same error as he did with Officer Phelps and Ed Bowling's testimony.  *See* Sections IV.B.1–3 *supra*.  He mistakes an argument about the state court's application of a state rule governing expert opinion for a federal due process challenge.  Regardless of whether Mitchell was qualified under state law, his testimony certainly did not fall within the "very narrowly" drawn category of evidence that violates constitutional due process.  *Dowling*, 493 U.S. at 352.  Thus, Bowling's sub-claim fails.

### 5.  Ronnie Freels and Jeffrey Scott Doyle's Testimony

Bowling claims that the prosecutor "misrepresented the significance" of the evidence that Ronnie Freels and Jeffrey Scott Doyle presented.  R. 1 at 131–32.  Freels was a "Forensic Ballistics Expert with the Kentucky Police, in Frankfort."  20 T.E. 3018.  Like Mitchell, Freels performed land and groove analysis of the bullets involved in the Smith and Hensley murders.  *See id.* at 3021–33.  Doyle was "a firearms and tool mark examiner" for the Kentucky State Police in Louisville.  See 21 T.E. 3070.  He also performed a lands and grooves analysis of the Smith and Hensley bullets, reaching the same results as Mitchell.  *See id.* at 3072–79.  Freels and Doyle conducted their analysis separately, with no knowledge of the other's findings. *See* 21 T.E. 3079.  Both testified that their analysis positively identified bullets from either the Smith or the Hensley murder as coming from the .38 revolver found

by the highway.[5]  *See* 20 T.E. 3026–33 (Freels: four bullets from Hensley and not analyzing the Smith bullets against the .38 revolver presented at trial); 21 T.E. 3078–39 (Doyle: one bullet from Smith and four bullets from Hensley).

Bowling's objection here is not about the witnesses' qualifications, but their presentations.  He claims that the prosecution misled the jury by using green and orange stickers.  *See* R. 1 at 131–32.  Since Freels and Doyle both analyzed a large number of bullets, both summarized their findings using pictorial charts.  *See* 20 T.E. 3024 (Freels); 21 T.E. 3093 (Doyle).  In order to signal the result for each bullet fired, both witnesses used green and orange stickers.  The green stickers signified a "positive" identification, i.e., where analysis showed the bullet was fired from the same gun.  *See* 20 T.E. 3031; 21 T.E. 3078. The orange stickers signified "the same class characteristics, meaning 5 grooves, right twist, and . . . same width measure of grooves."  20 T.E. 3029; 21 T.E. 3078.  Bowling faults the prosecution for characterizing the green dots as representing a "more positive identification." R. 1 at 131 (citing 20 T.E. 3032).   And he claims that the use of orange stickers was misleading because "the projectiles could have been fired from any one of a dozen different makes of guns."  R. 1 at 131.  He also claims that identifying these similarities "wasn't expert testimony, it was nothing more than conjecture."  *Id.*

But Bowling's criticism fails to realize that the ballistics analysis placed bullets on a continuum, ranging from absolutely no similarities to many similarities.  If a bullet recovered from either victim had the same number of grooves, twist direction, and width of grooves as

---

[5] Freels analyzed the Smith bullets on February 10, 1989, which was fifteen days before police found the murder weapon.  *See* 20 T.E. 3033.  Thus, Freels's inability to positively identify bullets from the Smith murder does not contradict Doyle's findings.

79

the .38 revolver, that information was relevant to the jury.  Identifying similarities among the bullets increased the possibility that the gun and the crimes were connected, even if they did not definitively prove it.  *See* 1 McCormick on Evidence § 185 (6th ed. 2009) (a relevant fact need not prove the entire case, just like "[a] brick is not a wall").  The bullets' groove number, twist direction, and groove width eliminated many calibers, makes, and models from the possible matches.  Thus, even the bullets with orange stickers had a fairly strong connection to the .38 revolver at issue.  And as the prosecutor's description made clear, the green stickers marked bullets with identifying markers beyond the grooves, twist, and width similarities.  *See* 20 T.E. 3032.  They were in fact more positively identified than the bullets with orange stickers because they had more identifying elements in common with the .38 revolver's bullets.  Thus, there was no "misrepresentation" by the prosecution.  R. 1 at 131. What's more, even if the prosecutor's characterization was improper, it was not "fundamentally unfair."  *Pritchett*, 117 F.3d at 964 (holding that improper prosecutorial comments are only fundamentally unfair where they are "so pronounced and persistent that [they] permeate[] the entire atmosphere of the trial").

More fundamentally, Bowling's criticism of Freels's and Doyle's testimony does not allege "fundamental unfairness."  Like his other sub-claims challenging expert testimony, Bowling's argument sounds in state evidence law, not federal due process.  *Compare,* R. 1 at 132 (citing to one state court decision involving expert medical opinion testimony), *with* Section IV *supra* (collecting cases reserving due process challenges for evidence outside the realm of standard statutory evidence law).  Thus, Bowling's sub-claim fails.

### 6.     R.J. Elkins and David Gross's Testimony

Bowling claims that testimony from R.J. Elkins and David Gross violated his due-process rights as well.  R. 1 at 132.  Elkins and Gross gave very similar testimony.  Elkins, a longtime friend who regularly visited Hensley at his station, 18 T.E. 2672–73, testified as follows.  Bowling entered the station one night several days before Hensley's murder.  *See id.* at 2673–74.  As Bowling was paying for his gas, Hensley attempted to engage him in conversation, but Bowling gave "no reply."  *Id.* at 2674.  While he was in the store, Bowling looked at Elkins and Hensley with "just kind of a strange look in his eyes; like he was trying to make a decision."  *Id.* at 2680.  Bowling gave "just kind of an intense look" at both men.  *Id.* at 2682.  Defense counsel objected to this characterization, but was overruled.  *See id.* at 2681.  The prosecution solicited similar testimony from Gross, an employee at Hensley's station.  *See id.* at 2694.  Gross described how Bowling bought 70 cents of gasoline from Hensley's station two weeks before the Hensley murder.  *See id.* at 2698.  When Bowling went to pay, Gross asked him to get an additional dollar and 30 cents of gas to make it an even two dollars, but Bowling declined.  *See id.* at 2698.  Instead of leaving, Bowling "sat outside around 20 minutes; around [the] air pumps."  *Id.* at 2699.  Elkins became "really concerned" because Bowling "just wasn't acting right."  *Id.*  However, Bowling left without incident.  *See id.*  The Kentucky Supreme Court held that both witnesses' testimony was admissible under Kentucky Rule 701.  *Bowling*, 942 S.W.2d at 305.  The state court reasoned that their testimony was based on personal experience and was "helpful to a clear understanding of the witness' testimony or determination of a fact in issue."  *Id.*

Neither Elkins nor Gross's testimony was "fundamentally unfair."  Like all Bowling's other sub-claims, Elkins and Gross's testimony falls within a recognized category of

evidence governed by statutory rule. *See* Ky. R. Evid. 701; *cf. Dowling*, 493 U.S. at 352 (rejecting due process challenges where courts can "deal with the potential for abuse through nonconstitutional sources"). And as with Officer Phelps's testimony, the state court's decision tracked the same logic federal courts have used in applying the federal rule. *See* Section IV.B.1 *supra*. Federal courts frequently allow such descriptions because lay witnesses often struggle explaining certain events without resorting to opinion testimony. *Gov't of Virgin Islands v. Knight*, 989 F.2d 619, 630 (3d Cir. 1993) (allowing lay opinion testimony where witness struggled to explain why a gunshot seemed "accidental"); *see also* Fed. R. Evid. 701, Advisory Committee's Note to 2000 Amendment. Here, Elkins obviously struggled to capture just what made Bowling's look "intense." 18 T.E. 2682. And Gross would have struggled to say just how "Bowling wasn't acting right." *Id.* at 2699. Declaring their testimony was "fundamentally unfair" on habeas appeal would reduce the Due Process Clause to a backstop for state evidentiary law. *See* Section IV *supra*. Thus, Bowling's sub-claim fails.

In sum, every one of Bowling's claims and sub-claims invites the Court to transform the Due Process Clause into a code of evidence. *Cf.* Henry J. Friendly, *The Bill of Rights as a Code of Criminal Procedure*, 53 Cal. L. Rev. 929, 953–54 (1965) ("[I]n applying the Bill of Rights to the states, the Supreme Court should not regard these declarations of fundamental principles as if they were a detailed code of criminal procedure, allowing no room whatever for reasonable difference of judgment or play in the joints."); *see also Lovasco*, 431 U.S. at 790. Accepting that invitation, especially on an issue of state evidentiary law, would do more than undermine current due process doctrine. It would turn federal habeas on its head. *See Gilmore v. Taylor*, 508 U.S. 333, 340–41 (1993) (stressing

the importance of "comity between federal and state courts" and that federal habeas should not intrude into "errors of state law" (citing *Estelle*)).  Thus, Bowling's claims fail.

## V.   Comparative Bullet Lead Analysis (Claims 51, 52, 2nd Amend. to Petition, 3rd Amend to Petition)

### A.   *CBLA Evidence as Brady Violation and Grounds for Vacating Death Sentence (Claim 52, 2nd Amend. Petition, 3rd Amend. Petition)*

One of the witnesses at Bowling's trial was FBI scientist Donald Havekost.  In its previous Opinion, the Court denied Bowling's claim that Havekost's testimony about Comparative Bullet Lead Analysis (CBLA) denied him due process and a fair trial.  *See* R. 245 at 101-09.  In Claim 52 and the second and third amendments to his habeas petition, Bowling claims two additional errors related to the CBLA evidence.  Claim 52 and the second amendment argue that the prosecution violated *Brady v. Maryland*, 373 U.S. 83, by failing to disclose information about the limitations of CBLA testimony, R. 1 at 262; R. 81 at 25, and the third amendment asserts that the Kentucky Supreme Court should have vacated his death sentence based on either the inadmissibility of the CBLA evidence or the *Brady* violation, R. 81 at 32.

These claims require differing standards of review.  The Kentucky Supreme Court addressed the merits of Bowling's *Brady* claim, *see Bowling*, 2008 WL 4291670, at *4, so the Court applies § 2254(d) deference to Claim 52 and the second amendment to the petition, *see Richter*, 131 S. Ct. at 786–87.  Conversely, the third amendment to the petition does not receive deferential review.  Bowling appears to have raised this claim in his state-court appeal, Appellant's Br. at 22, *Bowling v. Commonwealth*, 2008 WL 4291670 (Ky. Sept. 18, 2008) (No. 06-SC-34), App'x of App. Rec. 139, 167, but the Kentucky Supreme Court did

not consider it.  As a result, the Court reviews this claim *de novo*.  *See Nields v. Bradshaw*, 482 F.3d 442, 449–50 (6th Cir. 2007).

*Claim 52 and Second Amendment:* Bowling believes that the prosecution had a duty to turn over three kinds of information about the limitations of CBLA.  First, Bowling believes the prosecution should have told him that Havekost knew the retail distribution of bullets could cause two bullets from different ammunition boxes to share the same chemical composition.  R. 81 at 26; R. 159 at 226.  Retailers in a given geographical area may receive many bullets that a single manufacturer produced from the same batch of lead.  One retailer may therefore sell many bullets with the same chemical composition.  *See* National Research Council of the National Academies of Sciences, Forensic Analysis: Weighing Bullet Lead Evidence (2004), 6 Rule 60.02 Appeal Tr. 121, 185.  In a small city like London, Kentucky, only a few stores may sell bullets.  If those stores all receive bullets from the same lead batch of the same manufacturer, a large number of bullets sold in London will have identical characteristics.  As a result, without knowing more information about the geographical distribution of lead batches, the fact that two bullets share the same chemical composition might be purely coincidental.

Second, Bowling believes that he should have received a study co-authored by Havekost on the reliability of CBLA.  Havekost and other FBI forensic scientists tested bullets from four major U.S. manufacturers to determine how chemical composition varied between boxes.  Ernest R. Peele, Donald G. Havekost & Charles R. Peters, et al., *Comparison of Bullets Using the Elemental Composition of the Lead Component* 57, 57 *in* Proceedings of the International Symposium on the Forensic Aspects of Trace Evidence (1991) [hereinafter *Comparison of Bullets*].  Although Havekost and his co-authors

84

conducted this study in 1991, Bowling claims that the FBI did not release it publicly until 1994, two years after his trial.  R. 1 at 264 n.128.  The Warden does not dispute that claim.

In many ways, Havekost's 1991 study did more to confirm the validity of CBLA than to discredit it.  The authors found that "[a]ccurate, reproducible elemental concentration determinations in bullet leads can be obtained" using the FBI's methods, *Comparison of Bullets* at 65, and that CBLA was a "forensically significant" technique for "associating the victim, weapon, and suspect" in a criminal investigation.  *Id*. at 68.  Yet the study also invited questions about CBLA evidence.  Specifically, the study found that "it is reasonable to expect" that bullets "from boxes of the same type and brand of bullet, packaged near the same date" might share the same chemical composition.  *Id*.  In particular, boxes from Winchester—the manufacturer of the bullets that killed Smith and Hensley and of the bullets police found in Bowling's mobile home—had more distinct analytical groups in each box than bullets from other manufacturers.  That result stemmed from Winchester's "smaller production runs and more frequent component addition to the melted lead."  *Id*. at 62.  Several Winchester boxes also contained bullets with the same chemical composition.  Two boxes from the same date contained matching bullets, an "expected occurrence given the same packaging date for these two boxes."  *Id*.  Two boxes packaged seven months apart also contained bullets with identical compositions, a result "explained by a common production source and storage of components before cartridge loading."  *Id*.  Finally, Havekost's study recommended that the FBI test as many elements as possible because more elements improve CBLA's capability to differentiate among boxes and reduce "the potential for coincidental overlaps."  *Id*. at 65.

Third, Bowling believes Havekost should have informed him that the FBI database tracking the chemical composition of bullets did not contain "tens of thousands of rounds." R. 1 at 264 (quoting Havekost's testimony at trial, 21 T.E. 3121). Instead, Bowling points to more recent studies showing that in 2000, the FBI's database contained only 13,000 bullets. *See* R. 1 at 264 (citing Alicia L. Carriquay, et al., *Statistical Treatment of Class Evidence: Trace Element Concentrations in Bullet Lead*, at 3 (May 4, 2000)).

Certainly, the prosecution could have disclosed more information about the CBLA evidence. For example, the prosecutor could have provided Havekost's publications, a list of his publications, or a résumé including a list of his publications. The record does not indicate any such disclosure, and if Bowling had the study, then he could have attempted to impeach Havekost. But even so, the Kentucky Supreme Court did not unreasonably apply *Brady* when it held that Bowling did not suffer a constitutional violation.

A *Brady* claim has three elements. "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281–82. Bowling easily satisfies the first *Brady* prong: the Warden does not dispute that information about the flaws of CBLA would have been impeachment evidence. *See United States v. Bagley*, 473 U.S. 667, 676 (1985) ("[I]mpeachment evidence, . . . as well as exculpatory evidence, falls within the *Brady* rule.").

This evidence also meets the second *Brady* requirement because the prosecution did not disclose the possibility of coincidences in regional distribution, Havekost's 1991 study, or the size of the FBI database. Whether the prosecutor knew about these potential

86

weaknesses of CBLA makes no difference.  The *Brady* obligation to disclose applies even to "evidence known only to police investigators," and prosecutors have a duty "to learn of any favorable evidence known to the others acting on the government's behalf."  *Kyles*, 514 U.S. at 437–38.

Whether Bowling was prejudiced by the failure to disclose is more complicated, but Bowling ultimately suffered no prejudice.  The Kentucky Supreme Court's 2008 opinion ruled on only the CBLA evidence, holding that "nothing was withheld from defense counsel" because Bowling was capable of cross examining Havekost.  *Bowling*, 2008 WL 4291670, at *4.  But Bowling had other *Brady* claims, *see* Claims 18 & 45, Section VI.B. *supra*, and courts must consider the combined prejudicial effect of *all* of the prosecutor's failures to disclose.  *See Kyles*, 514 U.S. at 437–38; *Castleberry v. Brigano*, 349 F.3d 286, 291 (6th Cir. 2003) ("Because the state court applied only an item-by-item determination of materiality, the decision is contrary to the Supreme Court's decision in *Kyles*.").

A closer review, however, shows that the Kentucky Supreme Court had a perfectly good reason to adjudicate Bowling's claims piecemeal: Bowling argued them that way.  He raised his *Brady* claim about Havekost's testimony as a part of his Rule 60.02 appeal, and his brief did not discuss the prejudicial effect of evidence from his previous *Brady* claims.  *See* Appellant's Br. at 23–27, *Bowling v. Commonwealth*, 2008 WL 4291670 (No. 06-SC-34), App'x of App. R. 139, 168–72.  In 1997, the Kentucky Supreme Court denied Bowling's claim that the prosecution's failure to disclose Timothy Chappell's criminal history and psychiatric records violated *Brady*, *Bowling*, 942 S.W.2d at 304-05.  In 2002, it also denied his claim that the failure to disclose evidence about Chappell's federal charges violated *Brady*, *Bowling*, 80 S.W.3d at 409–10.  Bowling chose not to relitigate whether those pieces

of undisclosed evidence were prejudicial in his last state-court appeal.  *See* App'x of App. R.

at 168-72.  As a result, it was hardly unreasonable in 2008 for the Kentucky Supreme Court

to focus only on the claim Bowling presented.

And that final Kentucky Supreme Court decision was not an unreasonable application

of *Brady.*  Only evidence that creates the "reasonable probability" of "a different verdict" is

material under *Brady*'s third prong.  *Strickler*, 527 U.S. at 281.  A "reasonable probability"

exists only when the "favorable evidence could reasonably be taken to put the whole case in

such a different light as to undermine confidence in the verdict."  *Kyles*, 514 U.S. at 435.

Here, the retail distribution patterns of bullets increased the chance that the matches between

the bullets that killed Smith and Hensley and the bullets in Bowling's trailer were a

coincidence.  But standing alone, the greater chance of a coincidental match could not have

rendered Havekost's testimony meaningless.  To use a metaphor that Bowling himself

suggested, the CBLA evidence was "like a Nike shoe, size 10, found at a crime scene. . . . If

a suspect was found with the same type of snea[k]ers, it would be relevant evidence, it would

be admissible in court, although there would be a large number of people who might have

that type of shoe."  1 Rule 60.02 Appeal Tr. 20.  At best, the undisclosed evidence would

have shown that there were more owners of size 10 Nikes living around London.  That

information would have reduced the probative value of Havekost's analysis but not

discredited it.  Moreover, Bowling's lawyer already knew about the potential for a

coincidental match: he cross examined Havekost on the fact that up to 50,000 bullets could

share the same chemical signature.  21 T.E. 3133.

Havekost's 1991 study also did not completely discredit the CBLA evidence.  On the

contrary, the study emphasized that CBLA could produce "forensically significant" results

linking a suspect, weapon, and victim.  *Comparison of Bullets, supra*, at 68.  Even if

Bowling had known about the 1991 study and used it to impeach Havekost, the prosecutor

could have rehabilitated him with the conclusions supporting CBLA.  And to the extent that

Havekost's study did cast doubt on the utility of CBLA techniques, that doubt was already

present in the scientific literature.  If a defendant can obtain information through "minimal

investigation," *Brady* does not require the government to disclose it.  *Jalowiec v. Bradshaw*,

657 F.3d 293, 311 (6th Cir. 2011) (quoting *Coleman v. Mitchell*, 268 F.3d 417, 438 (6th Cir.

2001)).  Admittedly, the government's obligation to disclose may be higher when its witness

has authored a study casting doubt on his research methods.  But by the time of Bowling's

trial, criminal defendants had been attacking the reliability of CBLA evidence for more than

a decade.  *See, e.g.*, *Jones v. State*, 425 N.E.2d 128, 134–37 (Ind. 1981) (Hunter, J,

dissenting) ("The lack in certainty in [the government expert's] ultimate conclusion is further

emphasized by his testimony that as many as 100,000 bullets are produced from the same

batch of lead, that 200 boxes of bullets of similar composition would in turn result, and that

all retailers in a particular geographic area might consequently market bullets of similar

composition.").  Other metallurgical experts could have testified to the same flaws in CBLA

at Bowling's trial, regardless of whether they had consulted Havekost's 1991 study.  *Cf. Buie*

*v. McAdory*, 341 F.3d 623, 625–26 (7th Cir. 2003) (explaining that it is "neither a *Brady* nor

a *Giglio* problem" when a government expert makes "a statement more confident than the

science supports."  Rather, "[i]t is just a reason why defendants have the right to cross-

examine witnesses and present evidence of their own.").

　　Likewise, the true size of the FBI database would have had little effect on the jury's

verdict.  Havekost claimed the database had "tens of thousands" of rounds, 21 T.E. 3121,

when in reality in had fewer than 13,000, *see* R. 1 at 264.  But the fact that none of the bullets from the Smith and Hensley shootings matched the FBI database was relatively unimportant.  Havekost's chief finding was that the bullets used in the murders and the Rockcastle Sunoco shooting shared the same chemical composition as the bullets in Bowling's ammunition box.  Bowling's argument is akin to criticizing a fingerprint expert's testimony that prints at the scene matched the defendant's fingers by pointing out that the expert misstated the number of prints the police department has on file.  Information about the FBI database was therefore insufficiently material to undermine confidence in the jury's verdict.

Finally—and most importantly—the undisclosed information about CBLA was not prejudicial because CBLA was not the linchpin of the prosecution's case.  In fact, CBLA was not even the linchpin of the prosecution's forensic evidence.  As the Court explained in its previous opinion, the CBLA evidence was "corroborative" of other evidence linking Bowling to the crime.  R. 245 at 105–06 (quoting *Bowling*, 2008 WL 4291670, at *2).  Several other pieces of circumstantial evidence accomplished that task: (1) traditional "lands and grooves" ballistics tests linked the bullets that killed Smith and Hensley "to the handgun Bowling threw from his vehicle," *Bowling*, 2008 WL 4291670, at *2;  (2) Ricky Smith and Ora Lee Isaacs identified the revolver found along the side of the highway after the Rockcastle County shooting as belonging to Bowling, *id.*; and (3) the brown gloves Bowling threw out of his car during the police chase contained lead residue, *id*.  The prosecutor emphasized all this evidence in his closing argument, including the fact that the holster found in Bowling's trailer matched the unusual deformities of the trigger guard on the revolver used in the Rockcastle shooting.  *See* 24 T.E. 3578–95.  The Kentucky Supreme Court

90

determined that this additional evidence was so "compelling" that "the jury's verdict would have been the same even if [Havekost's] testimony had been excluded." *Bowling*, 2008 WL 4291670, at *3; *cf. Banks v. Dretke*, 540 U.S. 668, 700 (2004) (holding that a prosecution witness's undisclosed history of violent acts was material under *Brady* when the witness provided "crucial" testimony that was "uncorroborated by any other witness."); *Giglio v. United States*, 405 U.S. 150, 154 (1972) (holding that undisclosed evidence was material because it related to the credibility of a witness without whom "there could have been no indictment and no evidence to carry the case to the jury"). Because CBLA was merely corroborative evidence, its flaws could not have undermined confidence in the jury's verdict. As a result, the Kentucky Supreme Court did not unreasonably apply *Brady*, and Bowling cannot succeed on these habeas claims.

*Third Amendment:* Bowling's third amendment to his petition combines his first two: he argues that because the CBLA testimony violated due process and *Brady*, the Kentucky Supreme Court should have vacated his death sentence. R. 81 at 32. While the Court reviews this claim *de novo*, *see supra*, it fails even under that standard of review. As the Court has already explained, Bowling suffered neither a due-process nor a *Brady* violation from the CBLA evidence. *See* R. 245 at 101–09; *see also supra*. Zero constitutional harm from one claim plus zero harm from another equals zero total harm.

Even if the CBLA testimony did not affect his guilt, Bowling argues that the evidence still may have affected the jury's choice to sentence him to death. R. 81 at 32–33. Standing alone, this argument is pure speculation. Bowling does not explain why the CBLA evidence increased the likelihood that the jury would impose a death sentence instead of life imprisonment. The CBLA evidence did not affect any aggravating or mitigating factors,

imply any additional culpability, or suggest that Bowling's actions were particularly heinous. Rather, the evidence linked the murders to each other and to Bowling.  That link would have been relevant to the jury's deliberations in the guilt phase but not in the penalty phase.  The Supreme Court has rejected such "hypothetical analysis" of jury deliberations.  *Donnelly*, 416 U.S. at 644.  Thus, Bowling's claim fails.

### B.      *Ineffective Assistance for Failure To Secure Expert To Challenge Bullet Lead Testimony (Claim 51)*

Bowling argues that his trial counsel was ineffective for failing to find an expert who could counter the comparative bullet lead analysis (CBLA) testimony by FBI Agent Donald Havekost.  As the Court explained previously, Havekost testified that the bullets used to kill Smith and Hensley had identical chemical compositions to bullets from the Rockcastle Sunoco and an ammunition box in Bowling's trailer.  *See* R. 245 at 101–02.  After Bowling's trial, research found that bullet lead testimony, while still "appropriate" to "provide additional evidence that ties a suspect to a crime," was not as reliable as Havekost represented it to be.  National Research Council of the National Academies of Sciences, Forensic Analysis: Weighing Bullet Lead Evidence (2004); 2 T.R. for Rule 60.02 Appeal 121–22, 128-191.  Bowling had no expert to present testimony challenging Havekost's bullet lead analysis at trial.  Bowling not only claims that such expert testimony was necessary, he also argues that without expert assistance, his trial counsel could not cross examine Havekost effectively.

Bowling's lawyers did not intentionally go without expert assistance.  On February 28, 1992, Bowling's lawyers asked the state trial court for funds for an independent evaluation of the bullet lead evidence.  3 T.R. 339.  After four months without a ruling,

Bowling renewed his motion on July 6, 1992.  *Id.* at 427.  Three days later, the trial court granted the motion, and, in August, it ordered the Kentucky State Police to transport the bullet lead evidence to the Jefferson Regional Forensics Laboratory for testing.  4 T.R. 511. That plan had one slight problem: the Jefferson Laboratory did not have the equipment necessary for CBLA analysis.  Bowling's lawyers did not realize that limitation until August 25, 1992, when they asked the trial court to pay for analysis from an outside firm, University Analytical Microscopy Associates ("University Microscopy") in Louisville, Kentucky.  *Id.* at 542.  The trial court granted that request on September 9, 1992, and ordered that the examination "be done as quickly as possible."  *Id.* at 554.  Five days later, on September 14, the trial court ordered the Kentucky State Police to move the bullets from their laboratory in Louisville to University Microscopy, *id.* at 570, and that order was carried out the next day, *id.* at 598.

University Microscopy did not, however, share Bowling's sense of urgency.  The laboratory did not send Bowling's lawyers any reports, and none of their scientists testified as an expert for Bowling.  *See* Rule 11.42 Hr'g Video, Disc 3, 20:41:28–20:42:38 (testimony of one of Bowling's lawyers at state post-conviction hearing that he never received any reports or analysis from University Microscopy).  Even when Bowling's lawyers attempted to subpoena a University Microscopy expert, nothing happened.  R. 1 at 255.  One University Microscopy scientist later explained that their lab never tested the bullets.  *Id.*; *see also* 5 Rule 11.42 Appeal Tr. 731 (listing the affidavit of Dr. Alan Dozier as an exhibit at Bowling's Rule 11.42 hearing).  So after two weeks of inaction, the trial court ordered the Kentucky State Police to retrieve the evidence and bring it back to London because trial had started. 5 T.R. 615.

To prevail on an ineffective assistance of counsel claim, a defendant must show that his counsel's representation fell below an objective standard of reasonableness and that the result of the proceeding would have been different but for his counsel's errors. *Strickland*, 466 U.S. at 688, 694. The Kentucky Supreme Court held that Bowling could not meet the first prong of that test because his lawyers "recognized the importance of the bullet composition evidence and repeatedly moved the court for independent analysis of the evidence." *Bowling*, 80 S.W.3d at 415. Even if Bowling's lawyers were not up to snuff, the state court further held that Bowling suffered no prejudice because there was no "reasonable probability that the outcome of Bowling's trial would have been different" if University Microscopy actually had analyzed the bullet lead. *Id.* at 416. As a result, Bowling can only succeed on this claim by showing that the Kentucky Supreme Court unreasonably applied *Strickland* to his claim. 28 U.S.C. § 2254(d)(1). The U.S. Supreme Court has explained that this review is "doubly deferential." The Court must conduct a "highly deferential" evaluation of Bowling's lawyers through the "deferential lens of § 2254(d)." *Pinholster*, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at 689; *Mirzayance*, 556 U.S. at 121 n.2).

On any claim, double deference is a tough row to hoe. But this particular row is all the tougher because Bowling's real complaint is about University Microscopy, not his lawyers. Bowling's lawyers repeatedly sought expert assistance, and they successfully obtained funding. University Microscopy, not Bowling's lawyers, dropped the ball and left Bowling unable to present his own bullet-lead expert at trial. And only ineffective assistance by a defendant's counsel, not his expert witness, can violate the Sixth Amendment. *See Poyner v. Murray*, 964 F.2d 1404, 1419 (4th Cir. 1992) ("[T]here is no separately-cognizable claim of ineffective assistance of expert witnesses . . . .").

Admittedly, Bowling's lawyers could have done more. They could have asked for an expert witness earlier, more frequently, or with greater gusto. But Bowling presents no evidence that counsel should have known that University Microscopy would have been slow to analyze the bullets. *See* R. 159 at 219–25 (simply asserting that "waited too long"). The failure of defense lawyers to be psychic or pushy does not mean their performance was outside the realm of "reasonable professional judgment." *Strickland*, 466 U.S. at 690; *see also id*. at 689 (pointing out that "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable"). Rather, *Strickland* requires a defense lawyer to carry out the "basic duties" of representation that "will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. Bowling's lawyers did just that: they repeatedly asked for an expert witness, obtained funds for one, and even subpoenaed that expert in an attempt to compel his testimony. Despite those efforts, the expert failed to perform any analysis. A reasonably competent lawyer could have done little else to change that result.

And even if Bowling's lawyers erred in failing to procure a witness sooner, that mistake did not affect the trial's outcome. Bowling strings together a series of inferences to argue he was prejudiced by his lawyers' failures. According to Bowling, if his lawyers had obtained an expert sooner, that expert would have been able to testify at trial; if that expert had testified at trial, he would have cast doubt on the CBLA testimony; and if that expert had cast doubt on the CBLA testimony, the jury would not have reached a guilty verdict. The Kentucky Supreme Court denied those inferences as speculative, *see Bowling*, 80 S.W.3d at 416, and Bowling has done nothing to show that analysis was an unreasonable application of *Strickland*. Indeed, where a witness never testified at trial, "[s]peculation" about the

95

witness's testimony "cannot suffice to establish the requisite prejudice." *Pillette v. Berghuis*, 408 F. App'x 873, 887 (6th Cir. 2010) (citing *Bentley v. Motley*, 248 F. App'x 713, 717 (6th Cir. 2007)); *see also Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (holding the same specifically for expert witnesses).

For his part, Bowling argues that "Kentucky's subsequent *Ragland* decision," which held that CBLA evidence was not sufficiently reliable to be admitted as evidence, "ends the inquiry" into whether the lack of a defense expert was prejudicial. R. 159 at 224. But *Ragland* relied on recent studies to conclude that CBLA was unreliable. *See Ragland v. Commonwealth*, 191 S.W.3d 569, 578 (Ky. 2006) (citing four studies published between 2002 and 2004 that cast doubt on CBLA). Bowling's hypothetical expert could not have known about those studies more than a decade earlier. In fact, in 1992, a defense expert might even have agreed with Havekost. *See Bowling*, 80 S.W.3d at 416 ("[I]ndependent analysis may have increased the level of confidence in Havekost's results."). In 1998, Bowling presented the testimony of Dr. Robert J. Block at his state post-conviction hearing. Based on his own tests, Block believed that there were only three distinct groups of bullets, rather than the seven that Havekost found. *Id.* at 415–16. He also claimed that Havekost should have conducted more rigorous statistical analysis. *Id.* But that testimony alone is not sufficient to show that the Kentucky Supreme Court's factual determination was unreasonable. If a 1991 study by Havekost is any indication of the state of scientific research on CBLA at the time of Bowling's trial, a defense expert might plausibly have testified that CBLA was a "forensically significant" technique for "associating the victim, weapon, and suspect" in a criminal investigation, *Comparison of Bullets, supra*, at 57, 68.

Finally, even assuming that a defense expert would have introduced doubt about Havekost's testimony, that doubt alone would not have created a "substantial" likelihood of a different result. *Pinholster*, 131 S. Ct. at 1403 (quoting *Richter*, 131 S. Ct. at 791). As the Court has previously explained, the Kentucky Supreme Court found that CBLA was merely "corroborative" of other evidence. R. 245 at 105–06 (quoting *Bowling*, 2008 WL 4291670, at *2); *see also* Claim 52, Section V.A. *supra*. Even without the Havekost's testimony, the jury would have convicted Bowling of both murders. *Id*. That determination was not unreasonable, so this Court must defer to it. *See* 28 U.S.C. § 2254(d)(2). Consequently, even an effective challenge of the CBLA testimony would have made little difference to the jury's verdict. *See, e.g.*, *Thorne v. Timmerman-Cooper*, No. 09-4098, 2012 WL 1130420, at *12 (6th Cir. Apr. 4, 2012) (holding that a defendant did not suffer prejudice when there was "overwhelming" evidence that "corroborated" the testimony of a witness the defendant's lawyer should have impeached); *Gonzales v. Elo*, 223 F.3d 348, 357 (6th Cir. 2000) (holding that a defendant did not suffer prejudice from his attorney's failure to challenge the testimony of a government witness when "several witnesses corroborated the government's version of events"); *Mapes v. Coyle*, 171 F.3d 408, 425 (6th Cir. 1999) (concluding that a defendant was unable to establish prejudice when "corroborating evidence was admitted indicating he was the shooter"). And if his lawyers' actions would not have made a difference, Bowling did not suffer any prejudice under *Strickland*. Thus, Bowling's claim fails.

## VI.   Testimony of Timothy Lyle Chappell (Claims 18, 19, 45, 46, 47)

Timothy Lyle Chappell testified at trial that Bowling confessed to the two murders while they shared a cell in Laurel County Jail. *See* 18 T.E. 2623, 2626–29. Bowling makes

five claims based on Chappell's testimony.   First, he says that Chappell acted as a government agent, and thus, his testimony should have been excluded under *Massiah v. United States*, 377 U.S. 201 (1964).  R. 1 at 127–28 (Claim 19).  He also argues that: (1) the prosecutor failed to disclose Chappell's prior criminal history and psychiatric records in violation of *Brady v. Maryland*, 373 U.S. 83, R. 1 at 124-27 (Claim 18); (2) the prosecutor failed to disclose Chappell's various federal and state charges in violation of *Brady*, *Giglio v. United States*, 405 U.S. 150, and *Napue v. Illinois*, 360 U.S. 264, R. 1 at 197–222 (Claim 45); (3) his defense counsel failed to discover these charges and thus was ineffective, *id.* at 222–25 (Claim 46); and (4) his defense counsel was ineffective when he failed to investigate and then call Gilbert Jones as a witness at trial, *id.* at 225–27 (Claim 47).   None of these claims warrants relief.

### A.    *Suppression of Chappell's Testimony Under* Massiah *(Claim 19)*

Bowling brought a pretrial motion to suppress Chappell's testimony as a violation of his Sixth Amendment rights under *Massiah v. United States*, 377 U.S. 201.  *See* 2 T.E. 23133.  The trial court denied his motion.  *See* 3 T.E. 435–46.  Bowling challenged that ruling in his direct appeal.  *See* Appellant's Br. at 85–86, *Bowling v. Commonwealth*, 942 S.W.2d 293 (Ky. 1997) (No. 92-SC-1035), App'x of App. R. 1034–35.  The Kentucky Supreme Court did not address his claim in either of its opinions.  *See Bowling*, 942 S.W.2d 293; *Bowling*, 80 S.W.3d 405.  Accordingly, the Court reviews it *de novo*.  *See Rice v. White*, 660 F.3d 242, 252 (6th Cir. 2011).

While detained on the murder charges, Bowling shared a cell with Chappell in the Laurel County Jail.  *See* R. 1 at 28.  At the time, Bowling was represented by counsel. Bowling claims that Chappell obtained a confession from Bowling while working as a

government informant.   R. 159 at 167.   If true, Chappell's testimony would violate Bowling's Sixth Amendment rights under *Massiah*, 377 U.S. 201.

Bowling, however, offers no evidence to demonstrate that Chappell was working for the government at the time Bowling allegedly confessed.   *United States v. Henry*, 447 U.S. 264, 269–70 (1980) (finding no constitutional violation where witness was not "acting as an agent of the Government" when defendant made incriminating statements).   To be an "informant" under the *Massiah* doctrine, there must be "an express or implied agreement between the State and the informant at the time the elicitation took place that supports a finding of agency." *Ayers v. Hudson*, 623 F.3d 301, 311–12 (6th Cir. 2010).   Otherwise, the individual acted alone and the government did not "knowingly circumvent[] the accused's right to have counsel."   *Maine v. Moulton*, 474 U.S. 159, 176 (1985) (holding that a codefendant wearing a wire furnished by government agents and then eliciting details about the crime violated *Massiah*).

The evidence offered by both the Commonwealth and Bowling confirms that Chappell was not a government informant.   At the suppression hearing, Detective Johnny Phelps testified that Chappell contacted the state's investigators after Bowling had allegedly confessed to him.   *See* 2 T.E. 236.   The post-conviction affidavit that Bowling submits from Barbara Carnes, Chappell's lawyer in his federal case, confirms that sequence of events.   *See* 2 T.R. for Rule 11.42 Appeal 296–98.   Carnes attests that Chappell informed her of information he had received from Bowling *before* he talked to federal or state agents.   *Id.* at 296; *see also* 4 T.E. for Rule 11.42 Appeal 502 (Assistant United States Attorney relaying to federal district court at sentencing that Chappell had approached them with the information, not that Chappell acted as an informant directed by the government).   Carnes's affidavit thus

forecloses the "silver platter" theory that Bowling advances in his brief.  *See* R. 1 at 128 (arguing that Chappell's status as an agent of the federal government would bar him from delivering Bowling's confession to state authorities on a "silver platter").   The fact that Chappell obtained his information from Bowling before approaching federal and state authorities means that Chappell could not have been a government agent under the *Massiah* doctrine.  Thus, Bowling's claim fails.

### B.     **Brady** *and* **Giglio** *Evidence (Claims 18, 45)*

#### 1.     **Chappell's Criminal and Psychiatric Records (Claim 18)**

Bowling argues that the prosecution's failure to disclose Chappell's prior psychiatric records and criminal history violated *Brady v. Maryland*, 373 U.S. 83.  R. 1 at 124–27; R. 159 at 164–67.  The Kentucky Supreme Court rejected this claim on direct appeal.  *See Bowling*, 942 S.W.2d at 304–05.  The state court found that there was no suppression of psychiatric records because "there [wa]s no showing that any such evidence existed."  *Id.* at 304.  It further determined that the prosecution met "the *Brady* standard of disclosure" regarding Chappell's criminal history.  *Id.*  And the state court concluded that Bowling "fail[ed] to show how any of the requested information allegedly not disclosed could have possibly affected the outcome."  *Id.* at 305.  Those determinations deserve deference under § 2254(d).  Therefore, the Court must reject Bowling's claim "if it is possible fairminded jurists could disagree" that the state court's holding was "inconsistent with the holding in a prior decision of [the Supreme] Court."  *Wetzel v. Lambert*, 132 S. Ct. 1195, 1198 (2012) (applying the *Richter* standard in addressing a *Brady* claim brought on collateral review (quoting *Richter*, 131 S. Ct. at 786)).

To overturn a conviction on a *Brady* claim, "a convicted defendant must make each of three showings: (1) the evidence at issue is 'favorable to the accused, either because it is exculpatory, or because it is impeaching'; (2) the State suppressed the evidence, 'either willfully or inadvertently'; and (3) 'prejudice . . . ensued.'" *Skinner v. Switzer*, 131 S. Ct. 1289, 1300 (2011) (quoting *Strickler*, 527 U.S. at 281–282). The state court correctly rejected Bowling's psychiatric-records theory at the first step. *See Bowling*, 942 S.W.2d at 304. Bowling fails to provide any proof that a psychiatrist evaluated Chappell or that records of such an evaluation existed. *See* R. 1 at 126–27; R. 159 at 167. Explicit in the term "*Brady* material," is the notion that there is actual "material" for the prosecution to disclose. *See Bell v. Bell*, 512 F.3d 223, 234 (6th Cir. 2008) (en banc) (quoting *Todd v. Schomig*, 283 F.3d 842, 849 (7th Cir. 2002)). Bowling's assertion that "it is not unreasonable to assume that a psychiatric examination had been performed in the past," R. 1 at 126, is not sufficient to meet the first prong of *Brady*. *See Skinner*, 131 S. Ct. at 1300. Without some evidence that there was, in fact, undisclosed evidence, Bowling's psychiatric-records theory fails.

Bowling's criminal-history theory suffers from the same basic flaw. He never identifies a conviction, arrest, or other event in Chappell's "criminal history" that went unrevealed at trial. R. 1 at 125–26. And he never explains why those allegedly undisclosed parts of Chappell's criminal history were "material" under *Brady*. Instead, Bowling devotes both his initial brief and his reply brief to arguing that the prosecutor "suppressed" Chappell's criminal record. *Id.* at 124–26; R. 159 at 164–67. With no showing on the first prong (that there was "evidence . . . favorable to the accused") or the third prong (that "prejudice . . . ensued"), Bowling's claim fails. *Skinner*, 131 S. Ct. at 1300 (quotation omitted).

Finally, the state court reasonably determined that Bowling "fail[ed] to show how any of the requested information allegedly not disclosed could have possibly affected the outcome." *Bowling*, 942 S.W.2d at 305.  Defense counsel questioned Chappell—to great effect—about the favorable sentence he received in federal court for testifying against Bowling.  *See* Claim 45 & 46, Section VI.B.2 and C.1 *infra*.  Bowling never identifies anything in Chappell's criminal or psychiatric histories that would "have permitted the development of alternate theories or different lines of argument" to impeach Chappell.  *Bell*, 512 F.3d at 237.  And because Chappell "was effectively impeached at trial," evidence providing "additional reasons not to credit his testimony . . . would have been cumulative to the evidence already in the record."  *Brooks v. Tenn.*, 626 F.3d 878, 894 (6th Cir. 2010). Consequently, the state court's determination that Bowling was not prejudiced under *Brady* was consistent with *Brady*'s application by other "fairminded jurists."  *Lambert*, 132 S. Ct. at 1198 (quotation omitted).  Thus, Bowling's claim fails.

## 2.    Chappell's Federal and State Charges (Claim 45)

Claim 45 makes three different sub-claims.  Bowling argues that the prosecution: (1) violated *Giglio* by failing to correct Chappell's and attorney Barbara Carnes's "false" testimony about Chappell's federal charges; (2) violated *Brady* by not disclosing charges Chappell faced in Leslie County; and (3) violated *Brady* by not disclosing charges Chappell faced in Fayette County.  *See* R. 1 at 200–19 (citing *Giglio*, 405 U.S. 150; *United States v. Agurs*, 427 U.S. 97, 104 (1976) (applying *Brady*, 373 U.S. 83)); R. 159 at 194–06 (citing same).  None of these sub-claims justify relief.

***False testimony about Chappell's federal charges:***  At the time he agreed to testify against Bowling, Chappell faced four counts of mail fraud in federal court.  2 T.R. for Rule

11.42 Appeal 296.  The prosecution presented two witnesses who testified that Chappell did not receive any benefit in his federal case for cooperating in the Commonwealth's prosecution of Bowling.  One was Chappell.  18 T.E. 2631.  The other was Barbara Carnes, Chappell's federal public defender.  Carnes happened to be in the courthouse during Bowling's trial and was pulled out of the courthouse library by the prosecution without prior notice or a chance to review her three-year-old file on Chappell's case.  *See id.* at 2650–52.  Understandably, she was not as definitive as Chappell, testifying that she could not remember Chappell receiving any benefits in exchange for his cooperation.  *See id.* at 2663–64.  Bowling now claims that the prosecution's failure to correct their testimony violated his due-process rights.  *See* R. 1 at 200–210; R. 159 at 195–201.

Since the prosecution presented Chappell and Carnes's testimony, Bowling's claim is a *"Brady/Giglio* false-testimony claim[]" rather than a "traditional *Brady* withholding claim[]."  *Rosencrantz v. Lafler*, 568 F.3d 577, 583–84 (6th Cir. 2009) (quotations omitted).  A *Brady/Giglio* claim has its own three-part showing.  Defendants "must show (1) that the prosecution presented false testimony, (2) that the prosecution knew was false, and (3) that was material."  *Akrawi v. Booker*, 572 F.3d 252, 265 (6th Cir. 2009) (citation omitted).  The term "material" has a different meaning for *Brady/Giglio* claims than standard *Brady* claims.  False testimony introduced by the prosecution is "material" where it "could . . . in any reasonable likelihood have affected the judgment of the jury."  *Carter v. Mitchell*, 443 F.3d 517, 535 (6th Cir. 2006) (quoting *Giglio*, 405 U.S. at 154) (internal quotation marks omitted).  This is a less demanding standard than what traditional *Brady* withholding claims require.  *See id.*; *Rosencrantz*, 568 F.3d at 584.

The Kentucky Supreme Court addressed the merits of Bowling's claim. *Bowling*, 80 S.W.3d at 409–10. But it did so by applying the incorrect—and more stringent—test for traditional *Brady* withholding claims. *See id.* Its decision to apply *Brady* was "contrary to" clearly established federal law under § 2254(d)(1). *See Williams*, 529 U.S. at 405 ("A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases."). Thus, the Court must "review the merits of the petitioner's claim de novo." *Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006) (citing *Magana v. Hofbauer*, 263 F.3d 542, 551 (6th Cir. 2001) (citing *Williams*, 529 U.S. at 396–98)). That review requires an assessment of the claim's merits as well as "an independent determination of whether the alleged error . . . resulted in actual prejudice per *Brecht*." *Lorraine v. Coyle*, 291 F.3d 416, 444 (6th Cir. 2002); *see also Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (defining the standard for "actual prejudice" as "whether the error had substantial and injurious effect or influence in determining the jury's verdict'" (internal quotation marks omitted)). While *de novo* review is a more favorable standard than § 2254(d), Bowling still bears the burden of making all three showings under the *Brady/Giglio* test. *See Rosencrantz*, 568 F.3d at 584 (citing *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000) (placing the burden on the habeas petitioner)). He has not done so.

Carnes did not testify falsely. She qualified her testimony by saying that she had not had a chance to review Chappell's file, *see* 18 T.E. 2661, and repeatedly confessed that she could not remember the particulars of Chappell's case three years later. *See id.* at 2660, 2663–64. Confessing a faulty memory is not testifying falsely, and Bowling therefore cannot satisfy the first prong of the *Brady/Giglio* false statements test with respect to Carnes's testimony.

Nor does Chappell's testimony support Bowling's claim. For the purposes of this decision, the Court assumes (without deciding) that Chappell's testimony meets the first two prongs of the *Brady/Giglio* test. Chappell testified that he did not receive "anything of benefit" from "anyone" in the Government for his cooperation in Bowling's case. 18 T.E. 2631. That was a lie. At Chappell's federal sentencing hearing, the Assistant United States Attorney explicitly asked the judge to consider Chappell's cooperation in Bowling's case. *See* 2 T.R. for Rule 11.42 Appeal 278.

But meeting the first two prongs of the *Brady/Giglio* three-part test is not enough, and Bowling falters at the final step. Bowling must demonstrate a "reasonable likelihood" that Chappell's false testimony affected the verdict. *Carter*, 443 F.3d at 537 (internal quotation marks omitted). And for there to be a "reasonable likelihood" that Chappell's uncorrected testimony affected the verdict, two things must be reasonably likely. First, the jury must have found Chappell credible. After all, Bowling cannot claim that additional impeachment evidence would have affected the jurors' deliberations if he cannot demonstrate a "reasonable likelihood" that the jury found Chappell's uncorrected testimony credible in the first place. Second, Chappell's uncorrected testimony must have been the difference in the jury's decision to find Bowling guilty; otherwise, correcting his testimony would not have tipped the balance of evidence. If Bowling cannot establish a "reasonable likelihood" on either point, then Chappell's false testimony was not material to the jury's verdict.

Bowling fails to make the first "reasonable likelihood" showing because his defense counsel effectively impeached Chappell. Defense counsel called attention to the nature of Chappell's federal conviction. Through cross examination, he pointed out that Chappell had been convicted of one count of felony mail fraud, was originally charged with four counts,

and could have faced more.  18 T.E. 2632–33.  A conviction for fraud was "peculiarly probative of [Chappell's] credibility" because it "involves some element of deceit, untruthfulness, or falsification bearing on [his] propensity to testify truthfully."  Fed. R. Evid. 609, Advisory Committee's Note to subdivision (a) of 1974 Enactment.

Further, defense counsel questioned Chappell and Carnes at length about the drastic reduction of Chappell's federal sentence.  18 T.E. 2634–39, 2648–49 (Chappell); *id.* at 2655–63 (Carnes).  Counsel established that Chappell had no plea agreement before he offered to testify against Bowling and then had all but one charge dropped after he implicated Bowling. *Id.* at 2634–39.  Thus, disclosing the United States Attorney's request for lenience would have only confirmed what defense counsel's questions already demonstrated.  *See Bell*, 512 F.3d at 237; *Heishman v. Ayers*, 621 F.3d 1030, 1035 (9th Cir. 2010).  In addition, defense counsel exposed the lack of credible details in Chappell's account.  Counsel demonstrated that Chappell could not specify when Bowling had confessed to him and pointed out that it was likely that one of their cellmates would have overheard any confession.  18 T.E. 2636–2643.

Finally—and most importantly—Chappell admitted that he lied to investigators in an attempt to implicate Bowling.  On cross examination, defense counsel established that Chappell first told investigators that Bowling had confessed to murdering Kentucky State Trooper Johnny Edrington.  *See id.* at 2640.  But the police discounted Chappell's claims because they "didn't coincide[] with what the actual evidence was" in the Edrington case.  19 T.E. 2874.  So when Chappell next approached investigators, he claimed that he had witnessed Bowling's confession to the Smith and Hensley murders.  *See* 18 T.E. 2640.  The revelation that Chappell was willing to hang a false murder charge on Bowling was more

damning than confirmation of something the jury could already surmise—that Chappell received a lighter federal sentence in return for his testimony. *See, e.g., Heishman*, 621 F.3d at 1035 (holding that impeachment evidence was not "reasonably likely . . . [to] have swayed the jury" where it was "similar to and cumulative of the extremely thorough impeachment during [defense counsel's cross-examination]"); *cf. Brooks*, 626 F.3d at 894 (holding the same for cumulative impeachment evidence under *Brady*).

During closing argument, the defense effectively used all of the above to hammer away at Chappell's credibility. *See* 24 T.E. 3558–60. What's more, the prosecution's own closing argument effectively admitted that the defense had discredited Chappell. Instead of trumpeting Chappell's testimony as proof of Bowling's guilt, the prosecutor had to engage in damage control. Except for half of a sentence, the prosecutor's entire discussion of Chappell in closing argument was spent attempting to rebut the defense's impeachment of Chappell's testimony. *See id.* at 3568–70. And even that half of a sentence was still largely framed as a response to the defense's arguments. *See* 24 T.E. 3570 (asserting that the defense would "rather rake . . . a red herring across the trail, of a true confession made by that man as to the murders that he's charged with, to get you off the trail").

The prosecutor's closing argument also speaks to Bowling's failure to make the second "reasonable likelihood" showing. Bowling has not demonstrated a "reasonable likelihood" that Chappell's testimony was a decisive factor in the jury's verdict. As closing arguments made clear, Chappell was not "the 'keystone' of the prosecution's case." *Carter*, 443 F.3d at 537; *Foley v. Parker*, 488 F.3d 377, 392 (6th Cir. 2007) (rejecting *Giglio* claim where the witness "was not a crucial link" in the prosecution's case); *see also Wogenstahl v. Mitchell*, 668 F.3d 307, 325–26 (6th Cir. 2012). The prosecution presented ample evidence

more compelling than Chappell's testimony. Ricky Smith testified that Bowling entered the
Sunoco shortly after 6:00 a.m., surveyed the station to make sure they were alone, and then
opened fire on Smith with a pistol. 19 T.E. 2768–77. Bowling emptied his revolver as
Smith ducked behind the counter and fled after Smith returned fire. *Id.* at 2774–76. When
police cruisers approached Bowling's car, he accelerated—leading officers on a high-speed
chase over thirty miles and often exceeding 100 miles per hour. *Id.* at 2812–21. During the
chase, officers saw Bowling throw a pair of brown gloves out of his car's window, which
they retrieved after the chase. 19 T.E. 2822–23. Those brown gloves "contained lead
residue." R. 245 at 106 (citing *Bowling v. Commonwealth*, No. 2006-SC-000034-MR, 2008
WL 4291670, at *2 (Ky. Sept. 18, 2008)). Several hours later, officers conducting a roadside
search for evidence found a .38-caliber revolver lying on top of the snow near the road where
the chase first started. 19 T.E. 2847–52. Traditional "lands and grooves" ballistics tests
linked that revolver to the Hensley and Smith murders. *See* R. 245 at 105 (citing R. 1 at 20–
21). In addition, both Ricky Smith and Oral Lee Isaacs testified that the revolver looked like
the gun each had seen in Bowling's possession. R. 245 at 105–06 (citing *Bowling*, 2008 WL
4291670, at *2). In turn, the prosecution dedicated the vast bulk of its case in chief and
closing argument to these connections instead of Chappell's testimony. *See* 17 T.E. 257322
T.E. 3218; 24 T.E. 3564–98. Nevertheless, Bowling argues that the prosecution *should* have
disclosed Chappell's favorable sentence. But he never shows that Chappell's testimony
made a difference at trial. *See* R. 1 at 201–10; R. 159 at 195–201. Therefore, Bowling fails
to show that Chappell's testimony was more than a single drop in the bucket of evidence
against him.

Finally, considering the two likelihoods in tandem (that Chappell's credibility turned on the undisclosed federal sentencing transcript and that Bowling's sentence turned on Chappell's uncorrected testimony) solidifies the conclusion that there was not a "reasonable likelihood" of a different verdict. Defense counsel so thoroughly discredited Chappell that the prosecutor's closing argument had to perform argumentative triage on Chappell's credibility. *See* 24 T.E. 3568–70; *Heishman*, 621 F.3d at 1035. And Chappell "was not a crucial link" in the prosecution's case anyway. *Foley*, 488 F.3d at 392. Highly questionable evidence, playing a highly limited role at trial, is highly unlikely to have affected the outcome. There is not "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Rosencrantz*, 568 F.3d at 584 (citing *Agurs*, 427 U.S. at 104). Thus, Bowling's claim fails.

***Leslie and Fayette County charges:*** Bowling's additional two sub-claims allege that the prosecution failed to disclose various state charges that were pending against Chappell at the time of Bowling's trial. First, he argues that the prosecution should have disclosed "information on why Chappell's Leslie County charges" for assault and kidnaping "were mysteriously dropped." R. 159 at 201. Second, he argues that the prosecution should have disclosed Chappell's "pending charges in Fayette County for two counts of Rape and one count of Kidnaping." *Id.* at 204. The Kentucky Supreme Court denied both claims on direct appeal, *see Bowling*, 80 S.W.3d at 410–11, so the Court must apply § 2254(d) deference to the state court's judgment, *see Richter*, 131 S. Ct. at 785–86. Since Bowling does not allege that the prosecutor elicited false testimony concerning any of these charges, the traditional three-prong *Brady* test governs these claims. *See Brady*, 373 U.S. 83; *see also Rosencrantz*, 568 F.3d at 583–84.

109

Both sub-claims falter on the materiality portion of the *Brady* test. Bowling himself characterizes the dismissal of the Leslie County charges as "a mystery." R. 1 at 211. A mystery is not a showing. And Bowling has the burden to identify facts about the Leslie County dismissal that would be favorable to his defense; the Court cannot presume them. *See Bell*, 512 F.3d at 234 (quoting *Schomig*, 283 F.3d at 849). His failure to show extant information "favorable" to the defense sinks his claim. *Skinner*, 131 S. Ct. at 1300 (quotation omitted). And while there were actual charges pending in Fayette County, the Kentucky Supreme Court ruled that they were inadmissible under state law. *Bowling*, 80 S.W.3d at 411 (citing *Adcock v. Commonwealth*, 702 S.W.2d 440, 441 (Ky. 1986)). Those charges were thus not "material" under *Brady*. *See Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (holding that evidence that is inadmissible under state law "is not 'evidence' at all" for *Brady* purposes). For all of these reasons, the state court's decision was not "objectively unreasonable" under § 2254(d). *See Williams*, 529 U.S. at 409. Thus, Bowling's claim fails.

### C.    *Ineffective Assistance of Counsel (Claims 46, 47)*

#### 1.    **Failure to Investigate Chappell (Claim 46)**

Bowling claims, in the alternative, that if the prosecution had no obligation to disclose Chappell's federal and state charges, defense counsel had a duty to investigate them. *See* R. 1 at 224; R. 159 at 207–10. Specifically, Bowling faults his trial counsel for failing "to investigate and obtain" Chappell's federal sentencing transcript. R. 1 at 224. The Kentucky Supreme Court did not address this claim. In fact, the state court stressed that defense counsel could have obtained the transcript in finding that the prosecution complied with *Brady*. *See Bowling*, 80 S.W.3d at 410 (addressing what is now Claim 45). Accordingly, the

Court reviews Bowling's claim *de novo*. *See Amos*, 683 F.3d at 731 (citing *Maples*, 340 F.3d at 436).

The Court applies *Strickland*'s two-part test, though without the normal "doubly deferential judicial review." *See* Section I *supra*. As for deficient performance, trial counsel testified at the Rule 11.42 hearing that he "was remiss" for not obtaining a copy of the Chappell's federal sentencing transcript. *See* Rule 11.42 Hr'g Video, Disc 3, 20:29:49–29:30:07. The Warden fails to offer any strategic reason for defense counsel's failure to obtain the transcript. *See* R. 114 at 152–53. The transcript was just as available to defense counsel as it was to the prosecution. And a careful review of the record confirms that defense counsel's failure to obtain the transcript "was not the result of an informed tactical decision about how the lawyers' time would best be spent." *Rompilla v. Beard*, 545 U.S. 374, 395 (2005) (O'Connor, J., concurring). Thus, trial counsel's investigation was unreasonable under the circumstances. *See Strickland*, 466 U.S. at 691.

But Bowling also has the burden of showing prejudice. *See id.* ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."). As Bowling himself acknowledges, the "prejudice" standard under *Strickland* is the same as the "prejudice" standard under *Brady*: a "reasonable probability" of a different outcome. *See* R. 1 at 227; *see also Owens v. Guida*, 549 F.3d 399, 415 (6th Cir. 2008) ("Prejudice in the Brady sense means the same as in the Strickland sense: a reasonable probability that there would have been a different result had the evidence been disclosed." (citing *Kyles*, 514 U.S. at 434)). As the Court has already held on Bowling's *Brady/Giglio* claim, there was not a "reasonable likelihood" that the prosecution's failure to disclose Chappell's federal sentencing transcript affected the jury's

verdict.  *See* Section VI.B.2 *supra*.  And if there was not a "reasonable *likelihood*" under the *Brady/Giglio* standard, then there cannot be a "reasonable *probability*" under the more demanding *Brady* or *Strickland* standards.  Accordingly, any deficiencies in trial counsel's investigations did not "prejudice" Bowling because counsel still effectively impeached Chappell.  *See* Section IV.B.1 *supra* (citing *Bell*, 512 F.3d at 237; *Brooks*, 626 F.3d at 894).  Thus, Bowling's claim fails.

### 2.      Failure to Investigate and Call Gilbert Jones (Claim 47)

Bowling claims that he received ineffective assistance of counsel because his trial counsel did not adequately investigate Gilbert Jones's potential as a witness to impeach Chappell.  R. 1 at 225–27.  The Kentucky Supreme Court denied this claim in Bowling's state habeas appeal.  *See Bowling*, 80 S.W.3d at 412.  Accordingly, the Court applies § 2254(d) deference to the state court's decision.  *See Richter*, 131 S. Ct. at 785–86.

If Jones had testified at trial, he could have offered testimony impeaching Chappell.  *See* R. 1 at 226.  Jones had been in jail at the same time as both Chappell and Bowling.  *See* Rule 11.42 Hr'g Video, Disc 1, 14:07:07–14:09:36.  According to Jones, Chappell had "personally told" him that "he was gonna make something up on Ronnie to try and . . . get hisself [sic] out of jail."  *Id.* at 14:08:46–14:08:56.  But Bowling's counsel never called Jones as a witness at the trial.  Instead, counsel chose to impeach Chappell through cross examination.  Defense counsel called attention to Chappell's felony fraud conviction, revealed the drop in Chappell's federal sentence after he agreed to testify against Bowling, exposed the lack of detail in Chappell's account, and forced Chappell to concede that he only implicated Bowling in the Smith and Hensley murders after investigators did not believe his

story that Bowling was involved in the Edrington murder.  *See* Section VI.B.2 *supra* (citing 18 T.E. 2636–2643; 19 T.E. 2874; 24 T.E. 3558–60).

At the Rule 11.42 hearing, Bowling's counsel testified that not calling Jones was a strategic decision.  He explained that calling Jones would have complicated his argument, forcing him to tell the jury, "Don't believe this felon [Chappell], believe my felon [Jones]." *Bowling*, 80 S.W.3d at 412.  The Kentucky Supreme Court accepted that logic, ruling that Bowling did not "overcome the strong presumption that counsel was effective" in impeaching Chappell.  *Id.* (citing *Strickland*, 466 U.S. at 690).

But Bowling insists that this was an unreasonable application of established federal law.  R. 1 at 227.  While he concedes that the choice not to call Jones was strategic, he insists that the choice itself rested on a flawed investigation.  R. 1 at 226.  If defense counsel had fully investigated Jones's background, Bowling argues, it would have learned that he was a model prisoner and had nothing to gain from testifying in support of Bowling.  *Id.* at 226–27.  That information, he reasons, would have shifted "[t]he balance beam between felons" so that it would be easier to assert that the jury should believe Jones over Chappell.  *Id.* at 226.  Bowling concludes that it was critical for Jones to testify because Jones was "essential to deflect[ing] the impact of the alleged 'confessions' from Chappell's mouth."  *Id.* at 227.

To win an ineffective assistance of counsel claim, Bowling has the burden of showing that his counsel's representation was deficient and that "the deficient performance prejudiced the defense."  *Strickland*, 466 U.S. at 687.  Again, the "doubly deferential" standard applies to his deficient-performance showing.  *See* Section I *supra*.  Bowling has not carried either burden.

113

First, Bowling has not shown that his trial counsel's performance was unreasonable "under prevailing professional norms." *Strickland*, 466 U.S. at 688. Even assuming that Jones was a more credible witness than Chappell, it was not unreasonable to refrain from calling Jones. Trial counsel already had ample ammunition to impeach Chappell and used it to great effect. Counsel got Chappell to essentially concede that when he met with investigators he falsely accused Bowling of another murder and had numerous charges dropped after agreeing to testify against Bowling. *See* 18 T.E. 2636–40. So Jones's testimony would not have provided "additional reasons not to credit [Chappell's] testimony." *Brooks*, 626 F.3d at 894. At most, he could have confirmed what defense counsel's cross examination already demonstrated: that Chappell most likely made up a story to receive a lighter sentence. Failure to present cumulative impeachment evidence is not ineffective assistance of counsel. *See* Section VI.B.1 *supra* (collecting Sixth Circuit cases finding no prejudice where additional impeachment evidence would have been cumulative); *see also, Hall v. Luebbers*, 296 F.3d 685, 694 (8th Cir. 2002); *United States v. Smith*, 104 F. App'x 266, 271 (3d Cir. 2004).

Moreover, calling Jones would have needlessly complicated the defense's impeachment efforts. By relying just on cross examination to impeach Chappell, Bowling's counsel was able to build ethos with the jury in closing argument. *See* Peter C. Lagarias, Effective Closing Argument 97 (2d ed. 1999) (explaining ethos, the personal credibility of the speaker and one of Aristotle's three pillars of rhetoric). He was able to paint the prosecution as "very desperate, to bring somebody like" Chappell up on the stand. 24 T.E. 3560. Calling Jones to the stand would have undermined that rhetorical strategy—regardless of what a more detailed investigation of Jones revealed. And the prosecution would have no

114

doubt impeached Jones.  It could have used both his criminal record and the fact that Jones had an interest in helping Bowling because he was "a good friend" of Bowling's.  Rule 11.42 Hr'g Video, Disc 1, 14:07:32– 4:07:36.  Defense counsel would then have had to, in Bowling's words, walk "[t]he balance beam between felons" in his closing argument, attempting to rehabilitate Jones as he attacked Chappell.  R. 1 at 226.  Defense counsel would not have been able to draw a stark contrast between himself and a prosecutor so "desperate" to win that he put an untrustworthy felon on the stand, 24 T.E. 3558–60.  So, in essence, Bowling argues that defense counsel should have presented more proof discrediting Chappell, even if it meant sacrificing the more persuasive presentation.

Choosing the more effective presentation was "reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688.  Counsel was not ineffective when he refrained from presenting additional impeachment evidence that was likely to create complications and detract from the defense's more powerful arguments.  *See, e.g., Gentry*, 540 U.S. at 10 (finding that effective counsel will often "make certain concessions showing that [they] are earnestly in search of the truth" to build credibility with the jury (quotation omitted)); *United States v. Munoz*, 605 F.3d 359, 382 (6th Cir. 2010) (finding no ineffective assistance where uncalled impeachment witness could have raised inferences of associative guilt in the jurors' minds); *United States v. Harris*, 394 F.3d 543, 556 (7th Cir. 2005) (reasoning that failure to pursue additional impeachment based on prior inconsistent statements could have detracted from more effective impeachment of witness's character and motive).  A good lawyer knows when enough is enough.  This appears to be one of those times.  In any event, given the "highly deferential" scrutiny owed to counsel's performance, the Court cannot say that defense counsel's strategy was deficient under *Strickland*.  466 U.S. at 689.

Moreover, the state court's application of *Strickland*'s deferential standard was not "necessarily unreasonable" under § 2254(d). *Pinholster*, 131 S. Ct. at 1403. The state court correctly articulated *Strickland*'s deficient-performance standard. *See Bowling*, 80 S.W.3d at 411-12 (citing *Strickland*, 466 U.S. at 690). And Bowling fails to identify any Supreme Court case that is "materially indistinguishable" from his own and that arrives at the opposite result. *See Williams*, 529 U.S. at 405. Thus, the state court's decision was not "contrary to" clearly established federal law. *Id.* (citing § 2254(d)(1)). Indeed, the state court's decision follows the Supreme Court's holding in *Yarborough v. Gentry* that sacrificing a piece of proof in service of an established "rhetorical device" is not ineffective assistance of counsel. 540 U.S. at 11 (holding that use of an rhetorical technique, even if it concedes evidentiary ground, is not ineffective assistance of counsel (citing Lagarias, Effective Closing Argument at 99–101 (citing Aristotle's theory that a speaker should foster a sense of shared attitudes with the audience))). Thus, the state court's decision was a reasonable application of established federal law.

Finally, defense counsel's failure to call Jones as a witness did not prejudice the defense. To carry his burden under the prejudice prong, Bowling "must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Id.* Bowling has not raised such a probability. The Court has already explained that other evidence impeaching Chappell was not "material" under *Giglio*, *see* Section VI.B.2 *supra*, or "prejudicial" under *Brady* and *Strickland*, *see* Section VI.B.1 *supra* (*Brady*); Section VI.C *supra* (*Strickland*), because Chappell was

116

thoroughly impeached and insignificant to the prosecution's case.  The same logic applies here.  Thus, Bowling's claim fails.

## VII.   Bowling's Alleged Brain Damage (Claims 53, 54, 55, 57, 58, 59, 60, 61)

### A.   *Ineffective Assistance of Counsel (Claims 53, 55, 58, 59, 61)*

Early in his case, Bowling and his defense team had to choose between three basic strategies: (1) pursue a total innocence defense and investigate evidence that Bowling had not committed the murders; (2) pursue a mitigation defense and investigate evidence that Bowling had brain damage or other mental impairments that diminished his culpability enough to avoid the death penalty; or (3) hedge with a blended defense of innocence and mitigation and investigate both kinds of evidence.  After "talk[ing] to Mr. Bowling several times" about their options, the defense chose outright innocence.  Rule 11.42 Hr'g Video, Disc 3, 21:06:12–21:06:20.  Bowling and his counsel "just didn't feel like [a diminished capacity defense] was satisfactory to Mr. Bowling." *Id.*; *see also id.* at 21:02:39–21:02:55. And the hedge approach "wouldn't [have been] consistent with his [innocence] defense."  *Id.* at 21:04:50–21:04:56; *see also id.* at 21:03:26–21:03:50.  Consequently, defense counsel did not make securing evidence of brain damage a priority in investigating Bowling's case.  *See id.* at 21:02:39–21:06:26.

Now, after his conviction, Bowling claims that he has severe brain damage, that his trial counsel should have discovered evidence of it, and that it was professionally unreasonable to forego a diminished capacity defense.  R. 1 at 267–70, 279–88; R. 159 at 235–57, 266–70.  His claims confirm the "truism that, regardless of the [] strategy that capital defense lawyers choose, they are often 'damned if they do, and damned if they don't'

when their clients later assert claims of ineffective assistance of counsel during collateral review." *Morton v. Sec'y, Florida Dept. of Corr.*, 684 F.3d 1157, 1161 (11th Cir. 2012).

Bowling makes five distinct claims regarding his counsel's shortcomings. Three of them—Claims 53, 58, and 59—allege that trial counsel should have been more diligent in investigating and presenting expert testimony regarding Bowling's brain damage. Claim 55 argues that trial counsel was ineffective for accepting the trial court's ruling that a Kentucky Correctional Psychiatric Center (KCPC) psychiatrist should evaluate Bowling. Finally, Claim 61 argues that Bowling's appellate counsel was ineffective for not raising his various mental health claims, as well as other claims, on direct appeal.

### 1. Investigating, Securing, and Presenting Expert Testimony Regarding Bowling's Alleged Brain Damage (Claims 53, 58, 59)

During Bowling's post-conviction hearing, Bowling asked his trial counsel how the defense team would have proceeded if, hypothetically, they had discovered evidence that Bowling had brain damage. *See* Rule 11.42 Hr'g Video, Disc 3, 21:04:59–21:05:11. Trial counsel responded that they would have remained totally committed to their innocence defense.

> The problem was always going to be -- and what we were always faced with, was how would you use that [evidence of brain damage] in terms of saying, 'He's totally innocent, but he's brain damaged.' That sounds like, to me, we're saying, 'Well, if you don't believe he's totally innocent, would you believe he did it because he was brain damaged?' That is *terribly* inconsistent and I felt like our credibility before that jury would be severely damaged by doing that. I felt like it would even be severely damaged in the penalty phase.

*Id.* at 21:05:22–21:05:50. In Claims 53, 58, and 59, Bowling asserts that this line of thinking "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. All three claims present the same basic theory of deficient performance, with varying reasons as to

why that performance prejudiced Bowling.[6]   Claim 53 argues that, generally, trial counsel's failure to fully investigate Bowling's potential brain damage prevented him from presenting mitigating evidence in the penalty phase.   *See* R. 1 at 267–70; R. 159 at 235–57.   Claim 58 asserts the more specific theory that counsel's inadequate investigation meant he did not make an adequate argument to secure funding for a neuropsychologist.   *See* R. 1 at 279–80; R. 159 at 266–67.   And Claim 59 alleges that, if counsel had conducted an adequate investigation and argument, Bowling could have had a neuropsychologist testify that he fled from police due to post-traumatic stress disorder (PTSD).   R. 1 at 280–88; R. 159 at 268–70. To succeed on any of these claims, Bowling must show that: "(1) his counsel's performance was deficient—that it was objectively unreasonable under previous professional norms—and (2) it prejudiced the defense."   *Wogenstahl*, 668 F.3d at 335 (citing *Strickland*, 466 U.S. at 687–88).

The Kentucky Supreme Court denied all three claims on direct appeal.   Though it was not their main strategy, defense counsel did investigate the possibility Bowling had brain damage and sought funding for an independent neuropsychological examination.   *See, e.g.*, Rule 11.42 Hr'g Video, Disc 3, 21:03:50–21:04:18; *see also Bowling*, 80 S.W.3d at 422–23 (recounting counsel's motions).   The Kentucky Supreme Court reviewed those efforts and concluded "that defense counsel's investigation into psychological mitigating evidence was

---

[6] At times, Bowling seems to argue that counsel should have presented lay testimony by his friends and family members to the jury, *see* R. 1 at 267-68.   However, the Court construes his three claims as arguing that counsel should have secured expert witness testimony. Given that Bowling himself acknowledges that "layperson testimony" about "possible brain damage" would not have been persuasive evidence, *see id.* at 269–70, this seems the fairest reading of his claims.

reasonable." *Bowling*, 80 S.W.3d at 422. Accordingly, the Court must exercise "doubly deferential" judicial review in assessing Bowling's claims of deficient performance. *Pinholster*, 131 S. Ct. at 1403 (quotations omitted). While its opinion is not entirely clear, it does not appear that the Kentucky Supreme Court applied *Strickland*'s prejudice prong. The Court therefore reviews Bowling's prejudice claims *de novo*. *See Rayner*, 685 F.3d at 638.

### a.    Deficient Performance

All three of Bowling's claims rest on the assertion that counsel should have fully investigated Bowling's possible brain damage before deciding to commit to an innocence defense. *See* Claim 53, R. 159 at 240 ("That investigation was a *prerequisite* to making a 'strategic' decision." (emphasis added)); *see* Claim 58, *id.* at 266 ("[T]rial court's failure to find that Bowling made the necessary showing is intricately intertwined with the evidence that trial counsel failed to present."); *see* Claim 59, *id.* at 269 ("[T]rial counsel did not conduct an objectively reasonable investigation *prior* to making any decisions regarding the sentencing phase presentation." (emphasis added)). In effect, Bowling advocates an exhaustion requirement. He asserts that counsel should have explored all possible evidence supporting a diminished capacity defense before fully committing to the innocence defense Bowling preferred. That assertion discredits counsel's strategic decisions, adopts the "checklist" approach rejected by the Supreme Court, and denies the state court's decision the respect required by § 2254(d).

First, Bowling's assertion contravenes the principle that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. In *Strickland*, the Supreme Court advised that "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's

failure to pursue those investigations may not later be challenged as unreasonable." *Id.* at 691. That was the case here. Bowling wanted to pursue an innocence defense. *See* Rule 11.42 Hr'g Video, Disc 3, 21:06:12–21:06:20. Counsel advised Bowling that presenting mitigation evidence in the guilt phase would likely undermine that innocence defense. *See id.* Similarly, counsel felt that presenting this evidence in the penalty phase would have "severely damaged" their "credibility with the jury." *See id.* at 21:05:43–21:05:47. Counsel's advice was reasonable. *Cf. Gentry*, 540 U.S. at 9–10 (explaining that effective advocates "buil[d] credibility with the jury" by presenting themselves as "earnestly in search of the truth" (internal citation and quotation omitted)); *see also Jackson*, 681 F.3d at 773 (finding counsel performed reasonably by withholding testimony that would have contradicted the defense's main strategy). So when Bowling and his attorneys decided to fully commit themselves to an innocence defense, *see* Section VII.A *supra*, pursuing mitigation evidence became "fruitless or even harmful." *Strickland*, 466 U.S. at 691. Time spent investigating mitigation evidence would have been "fruitless" because Bowling did not plan to present that evidence at trial, and it would have been "harmful" by limiting the time Bowling's lawyers spent investigating evidence for his innocence defense. And presenting the evidence would have been "harmful" to his innocence defense and his credibility with the jury. So, unlike many cases involving allegedly deficient investigations, defense counsel's decision was strategically sound *regardless* of whether there was in fact evidence that Bowling had brain damage. *Compare* Rule 11.42 Hr'g Video, Disc 3, 21:05:22–21:05:50 (explaining that evidence of brain damage would have been inconsistent with Bowling's innocence defense), *with Rompilla v. Beard*, 545 U.S. at 390–93 (finding deficient

performance where counsel failed to realize there was available mitigating evidence of defendant's childhood and mental health).

Bowling's argument fails to appreciate this dynamic.  Instead, he insists that Bowling had "everything to gain and nothing to lose by introducing evidence of his brain injury at the penalty phase of the case."  R. 159 at 237 (quoting *Frazier v. Huffman*, 343 F.3d 780, 796 (6th Cir. 2003)).  The Supreme Court has squarely rejected Bowling's "nothing to lose rule" as inconsistent with § 2254(d)(1), *see Mirzayance*, 556 U.S. at 122.  What's more, that rule is inapplicable here.  Defense counsel had two things to lose by pursuing and presenting potential brain damage evidence: time to prepare the best possible innocence defense and credibility with the jury.  So there was a "rational trial strategy" justifying counsel's decision not to investigate Bowling's head injuries further.  *Frazier*, 343 F.3d at 794.  Thus, trial counsel's representation was not deficient because "reasonable professional judgments support[ed] the limitations on investigation."  *Strickland*, 466 U.S. at 691.

Second, Bowling contravenes the Supreme Court's repeated admonition against "a checklist for judicial evaluation of attorney performance."  *Strickland*, 466 U.S. at 688; *see also Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (declining to articulate specific guidelines for attorney performance); *Roe v. Flores–Ortega*, 528 U.S. 470, 479 (2000) (same).  By arguing that counsel should have fully investigated and then presented evidence of his alleged brain damage, Bowling in effect adopts the following *per se* rule: Defense counsel must pursue and present such evidence, even when the defendant prefers a different strategy which that evidence would undermine.  *See* R. 159 at 237 (claiming, incorrectly, that the Sixth Circuit has adopted a general rule that there "cannot [be] a strategic reason for failing to develop and present mitigating evidence of [the] brain injury and its potential

122

implications" (quotation omitted)).  This argument defies the Supreme Court's insistence that "strategic choices must be respected" in a system in which "advocacy is an art and not a science."  *Strickland*, 466 U.S. at 681.  Moreover, it ignores the Supreme Court's teaching that ineffective assistance claims will not lie where attorneys follow the strategy their clients chose.  *See Schriro v. Landrigan*, 550 U.S. 465, 475 (2007) (holding that, where a defendant instructs counsel not to offer mitigating evidence, "counsel's failure to investigate further could not have been prejudicial").  Consequently, Bowling's theory of deficient performance undermines "the wide range of reasonable professional assistance" recognized by *Strickland*, 466 U.S. at 689.

Third, Bowling's assertion fails to provide proper deference to the state court's decision under the second layer of habeas deference.  *See Pinholster*, 131 S. Ct. at 1403.  To be "objectively unreasonable" that holding must have either been "contrary to" or "an unreasonable application of" clearly established federal law.  *Williams*, 529 U.S. at 409, 412–13 (quoting 28 U.S.C. § 2254(d)(1)).  The state court's conclusion was not "contrary to" clearly established law because Bowling's case is not "materially indistinguishable" from the Supreme Court's previous habeas cases applying *Strickland*.  *Id.* at 405.  The only habeas cases where the Supreme Court has found deficient performance involving expert witness testimony are cases in which trial counsel was ignorant of the possible mitigation evidence.  *See id.* at 370–71 (finding counsel "fail[ed] to discover and present [] significant mitigating evidence"); *Wiggins*, 539 U.S. at 516, 524–26 (finding "counsel chose not to commission [a social history] report" based on "inattention, not reasoned strategic judgment"); *Rompilla*, 545 U.S. at 390–93 (finding counsel "fail[ed] to look" at a file that would be an issue at sentencing and contained numerous leads to "a mitigation case that bears no relation to the

123

few naked pleas for mercy actually put before the jury"). As explained above, that was not the case here. *See* Section VII.A *supra* (describing counsel's strategic decision). Thus, the state court's decision was not "contrary to" clearly established law.

Similarly, the state court's decision was not an "unreasonable application" of Supreme Court precedent. 28 U.S.C. § 2254(d)(1). The state court's decision followed the distinction that the Supreme Court has repeatedly drawn in its failure to investigate cases between "inattention" and "reasoned strategic judgment." *Wiggins*, 539 U.S. at 526; *see also Rompilla*, 545 U.S. at 395 (finding counsel's "decision not to obtain [defendant's] prior conviction file was not the result of an informed tactical decision about how the lawyers' time would best be spent"); *Williams*, 529 U.S. at 373 (finding "counsel's failure to contact a potentially persuasive character witness was likewise not a conscious strategic choice"). The state habeas court's decision, which the Kentucky Supreme Court incorporated into its opinion, *see* Section VII.A.1 *supra*, found counsel's investigation reasonable in light of Bowling's commitment to an innocence defense. *See* 5 Supp. T.R. for Rule 11.42 Appeal 641. Given the "strong presumption" that the state court owed to trial counsel's strategic judgment, *see Strickland*, 466 U.S. at 689, the Court cannot say that the state court's deference to counsel's judgment was "necessarily unreasonable." *Pinholster*, 131 S. Ct. at 1403.

The Supreme Court has instructed courts to make "every effort [] to eliminate the distorting effects of hindsight" and "evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Cone*, 535 U.S. at 698; *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Just like the poker player who pushes all in with the stronger hand and loses, a defendant cannot second-guess his strategy based on the fact he lost at trial. When

Bowling consulted with his attorneys, he chose to fully commit to an outright innocence defense. *See* Rule 11.42 Hr'g Video, Disc 3, 21:06:12–21:06:20. That decision, even if it was a gamble Bowling now regrets, was reasonable. Presenting diminished capacity evidence in the guilt phase would have undermined the innocence defense that Bowling preferred. And presenting mitigating evidence of brain damage in the penalty phase would have seemed disingenuous, undermining the defense's credibility with the jury. *See id.*; *see also supra* (citing *Gentry*, 540 U.S. at 9–10). What's more, Bowling would have faced "overwhelming evidence" that he did not have appreciable brain damage. *See* 5 Supp. T.R. for Rule 11.42 Appeal 647. As the state habeas court points out, Bowling would have had to counter evidence from numerous sources that he "was an average or above-average student, and that he was the same person before and after his [car] accident." *Id.* The low likelihood of the jury finding Bowling's claim to brain damage persuasive made counsel's concerns about damaging the defense's credibility all the more reasonable. Therefore, when Bowling and his trial counsel committed to an innocence defense, their decision fell "within the wide range of reasonable professional assistance." *Cone*, 535 U.S. at 702.

### b.    Prejudice

To demonstrate prejudice under *Strickland*, a habeas petitioner must "show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." 466 U.S. at 694; *see also* Section I *supra*. *Strickland*'s prejudice standard extends beyond the trial and the jury's verdict of guilty or not guilty. *See Lafler v. Cooper*, 132 S. Ct. 1376, 1385–86 (2012). It applies to, among other things, sentencing in capital cases, *see Wiggins*, 539 U.S. at 538, and evidentiary motions. *See Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

As an initial matter, all three claims require a kind of triple-prejudice analysis.  In an ordinary *Strickland* case, the "reasonable probability" determination requires one level of inference: If the attorney had presented certain evidence or arguments, the jury would have reached a different result.  *See, e.g.*, *Wiggins*, 539 U.S. at 534–38.  Here, there are three levels of inference: (1) if trial counsel had conducted a more thorough investigation and made a better argument in moving for expert funding, the trial court would have ordered funding for a neuropsychological expert; (2) if Bowling had received that funding, the neuropsychologist would have found evidence of organic brain damage or PTSD; and (3) if trial counsel had presented that evidence to the jury, it would have reached a different result.  If there is not a reasonable probability of a favorable result to Bowling at any of those levels, then that claim must fail under the *Strickland* prejudice standard.  *Cf. Hill v. Lockhart*, 474 U.S. 52, 59–60 (explaining that the prejudice inquiry often requires predicting whether the defendant would have "succeeded at trial," not just whether the pretrial proceeding would have reached a different outcome).

The first level of inference—a different outcome from a better investigation and argument in support of the motion for expert funding—is common to Claims 53, 58 and 59.  Bowling does not establish a reasonable probability that a better argument in support of his motion would have changed the trial court's decision.  Bowling had no right to such expert funding under Kentucky case law because he would have used the evidence at the mitigation phase, not the guilt phase.  As the Court discusses in greater detail later, *see* Section VII.A.3 *infra*, the Kentucky Supreme Court had already held that defendants have no right to the kind of expert funding Bowling requested.  *Kordenbrock v. Commonwealth* held that defendants have no constitutional or statutory right to expert testimony "primarily for the penalty phase

of the trial" because the testimony is "irrelevant to a legal defense to the crime."  700 S.W.2d 384, 387 (Ky. 1985) (citing *Ake* and KRS § 31.110); *see also* Section VII.A.3 *infra* (collecting Kentucky case law holding that defendants in Bowling's position have no right to expert funding).  Since Bowling had not right to such funding, he cannot claim that counsel's failure to secure it was "prejudice" under *Strickland*.  *Cf. Lafler*, 132 S. Ct. at 1387 (explaining that defendants cannot claim prejudice based on outcomes that that would require "the application of an incorrect legal principle or a defense strategy outside the law").

Also, the trial court rejected Bowling's request based on "the expenditures involved" with funding a private out-of-state expert in addition to the lack of a particular need for a neuropsychologist.  3 T.E. at 389.  Nothing counsel could say would ameliorate the trial court's concern about "the economics" of hiring a neuropsychologist.  *Id.* at 397.  And there is no reported case in which a Kentucky court has held that a defendant has a right to funding for a neuropsychologist under KRS § 31.110.  To the contrary, in every reported case where defendants have claimed they were wrongly denied such funds, the appellate court has upheld the trial court's decision.  *See Barnett v. Commonwealth*, 317 S.W.3d 49, 57 (Ky. 2010); *Bowling*, 80 S.W.3d at 421, *Woodall v. Commonwealth*, 63 S.W.3d 104, 126 (Ky. 2001); *see also Gambrel v. Commonwealth*, 2002-CA-001506-MR, 2004 WL 405734, at *6 (Ky. Ct. App. Mar. 5, 2004) *Blevins v. Commonwealth*, 2006-CA-001318-MR, 2009 WL 3399287, at *4 (Ky. Ct. App. Oct. 23, 2009).  So there was no established standard in Kentucky case law that Bowling's counsel could have relied on to overcome the trial court's fiscal concerns.  Therefore, Bowling—who carries the burden here—has not shown that it is "reasonably likely" that taking affidavits from a neuropsychologist or his family members

and including them in his motion would have altered the trial court's ruling. *Strickland*, 466 U.S. at 696.

At the second level of inference—the probability that a neuropsychologist would supply the asserted evidence—the claims rely on different theories as to what an expert would find. For Claim 53 and 57, it is not altogether clear what specific findings an examination would have produced. But the Court nevertheless assumes that there was a reasonable probability that a neuropsychologist could have testified that Bowling had some form of "organic brain damage." *See* R. 1 at 270 (citing 3 Supp. T.R. for Rule 11.42 Appeal 345–46 (affidavit of Dr. Michael Gelbort)). However, Bowling undermines his own argument that a neuropsychologist would have discovered the particular PTSD symptoms that he premises Claim 59 on. *See* R. 1 at 283. Bowling acknowledges that it is only "[i]n rare instances" that a person with PTSD experiences the kind of "dissociative states" he claims could have explained Bowling's flight from the police. *Id.* at 284–85. To be sure, Bowling's claim that he has PTSD is pure speculation. *See id.* at 283 (arguing that PTSD could explain Bowling's flight from police without any medical evidence that he in fact had PTSD). But even assuming that Bowling's did have PTSD, it is "rare" that PTSD would cause the symptoms he claims he should have been able to present to the jury. Accordingly, it is not "reasonably likely" that a neuropsychological examination would have produced evidence that Bowling is prone to dissociative states. *Strickland*, 466 U.S. at 696. And without evidence that he suffered from dissociative states, Bowling would not be able to use his PTSD to explain his flight from the police. Therefore, Claim 58 fails at the second level of inference.

At the third level of inference—whether neuropsychological evidence would have swayed the jury—none of the claims raises a "reasonable probability" of a different outcome. As to Claim 53 and 57, the state habeas court found that there was "overwhelming evidence" that Bowling "was an average or above-average student, and that he was the same person both before and after his accident." *See* 5 Supp. T.R. for Rule 11.42 Appeal 647. The court specifically pointed to evidence "presented by KCPC, [Bowling's] mother, and numerous teachers." *Id.* So trial counsel would have had to convince the jurors that Bowling graduated from high school with organic brain damage. And counsel would have had to further prove that the damage was so severe that it mitigated Bowling's moral culpability for planning and carrying out multiple murders for monetary gain. There is not a reasonable probability that expert testimony would have persuaded the jurors differently. *Compare* 5 Supp. T.R. for Rule 11.42 Appeal 647 (noting strong testimonial evidence that Bowling was not appreciably affected by his accidents), *with Williams*, 529 U.S. at 398, 415, 419 (all nine Justices accepting that evidence would prove defendant had a horribly abusive childhood and was borderline retarded).

Bowling's arguments to the contrary are unpersuasive. First, he claims that "failure to investigate and present to the jury 'potential organic brain damage' or the 'likelihood of brain dysfunction' establishes prejudice without having to prove actual brain damage." *See* R. 159 at 244 (quoting *Coleman v. Mitchell*, 268 F.3d 417, 450 (6th Cir. 2001)). But Bowling misrepresents the two cases he cites for this proposition—*Coleman*, 268 F.3d at 450, and *Frierson v. Woodford*, 463 F.3d 982, 994 (9th Cir. 2006). Neither case holds that "potential organic brain damage" alone establishes prejudice. Rather, both list it in addition to a multitude of established mitigating factors. *See Coleman*, 268 F.3d at 451 (citing "a

129

likelihood of organic brain dysfunction" in addition to a diagnoses of borderline personality disorder, a finding defendant was incompetent to represent himself, and a diagnosis of probable manic-depressive psychosis); *Frierson*, 463 F.3d at 993–94 (listing potential "organic brain dysfunction" in addition to a learning disability, low intelligence, an emotional disorder, chronic lifelong substance abuse, and potential borderline mental retardation).

Claim 58 does not present a reasonable probability of a different outcome either. The only reason that Bowling would have introduced evidence of his potential PTSD was to explain his flight from police following his shootout with Ricky Smith. *See* R. 1 at 281–88. At most, this evidence could have dispelled the negative inference of guilt that the jurors likely drew from the fact that Bowling ran from the police. *Id.* at 281. Bowling does not identify another part of the prosecution's case that this evidence would undermine or any other exculpatory value that it would have had. Nor does he make any showing that this inference of guilt was a critical part of the prosecution's case. Even if defense counsel had explained away his chase from the police, the PTSD evidence would not have contradicted the testimony of Ricky Smith or the wealth of incriminating forensic evidence that the prosecution presented. It is therefore not "reasonably likely" that the evidence Claim 58 rests on would have produced a difficult outcome. *Strickland*, 466 U.S. at 696. Thus, Bowling's claims fail.

### 2.    Trial Court's Assignment of a KCPC Expert (Claim 55)

Bowling claims that his "trial counsel was ineffective for ultimately conceding that a non-independent psychologist . . . could be a sufficient substitute for a neuropsychologist." R. 159 at 257. The Kentucky Supreme Court denied Bowling's claim on habeas appeal.

*Bowling*, 80 S.W.3d at 422 ("[Bowling] argues that defense counsel should have procured an independent neuropsychologist to examine Bowling for possible mitigating evidence. We disagree."). Accordingly, the Court applies § 2254(d) deference to Bowling's claim. *See Richter*, 131 S. Ct. at 786–87.

First, Bowling only had a right to a competent expert, not an "independent" expert or the expert of his choice. *Smith v. Mitchell,* 348 F.3d 177, 207–08 (6th Cir. 2003) (holding that a defendant has no right under *Ake* to "independent expert assistance," that "a 'friend of the court' appointment" satisfies *Ake*, and that the constitution "does not entitle [a defendant] to the psychiatrist of his choosing"); *Wogenstahl*, 668 F.3d at 340; *see also Kordenbrock*, 799 S.W.2d at 387 (holding that defendant had no right under Kentucky law to expert funding "primarily for the penalty phase of the trial"). Nevertheless, Bowling insists that he has such a right. *See* R. 159 at 258. But the one case he cites, *Powell v. Collins*, 332 F.3d 376, 391 (6th Cir. 2003), is clearly inapplicable. *Powell* "held that an indigent criminal defendant's constitutional right to psychiatric assistance *in preparing an insanity defense* is not satisfied by court appointment of a 'neutral' psychiatrist." *Id.* at 392 (emphasis added). Here, Bowling was not pursuing a mental-health defense, *see* Rule 11.42 Hr'g Video, Disc 3, 21:06:12–21:06:20, so there was no possibility that his mental health "at the time of the offense" could be "a 'significant factor at trial.'" *Powell*, 332 F.3d at 392 (citing *Ake*). Bowling therefore had no grounds to claim a right to an independent expert. And without a right to such expert testimony, he cannot claim his counsel was ineffective for not securing it. *See United States v. Cronic*, 466 U.S. 648, 658 (1984) (explaining that the right to effective assistance of counsel is an instrumental right meant to secure a defendant's underlying constitutional and statutory rights).

Second, Bowling fails to establish that counsel performed deficiently in handling the motion for independent expert funding. As previously explained, Bowling and his attorneys had made the decision to forego a mitigation defense in order to make the strongest possible innocence defense. *See* Section VII.A *supra*. Thus unlike the cases Bowling relies on, *see* R. 159 at 259 & n.862, trial counsel had a strategic reason for not investing significant time in preparing or renewing the motion for expert funds. And Bowling never even establishes that the argument trial counsel made in support of funding was itself deficient. To be "deficient," counsel's errors must be "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. That was simply not the case here. Bowling's trial counsel made specific arguments to the trial court as to why he should receive funding for a neuropsychological evaluation. Bowling presents no evidence that it is "standard practice" in Kentucky for defense attorneys seeking expert funds under KRS § 31.110(1)(b) to present the kind of affidavits or details about neuropsychology that he claims trial counsel should have included in its motion. *Compare* R. 159 at 260–62 (asserting that counsel should have "educate[d] themselves in the fields of psychiatry and neuropsychology" and included testimony from Bowling's family and friends along with the motion without providing evidence that such a practice is commonly expected for such motions), *with Wiggins*, 539 U.S. at 524 (finding counsel's efforts deficient because preparing a social history report was "*standard practice* in Maryland in capital cases at the time of Wiggins' trial" (emphasis added)). The fact that, in hindsight, there are additional points that might have strengthened counsel's argument does not mean Bowling's representation was "deficient" under *Strickland*. *See Gentry*, 540 U.S. at 8 (emphasizing that *Strickland* does not require "perfect advocacy judged with the benefit of hindsight").

132

Bowling therefore falls short of his burden to prove that counsel's argument fell below "prevailing professional norms." *Strickland*, 466 U.S. at 688.

Finally, Bowling does not establish prejudice.   As the Court already explained, Bowling had no right to expert funding under Kentucky law.  *See* Section VII.A.1.b *supra* (citing *Kordenbrock*); *see also* Section VII.A.3 *infra* (collecting Kentucky cases holding that defendants in Bowling's position have no right expert funding).  So there is not a reasonable likelihood that better supported argument would have secured expert funding.  Also, Bowling had committed to not present evidence of brain damage in order to maximize his innocence defense.   *See* Rule 11.42 Hr'g Video, Disc 3, 21:02:39–21:02:55, 21:05:22–21:05:50, 21:06:12–21:06:20 (explaining that, had Bowling secured evidence of brain damage, the defense would still not have presented it in order to preserve credibility with the jury).  So there was not a reasonable probability that the evidence would have been presented to the jury.  Thus, Bowling's claim fails.

### 3.    Direct Appeal (Claim 61)

Bowling claims that he received ineffective assistance of appellate counsel because his appellate attorney failed to brief five issues on direct appeal.[7]   He argues that his "appellate counsel knew or should have known" to brief both the "mental health issues" and the "improper 'other bad acts evidence' . . . in the penalty phase."  R. 1 at 290–91. Specifically, he claims that appellate counsel should have challenged the trial court's rulings:

---

[7]  Bowling's original petition claimed that appellate counsel was ineffective for not challenging (1) the alleged dismissal of disabled jurors and (2) the trial court's judgment of Ora Lee Isaac's mental health records.  *See* R. 1 at 290.  However, Bowling has withdrawn those arguments from Claim 61.  *See* R. 159 at 272.  Accordingly, the Court does not address them.

(1) denying funding for an independent expert, (2) denying an *ex parte* hearing on the funding issue, (3) appointing a psychologist instead of a neuropsychologist, (4) ordering that a KCPC expert to evaluate Bowling, and (5) admitting evidence of "other bad acts" at the penalty phase. *See* R. 1 at 290–94; R. 159 at 272–80.

Defendants have a right to effective assistance of counsel on their first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). To succeed on his claim, Bowling must show both deficient performance and prejudice. *See Hoffner v. Bradshaw*, 622 F.3d 487, 505 (6th Cir. 2010) ("The usual two-pronged analysis of ineffective-assistance claims under Strickland also governs claims of ineffective assistance of appellate counsel." (citing *Smith v. Robbins*, 528 U.S. 259, 285 (2000)). "Generally," where appellate counsel totally overlooked the omitted issues, a defendant meets the deficient performance prong by showing that the "ignored issues are clearly stronger than those presented." *Robbins*, 528 U.S. at 288 (citation and quotation omitted); *see also Hoffner*, 622 F.3d at 505. Here, an affidavit from one of Bowling's appellate attorneys attests that counsel "never considered whether or not these issues should [have] be[en] raised." 5 Supp. T.R. 11.42 Appeal 670. Consequently, the Court assumes that appellate counsel's performance was deficient. *See Wiggins*, 539 U.S. at 534 (holding counsel's performance was deficient where an error "was the result of inattention, not reasoned strategic judgment").

But Bowling must also meet the prejudice prong. That requires establishing "a reasonable probability that, but for his counsel's [omission], he would have prevailed on his appeal." *Robbins*, 528 U.S. at 285. The Court's calculation of this "reasonable probability" rests on the assumption that the appellate court would have properly applied the governing law on appeal. *See Strickland*, 466 U.S. at 695. Thus, to carry his burden, Bowling must

articulate a reason why a "reasonabl[e], conscientious[,] and impartial[]" appellate court would have overturned the trial court's decision. *Id.* He cannot make this showing.

Additionally, Bowling argues that § 2254(d) should not apply to the Court's evaluation of these claims because the Kentucky Supreme Court "refused to address [the merits of] the claim." R. 159 at 275. The Court need not decide whether § 2254(d) applies to resolve Bowling's claim. Under any standard of review, he has failed to make the necessary prejudice showing.

**Bowling's Burden of Proof:** As an initial matter, Bowling does not offer any evidence sufficient to carry his burden of proof. As the habeas petitioner, Bowling "has the burden of demonstrating prejudice." *See Robbins*, 528 U.S. at 285. But he never provides any evidence that these sub-claims would have fared any better as direct appeal claims than they did as state habeas claims. Instead, all he offers is the theory that omitting these claims from his direct appeal "subjected them to higher standards of review." R. 1 at 291.

But the Kentucky Supreme Court's opinions addressing Bowling's appeals suggest differently. On direct appeal, the state court expressly disavowed a higher standard of review. In death penalty cases, Kentucky appellate courts must consider "unpreserved" arguments as if they were properly preserved. *See Bowling*, 942 S.W.2d at 308 (finding "no error of sufficient gravity to warrant reversal of his convictions" on direct appeal (citing KRS § 532.075(2) and *Ice v. Commonwealth*, 667 S.W.2d 671 (Ky. 1984) (holding that, except for strategically withheld objections at trial, Kentucky appellate courts may not apply more deferential standards of review to unpreserved arguments in death penalty cases)). The same is true for Bowling's habeas appeal. The Kentucky Supreme Court, presumably still applying KRS § 532.075(2), never relied on a heightened standard of review in resolving

Bowling's claims.  *See, e.g.*, *Bowling*, 80 S.W.3d at 423 (applying harmless error standard to claim of inadmissible evidence).  Tellingly, Bowling does not identify a point in either state court opinion where the state court applied a higher standard of review to one of the sub-claims at issue here.

And the Kentucky Supreme Court affirmed the trial court's original rulings on all the issues Bowling claims his appellate counsel should have raised:  (1) It "affirm[ed] the trial court's ruling" where Bowling claimed "the trial court erred . . . in denying defense counsel's motion for an independent expert."  *Bowling*, 80 S.W.3d at 422.  (2) It also "affirm[ed] the trial court's ruling" where Bowling argued that the trial court "erred in denying defense counsel's motion to proceed ex parte" on the expert funding issue.  *Id.*  (3) It "conclude[d] that the funds for a neuropsychologist were not reasonably necessary" and therefore held "that the trial court did not err in denying the motion for funds."  *Id.* at 421; *see also id.* at 422–23.  (4) It "affirm[ed] the trial court's ruling" over Bowling's claim that "it was error to designate the KCPC to provide expert assistance."  *Id.* at 422.  (5) It twice held that the trial court properly admitted the evidence of prior bad acts, *see Bowling*, 942 S.W.2d at 300–01; *Bowling*, 80 S.W.3d at 423, and found that any error was harmless, *id.*

The Kentucky Supreme Court declared, without reference to a heightened standard of review, that the trial court ruled properly on all five issues that Claim 61 identifies.  Its opinions, directly addressing Bowling's actual underlying claims, eliminate any "reasonable probability that . . . he would have prevailed on his appeal."  *Robbins*, 528 U.S. at 285.  All Bowling counters with is the assertion that appellate counsel's oversight "was prejudicial because it subjected [Bowling's claims] to higher standards of review."  R. 1 at 291.  He makes no reference to the state court opinion and no explanation of how the standard of

review mattered in his case.  *See* R. 1 at 291.  That cannot carry Bowling's burden of establishing prejudice.  Second-guessing the state court's actual judgment based on a generic line would make a mockery of the "reasonable probability" standard.  *Cf. Richter*, 131 S. Ct. at 792 ("The likelihood of a different result must be substantial, not just conceivable." (citation omitted)).  Thus, all of Bowling's sub-claims fail.

**Expert Testimony About Bowling's Alleged Brain Damage:** In Kentucky, appellate courts will not overturn decisions regarding expert assistance unless the trial court denied the defendant assistance that was "reasonably necessary" to his defense.  That is true for both constitutional and statutory claims to expert assistance.  *See Young v. Commonwealth*, 585 S.W.2d 378, 379 (Ky. 1979) (holding that defendants are entitled only to "reasonably necessary" expert assistance under KRS § 31.110); *Simmons v. Commonwealth*, 746 S.W.2d 393, 394–95 (Ky. 1988) (finding "no violation of due process" where defendant "failed to establish that further expert assistance was reasonably necessary for his defense" (citing *Caldwell v. Mississippi*, 472 U.S. 320 (1985)).  At the time of Bowling's appeal, two lines of Kentucky Supreme Court precedent eliminated any "reasonable probability" that Bowling could have successfully appealed the trial court's mental health expert rulings.  First, defendants had no right to assistance for the kind of mitigation evidence Bowling sought.  Second, numerous decisions by Kentucky appellate courts had found no reversible error where a defendant who was denied expert assistance did not plan to use that assistance for defense during the guilt phase.

First, Bowling had no "reasonable probability" of success on direct appeal because Kentucky Supreme Court precedent denied his right to expert assistance for penalty-phase mitigation evidence.  In *Kordenbrock v. Commonwealth*, 700 S.W.2d 384, the Kentucky

Supreme Court rejected a defendant's claim for funding to secure "psychiatric testimony []

primarily for the penalty phase of the trial." *Id.* at 387.  There, the defendant sought expert

testimony on topics that parallel the ones for which Bowling sought funding.  The topics

included: (1) whether the defendant's actions at the time of the murder "were less than

intentional"; (2) what effect an earlier motorcycle wreck had on the defendant; and (3) "what

factors mitigated [the defendant's] acts." *Id.* at 387.  The court denied that *Ake v. Oklahoma*,

470 U.S. 68 (1985), applied to the defendant's request.  It distinguished between funding for

a "defense" that absolves a defendant of the criminal charges, as in *Ake*, and funding to

mitigate one's culpability at the penalty phase.  *Kordenbrock*, 700 S.W.2d at 387.  The court

concluded that it "d[id] not believe a defendant in a case such as this has a right to . . . an in-

depth analysis on matters irrelevant to a legal defense to the crime." *Id.*  Kentucky courts

have since applied *Kordenbrock* for the proposition that defendants do not have a right to

expert assistance in presenting mitigation evidence at the penalty phase.  *See Smith v.*

*Commonwealth*, 734 S.W.2d 437, 450–51 (Ky. 1987) (citing *Kordenbrock* in holding that

funds to secure expert testimony from psychologists at the penalty phase were not

"reasonably necessary" because they were "irrelevant to a legal defense"); *Dunn v.*

*Commonwealth*, No. 2002-000742-MR, 2004 WL 1299863, at *2–4 (Ky. Ct. App. June 11,

2004) (citing *Kordenbrock* in noting that "guilt phase" expert testimony has greater

importance than mitigation evidence).

 *Kordenbrock* eliminates any reasonable probability that Bowling's claim could have

succeeded on direct appeal.  Bowling's habeas petition asserts only that he should have been

given funding for expert testimony "at the sentencing phase," not at the guilt phase.  *See,*

*e.g.*, R. 159 at 264.  That is because Bowling was committed to an actual innocence defense

and did not want to detract from its effectiveness.  *See* Rule 11.42 Hr'g Video, Disc 3, 21:06:12–21:06:20; *id.* at 21:02:39–21:02:55.  What's more, Bowling did not even plan to present evidence of brain damage at the penalty phase.  *See id.* at 21:05:22–21:05:50.  So Bowling neither planned to use the evidence nor was it relevant to a legal defense of the crime.  *Smith*, 734 S.W.2d at 450–51 (finding no "reversible error occurred" in denial of expert funds where, among other things, defendant "did not rely on or pursue an insanity defense"); *Todd v. Commonwealth*, 716 S.W.2d 242, 247 (Ky. 1986) (finding same where "nothing had been filed by [the defendant] to indicate that he intended to raise insanity as a defense"); *Kordenbrock*, 700 S.W.2d at 387 (finding same where "there was no insanity defense or any pretense of a defense of mental disease or insanity"); *cf. Simmons*, 746 S.W.2d at 395 (finding same where defendant "stated in general terms only that expert assistance was needed to prepare adequately for trial and possible sentencing hearing" but never linked the expert testimony to a legal defense).  Thus, Bowling had no right to expert assistance under Kentucky case law, and in turn had no reasonable probability of success on direct appeal.

*"Other Bad Acts" Evidence:*  Bowling asserts that his appellate counsel was ineffective for not briefing "the issue of the improper 'other bad acts evidence' that the jury was permitted to consider at the penalty phase."  R. 1 at 291.  Bowling's original brief never precisely defines the "other bad acts evidence" issue.  *See id.* at 290–94.  However, a close reading of the habeas petition demonstrates that Bowling means Ricky Smith's testimony about Bowling's attempted murder at the Rockcastle Sunoco.  *Compare* R. 1 at 291 (referring to "improper 'other bad acts evidence' . . . at the penalty phase"), *with* R. 1 at 28 (describing the Rockcastle testimony as "'other bad acts' evidence").

Bowling has not demonstrated a reasonable probability of reversal. To do so, Bowling must show that an appellate court would have found "an abuse of discretion" under state law. *Driver v. Commonwealth*, 361 S.W.3d 877, 883 (Ky. 2012) ("We review the trial court's application of KRE 404(b) for an abuse of discretion." (citation omitted)). But the Kentucky Supreme Court's decisions foreclose that possibility. On direct appeal it held that this evidence was admissible under the Kentucky rules of evidence. *Bowling*, 942 S.W.2d at 300–01. And it rejected Bowling's claim again in his state habeas appeal. *See Bowling*, 80 S.W.3d at 423 (holding that any error the trial court committed in admonishing the jury "was harmless" because the "testimony was admissible as substantive evidence against Bowling"). *Id.* Bowling does not explain why a state appellate court would have reached a different conclusion than the one the Kentucky Supreme Court reached—twice. He offers only citations to the general standard for Kentucky Rule 404(b) without articulating a reason why an appellate court would have found an abuse of discretion. *See* R. 1 at 290–94; R. 159 at 272–76. Again, there cannot be "a reasonable probability that . . . he would have prevailed on his appeal" if the state court already denied his appeal on its merits. *Robbins*, 528 U.S. at 285. Thus, Bowling's other-bad-acts sub-claim fails.

### B.    Trial Court Rulings (Claims 54, 57, 60)

#### 1.    Granting Funds for a Psychiatrist and Denying Funds for a Neuropsychologist (Claim 57)

Bowling asserts that the trial court "abused its discretion" by providing funding for a psychiatrist instead of funding for a neuropsychologist. *See* R. 1 at 276. The Kentucky Supreme Court affirmed the trial court's ruling on the merits. *See Bowling*, 80 S.W.3d at 421–23 (quoting *Hicks v. Commonwealth*, 670 S.W.2d 837, 838 (Ky. 1984); citing *Ake*, 470

U.S. 68)).   Accordingly, the Court applies § 2254(d) deference to the state court's ruling. *See Richter*, 131 S. Ct. at 786–87.

Bowling's claim must rest on a federal constitutional right, but the Supreme Court has not recognized the broad right to expert funding that Bowling claims here.   As the Court's previous Opinion explained, the Supreme Court's decision in *Ake v. Oklahoma* recognized a right to funding for a psychiatric expert in two scenarios.   *See* R. 245 at 94.   Again, those scenarios are: where the defendant presents an insanity defense, and where the state plans to present psychiatric evidence of the defendant's future dangerousness in the penalty phase. *Ake*, 470 U.S. at 82–84.   The Sixth Circuit has repeatedly affirmed the reasonableness of state court decisions that withhold expert-testimony funding to defendants outside those two scenarios.   *See, e.g.*, *Durr v. Mitchell*, 487 F.3d 423, 433 (6th Cir. 2007) (holding that petitioner was not entitled to funding for a psychologist outside of *Ake*'s two scenarios); *Smith*, 348 F.3d at 207 (holding that petitioner did not have a right to funding for a psychiatric expert at the penalty phase because he withdrew his insanity defense before trial); *Mason v. Mitchell*, 320 F.3d 604, 616 (6th Cir. 2003) (holding that petitioner did not have a clearly established right to any psychiatric assistance at sentencing because the prosecution had not introduced evidence of petitioner's future dangerousness); *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1120 (6th Cir. 1990) (en banc opinion of Kennedy, J., with five Judges concurring and one Judge concurring in the result) (finding that *Ake* did not apply where the prosecution "presented no psychiatric experts at the sentencing phase" that the petitioner would need an expert's testimony to counter).   So even assuming that it would be unreasonable not to extend *Ake*'s holding from psychiatrists to neuropsychologists, Bowling's case does not fit either scenario in which *Ake* requires funding.   He did not mount

an insanity defense at trial, and the government did not present psychiatric evidence of his future dangerousness at the penalty phase.  Consequently, the state court's decision to affirm the denial of funding for a neuropsychologist was reasonable.

Bowling's arguments in support of his claim are either incorrect or inapplicable to federal habeas review.  Bowling first argues that the trial court denied him "the guiding hand of counsel."  R. 1 at 278.  He reasons that the trial court, by ruling that a psychiatric examination was sufficient under Kentucky law, "usurped the role of counsel and made a tactical decision for the defense."  *Id.*  But deciding a motion put before the court is the purview of the trial judge, not trial counsel.  *See Bowling*, 80 S.W.3d at 421 (illustrating that such funding determinations are made by the trial court pursuant to Kentucky law's "reasonably necessary" standard).  Bowling also asserts that the trial court's ruling restricted his attorney's freedom to represent him and burdened Bowling's right to testify.  *See* R. 1 at 277–78 (citing *Brooks v. Tennessee*, 406 U.S. 605 (1972), in which a state statute required defendants to testify first or not at all).  But the trial court's ruling did no such thing.  Rather, it simply ruled that Bowling was not entitled to funds that are not critical to any of the constitutional rights Bowling cites.  *See id.* at 279; *Mason*, 320 F.3d at 615–16 (denying a habeas petitioner's claim that he had a constitutional right to funding for various expert witnesses).

Bowling also asserts that the trial court's ruling "prejudiced" him because Bowling had demonstrated a "sufficient need" for neuropsychological testimony.  R. 1 at 278–79.  But Bowling fails to identify any decision by the Supreme Court, or even the Sixth Circuit, which establishes a right to the services he claims were "as basic to [his] defense as the right to counsel."  *Id.* at 279 (citing only *Ake*); *but see supra* (collecting cases holding that defendants

in Bowling's position have no constitutional right to expert assistance).  And a trial court's ruling is not a violation of due process or otherwise fundamentally unfair simply because it works to a defendant's general disadvantage.  *See Medina*, 505 U.S. at 451 (due process analysis does not turn on what "may produce results more favorable to the accused" (citation omitted)).  Thus, Bowling's claim fails.

### 2.    Denying Funds for an Independent Expert Witness (Claim 54)

Bowling asserts that the trial court "denied his right to an independent expert witness" by denying his motion for funding.  R. 1 at 270.  The Kentucky Supreme Court denied this claim on its merits, s*ee Bowling*, 80 S.W.3d at 422–23 (citing *Ake*, 460 U.S. 68), so § 2254(d) deference applies, *see Richter*, 131 S. Ct. at 876–77.  As previously explained, *see* R. 245 at 92–95; Section VII.B.1 *supra*, there is no federal constitutional right to an "independent expert" for a defendant in Bowling's position.  *Smith*, 348 F.3d at 207–08 (holding that a defendant has no federal constitutional right to "independent expert assistance" outside the two scenarios envisioned by *Ake*).  What's more, Bowling had no constitutional right to any psychiatric expert whatsoever because he did not present an insanity defense and the prosecutor did not present psychiatric evidence of future dangerous.  *See id.*  Finally, his citations to Kentucky state court decisions, R. 1 at 271, are irrelevant because federal habeas courts do not review errors of state law, *see Estelle*, 502 U.S. at 67, and even if the Court were to consider them, they are meritless.  *See* Section VII.A.3 *supra*.  Thus, Bowling's claim fails.

### 3.    Ordering KCPC's "Neutral" Evaluation (Claim 60)

Bowling asserts that the trial court violated his constitutional rights by "order[ing] that KCPC evaluate him."  R. 1 at 289.  The Kentucky Supreme Court affirmed the trial

court's ruling on its merits, *see Bowling*, 80 S.W.3d at 422–23 (citing *Ake*, 460 U.S. 68).  So the Court applies § 2254(d) deference to its decision, *see Richter*, 131 S. Ct. at 876–77.

Claim 60 does not present an independent theory as to why Bowling had a federal constitutional right to an expert other than the one he received.  Because the "neutral" expert is the alternative to the "independent" expert that Bowling sought, Claim 60 is effectively a restatement of Claim 54.  *Compare* Claim 60, R. 1 at 290 ("The neutral KCPC expert could not provide Bowling the essential assistance of an independent expert, including confidentiality."), *with* Claim 54, R. 1 at 270 ("Bowling was denied his right to an independent expert due to the trial court's de facto denial of his motion for funding.").  So Claim 60 offers the same basic arguments that Bowling made in Claim 54.  *See* Section VII.B.2 *supra*.

And the Court has already found those arguments unavailing.  Bowling had no federal constitutional right to an "independent expert."  *See* Section VII.B.2 *supra*; *see also* R. 245 at 92–95.  And Bowling's state-appointed KCPC expert satisfied whatever rights he had under federal and state law to expert assistance.  *See* Section VII.A.2 *supra*.  Finally, any trial court error concerning funding for an independent or neuropsychological expert was necessarily harmless because Bowling chose not to present an insanity or diminished capacity defense.  *See* Section VII.A.3 *supra*.  Consequently, Bowling has no grounds—in either federal or state law—for challenging the trial court's order that he undergo a KCPC evaluation.

The only arguably novel argument that Claim 60 contains is Bowling's assertion that the trial court "acknowledged that . . . an expert was as basic to [Bowling's] defense as the right to counsel."  R. 1 at 290.  But the trial court's ruling held no such thing.  The trial court's ruling established that a neutral psychiatrist was "reasonably necessary" to his

defense under KRS § 31.110, not that it was a constitutional right.  *See Bowling*, 80 S.W.3d at 421 (quoting *Hicks*, 670 S.W.2d at 838).  And even if the trial court had so held, it was a reasonable interpretation of *Ake*.  *See Durr*, 487 F.3d at 433 (holding that petitioner was not entitled to funding for a psychologist outside of *Ake*'s two scenarios); *Smith*, 348 F.3d at 207 (same).  Thus, Bowling's claim fails.

## VIII.   Victim Impact Testimony (Claim 4)

Bowling claims that the trial court violated his due-process rights by allowing the victims' families to testify during the sentencing phase of his trial.  *See* R. 1 at 80; R. 159 at 101.  The state court reviewed and rejected this claim.  While the Kentucky Supreme Court found some of the testimony's "details about the victims' personal life" "irrelevant," *Bowling*, 942 S.W.2d at 302, it ultimately "conclude[d] that the information provided to the jurors was not unduly prejudicial," *id.* at 303.  Thus, AEDPA review applies.  *See Pinholster*, 131 S. Ct. at 1398–99; *Fautenberry v. Mitchell*, 515 F.3d 614, 639 (6th Cir. 2008).

Since the trial court instructed the jurors to incorporate the evidence from the guilt phase into their sentencing deliberations, *see* 24 T.E. 3637, the prosecution called only two witnesses during the penalty phase.  The prosecution chose one relative for each victim: for Ronald Smith, his mother Oda Proffitt, and for Marvin Hensley, his widow Martha Hensley.  *See id.* at 3637, 3642.  Each witness answered several questions about her respective victim's personal history and future plans.  *See id.* at 3638–41 (Smith), 3642–50 (Hensley).  In his closing argument, the prosecutor only referenced details from the victim impact testimony twice.  *See* 25 T.E. 3755, 3759.  He focused primarily on the statutory factors and the nature of the crimes.  *See id.* at 3753–59.  If there was a dominant theme in his argument, it was the reprehensibility of carrying out multiple premeditated murders for monetary gain.  *See id.* at

3755, 3757–59.  After closing arguments, the jury returned a sentence of death based on three aggravating factors for both murders: (1) that the "acts of killing were intentional and resulted in multiple deaths," (2) that the murders were "committed while the Defendant was engaged in the commission of a first degree robbery upon" each victim, and (3) that the murders were "committed while the Defendant was engaged in the commission of first degree burglary" of each station.  *Id.* at 3774–75.

Bowling argues that the victim impact testimony was largely irrelevant under Kentucky's statutory factors.  *See* R. 1 at 82–83; R. 159 at 104–05.  But the testimony's relevance or irrelevance under that statutory scheme is a question of state law that is usually not cognizable on habeas review.  *See Strouth v. Colson*, 680 F.3d 596, 605 (6th Cir. 2012); *see also Estelle*, 502 U.S. at 67.  As a federal habeas petitioner, Bowling has the burden to establish that this introduction of testimony amounted to a federal constitutional violation. He can do so in two ways: First, he can show that "the state court based its death sentence on 'factors . . .  totally irrelevant to the sentencing process' in violation of the Eighth Amendment."  *Strouth*, 680 F.3d at 605 (quoting *Johnson v. Mississippi*, 486 U.S. 578, 585 (1988)).  Second, he can show that "the error 'was so pervasive as to have denied [Bowling] a fundamentally fair trial,' in violation of the Due Process Clause of the Fourteenth Amendment."  *Id.* (quoting *Apanovitch v. Houk*, 466 F.3d 460, 487 (6th Cir. 2006)). Bowling does neither.

There was no Eighth Amendment violation because victim-impact statements are not "totally irrelevant to the sentencing process."  *See id.* (internal quotation marks omitted).  In *Payne v. Tennessee*, the Supreme Court squarely held that there is "no per se bar to the introduction of victim impact evidence and argument" in capital sentencing.  *Byrd v. Collins*,

209 F.3d 486, 532 (6th Cir. 2000) (citing *Payne*, 501 U.S. 808, 827 (1991)).  The Kentucky Supreme Court properly applied that holding in determining that the family members' testimony was "not unduly prejudicial."  *See Bowling*, 942 S.W.2d at 303 (citing *Payne*, 501 U.S. at 825, 827).  Thus, the state court's decision was not "objectively unreasonable" under clearly established Eighth Amendment precedent.  *Cone*, 535 U.S. at 694.

Nor was the state court's decision "objectively unreasonable" under clearly established Due Process precedent.  *Id.*  Bowling claims that the state court "did not apply the United States Supreme Court's rule in *Payne v. Tennessee*."  R. 159 at 106 (citing *Payne*, 501 U.S. 808).  But the state court explicitly invoked *Payne* in "conclud[ing] that the information provided to the jurors was not unduly prejudicial."  *Bowling*, 942 S.W.2d at 303 (citing *Payne*, 501 U.S. at 825).  Accordingly, the state court's decision was not "contrary to [the Supreme] Court's clearly established precedent" under § 2254(d)(1).  *Williams*, 529 U.S. at 405.  The state court applied the proper "governing law" from Supreme Court precedent by invoking *Payne*.  *See id.* at 405.  And the state court did not contradict the Supreme Court's conclusion in a case with "materially indistinguishable" facts.  *Id.* at 406 ("A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.").

Bowling insists that the state court's decision was also "an unreasonable application of the clearly established law of *Payne*."  R. 159 at 106.  He supports his conclusion by arguing that here, unlike *Payne*, there was "extensive, pervasive testimony" that was "extremely inflammatory and prejudicial."  *Id.* at 104.  However, under the "unreasonable application" prong of § 2254(d)(1), Bowling must go beyond simply showing that the

testimony here was more extensive or more prejudicial than in *Payne*.  *See Williams*, 529 U.S. at 410 (stressing that "the most important point [under §2254(d)(1)] is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law").  Bowling must show that "fairminded jurists" would unanimously agree that the state court's decision was incorrect.  *Richter*, 131 S. Ct. at 786 ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." (internal quotation marks omitted)). Bowling fails to meet that heavy burden.

In *Payne*, the Supreme Court set a high bar for defendants claiming that victim-impact evidence was unduly prejudicial.  The facts of the case are brutal.  Pervis Payne attacked 28-year-old Charisse Zvolanek and her two children, 3-year-old Nicholas and 2-year-old Lacie, repeatedly slashing and stabbing them with a butcher knife.  *Payne*, 501 U.S. at 811–13.  When police arrived at the scene, Charisse and Lacie were already dead from multiple stab wounds.  *See id.* at 812.  But emergency workers managed to "miraculously" save Nicholas after "seven hours of surgery and a transfusion of 1,700 cc's of blood."  *See id.* At sentencing, the prosecution called Charisse's mother, Mary Zvolanek, to testify about how Charisse's son, Nicholas, "had been affected by the murders of his mother and sister." *Id.* at 814.  She told the jury that Nicholas "cries for his mom" and "doesn't seem to understand why she doesn't come home."  *Id.*  Zvolanek said that Nicholas also "cries for his sister Lacie" and "comes to me many times during the week and asks me, Grandmama, do you miss my Lacie."  *Id.*  Notwithstanding the undoubtedly heart-wrenching nature of Zvolanek's testimony, the Supreme Court affirmed Payne's death sentence.  The high court held that defendants claiming a due process violation must show that witness testimony "is

so unduly prejudicial that it renders the trial fundamentally unfair." *Payne*, 501 U.S. at 825. Zvolanek's testimony did not cross the line into fundamental unfairness, even though it undoubtedly moved the jurors. *Id.* at 826–27; *id.* at 831–32 (O'Connor, J., concurring).

Bowling has not come near to showing that the testimony here falls outside the reasonable ambit of *Payne*'s holding. First, the testimony at Bowling's penalty phase was similar in form to the testimony in *Payne*. *Compare* 24 T.E. 3637–50 (testifying about victims' personal histories, family life and future plans), *with State v. Payne*, 791 S.W.2d 10, 17–18 (Tenn. 1990) (testifying about victim's surviving child). Neither witness called for Bowling to receive a particular punishment, described the crimes themselves, or even relayed her personal sense of loss. *See Fautenberry*, 515 F.3d at 638 (explaining that *Payne* did not alter the Supreme Court's previous decisions barring "a victim's family members' characterization and opinions about the crime, the defendant, and the appropriate sentence" (internal quotation marks omitted)). Second, the witnesses' testimony served purposes that *Payne* endorsed. The *Payne* Court held that states may "properly" use victim impact testimony to help "the jury to assess meaningfully the defendant's moral culpability and blameworthiness." 501 U.S. at 825. And, as the Kentucky Supreme Court pointed out, much of the testimony Bowling objects to was part of the "background information" about each victim that helped create "a full understanding of the nature of the crime." *Bowling*, 942 S.W.2d at 302. Specifically, it supported "a logical inference that the murders were unnecessary and cold blooded" by showing that the victims were likely passive during the robberies. *Bowling*, 942 S.W.2d at 302. Also, the *Payne* Court held that the states have a legitimate interest in "demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide." 501 U.S. at 822. Testimony about either victim's

149

church membership, *see* 24 T.E. 3640, 3644–46, career history, *see id.* at 3643–44, family life, *see id.* at 3639, 3646–49, or charitable work, *see id.* at 3645–46, simply illustrated the tolls taken on "the victim's family and . . . society." *Payne*, 501 U.S. at 822.

Third, the testimony here was no more unduly prejudicial or inflammatory than in *Payne*. Indeed, the testimony in Bowling's sentencing phase lacked the emotional magnitude of Mary Zvolanek's testimony. *Compare* 24 T.E. 3638–50 (relaying facts of victims' lives without detailing each family's respective grieving), *with Payne*, 501 U.S. at 813–14 (grandmother's description of her grandson's sorrow after his mother and sister were murdered). Similarly, the prosecution's closing argument here did not play up the evidence's emotive power like the prosecutor's argument in *Payne*. *Compare* 25 T.E. 3752–59 (only mentioning victim statements twice and focusing on nature of crime and statutory factors), *with Payne*, 501 U.S. at 815–16 (describing in detail the various sorrows Nicholas Zvolanek will suffer).

Finally, the Sixth Circuit has previously upheld the admission of more inflammatory and pervasive victim impact evidence. *See, e.g.*, *Hicks v. Collins*, 384 F.3d 204, 221-22 (6th Cir. 2004) (affirming death sentence despite the prosecutor "appeal[ing] to the jury's emotions at both the guilt and penalty phase" by emphasizing one victim's "young age," the other victim's "handicap," as well as "the idea that the murders destroyed a whole family"). In finding Bowling guilty of both murders, the jury necessarily concluded that he intentionally murdered two men in order to rob them. *Compare* 24 T.E. 3610–11 (finding Bowling guilty of multiple murders conducted during the course of committing robbery and burglary), *with* KRS § 532.025(2)(a) (including among its aggravating factors: whether defendant's killings were "intentional and resulted in multiple deaths" and whether killing

150

was "committed while . . . engaged in the commission of . . . robbery in the first degree [or] burglary in the first degree"). So, compared to the "overwhelming" evidence of aggravating factors presented in the guilt phase, the victim impact evidence was "isolated, not extensive." *Hicks*, 384 F.3d at 222; *see also supra* (citing 25 T.E. 3755, 3759; *id.* at 3753–59; *id.* at 3755, 3757–59). Thus, there is certainly a "possibility" that "fairminded jurists" would conclude that the state court's decision was consistent with Supreme Court precedent. *Richter*, 131 S. Ct. at 786.

Bowling offers several reasons why the testimony here was more problematic than in *Payne*, but none are availing. He emphasizes that the only new evidence the prosecution presented at sentencing was victim-impact testimony. *See* R. 1 at 82–83; R. 159 at 101. But in *Payne* the only witnesses the prosecution called at sentencing were Mary Zvolanek and a police officer who authenticated the videotape of the crime scene shown to the jury. *See Payne*, 791 S.W.2d at 17. And nothing in the Supreme Court's decision indicates that fundamental fairness turns on how much of the sentencing-phase evidence the prosecution dedicates to victim-impact testimony. *See Payne*, 501 U.S. at 825–27. Moreover, the prosecution had a good reason for not introducing other evidence at sentencing: it was unnecessary. The trial court had instructed the jury to incorporate the evidence from the guilt phase into their sentencing deliberations. *See* 24 T.E. 3631, 3634. So presenting evidence of the crimes would have been unnecessarily cumulative. Thus, in the grand scheme of the prosecution's case, the victim-impact testimony was not unduly prejudicial and was only a small portion of what the jury ultimately considered when concluding that the death penalty was appropriate. *See Jackson v. Anderson*, 141 F. Supp. 2d 811, 856 (N.D. Ohio 2001).

Similarly, Bowling harps on the fact that the testimony from Oda Proffitt and Martha Hensley lasted "fourteen pages of the transcript." R. 159 at 103. But *Payne* teaches that it is the substantive effect, rather than the amount, of victim-impact evidence that matters. In requiring defendants to show that victim-impact testimony "render[ed] the trial fundamentally unfair," *Payne* cited the Supreme Court's decision in *Darden v. Wainwright*. *Payne*, 501 U.S. at 825 (citing *Darden*, 477 U.S. 168, 179–183 (1986)). *Darden* held that the prosecutor calling the defendant an "animal" and repeatedly trying to elicit "emotional" responses in his closing argument was improper but not "fundamentally unfair." 477 U.S. at 179–83. The *Darden* Court stressed that fundamental unfairness comes from subverting the jury's proper consideration of the evidence at the guilt phase. *See id.* at 181–82. *Payne* extended that reasoning to the sentencing phase. Thus, the *Payne* Court held that witnesses do not render sentencing fundamentally unfair simply because their testimony "illustrate[s] quite poignantly some of the harm" a defendant caused. 501 U.S. at 826. And that is because "there is nothing unfair about allowing the jury to bear in mind that harm at the same time as it considers the mitigating evidence." *Id.* Since the fourteen pages of testimony in Bowling's sentencing hearing served that same purpose and did so with less poignancy than *Payne*, *see supra*, there was "nothing unfair" about it. *Payne*, 501 U.S. at 826.

Bowling also objects to some of the prosecution's methods of presentation. He takes particular exception to the fact that the prosecution asked Marvin Hensley's children, who were present in the gallery, to stand and remain standing as Martha Hensley named them. *See* R. 159 at 102–03; *see also* 24 T.E. 3647–48. But this brief display of the children that Bowling left fatherless did not convey sorrow like Mary Zvolanek's testimony about little Nicholas crying for his mother and sister. *See Payne*, 501 U.S. at 814–15. Under *Payne*, the

state has a "legitimate interest in . . . reminding the sentencer that . . . the victim is an individual whose death represents a unique loss to society and in particular to his family." *Id.* at 825. The prosecution's presentation was reasonably related to that legitimate interest, so the state court's decision was not "objectively unreasonable." Bowling also criticizes the prosecution for showing a photograph of Marvin Hensley at Christmastime. *See* R. 159 at 104. But the prosecution chose that picture because it was the most recent photograph of Hensley. *See* 24 T.E. 3642–43. What's more, it was not as inflammatory as the video evidence in *Payne*, 501 U.S. at 832, or in *Byrd v. Collins*, 209 F.3d at 531–32 (allowing prosecutors to play a videotape of a television interview of the murder victim and his family, despite defense counsel's protests that it was "highly sympathetic and emotion-charged portrayal of the victim and the victim's family," because that video had allegedly prompted the defendant to confess his guilt to a fellow inmate).

Finally, Bowling argues—seemingly in the alternative—that the state court made "an unreasonable determination of the facts in light of the evidence presented in state court." R. 159 at 106. Because this is a challenge to factual findings, § 2254(d)(2) applies. Under § 2254(d)(2), a federal court must "presume state-court findings correct unless it determine[s] that the findings would result in a decision which [i]s unreasonable in light of clear and convincing evidence." *Miller-El v. Cockrell*, 537 U.S. 322, 323 (2003). But Bowling never objects to a specific factual determination made by the state court (other than its overall determination that the victim-impact evidence did not unduly prejudice Bowling). *See* R. 159 at 101–06.

Moreover, the only factual evidence that Bowling cites is one study's summary of another study's findings. *See* R. 159 at 104–05 (citing Bryan Myers & Edith Greene, *The*

*Prejudicial Nature of Victim Impact Statements: Implications for Capital Sentencing Policy*, 10 Pscyhol. Pub. Pol'y & Law 492, 508 (2004) (citing James Luginbuhl & Michael Burkhead, *Victim Impact Evidence in a Capital Trial: Encouraging Votes for Death*, 20 Am. J. of Crim. Just. 1–16 (1995)).   That original study is hardly convincing.   It involved undergraduates reading transcripts of hypothetical trials.   *See* SpringerLink, Abstract for *Victim Impact Evidence in a Capital Trial: Encouraging Votes for Death*, http://www.springerlink.com/content/c66g188744767372/ (last visited July 17, 2012).   After reading a transcript that either did or did not include a victim-impact assessment, the undergraduates would vote on whether to apply the death penalty to the hypothetical defendant.   *See id.*   Questionable social science about the general effect of hypothetical victim-impact statements on hypothetical jurors does not qualify as "clear and convincing evidence" for Bowling's own case.   *Miller-El*, 537 U.S. at 323.   Moreover, neither of these studies was presented to the state court.   *See* R. 1 at 81–86.   So even if the evidence were clear and convincing, a federal habeas court cannot consider it.   *See Pinholster*, 131 S. Ct. at 1401.

Habeas review under § 2254(d) "demands that state-court decisions be given the benefit of the doubt."   *Visciotti*, 537 U.S. at 24.   Here, the state court's decision fits reasonably under both the facts and logic behind the Supreme Court's holding in *Payne*.   Accordingly, the Court cannot say that the state court's decision to affirm Bowling's sentence was "objectively unreasonable."   *Cone*, 535 U.S. at 694.   Thus, Bowling's claim fails.

## IX.    Cumulative Prejudice Analysis

Bowling's *Brady* and *Strickland* claims, from the Court's prior opinion as well as this one, require a cumulative analysis.  These claims assert rights rooted in the guarantee of a fair trial, a guarantee that requires a holistic analysis of the evidence at trial.  *See Strickler*, 527 U.S. at 290; *Strickland*, 466 U.S. at 695–96.  Consequently, the Supreme Court has held that courts evaluating *Brady* claims must consider the "cumulative effect of suppression" in determining the materiality of the evidence.  *Kyles*, 514 U.S. at 437.  And, similarly, courts considering *Strickland* claims must measure the cumulative effect of counsel's errors in light of the totality of the evidence.  *Williams*, 529 U.S. at 397–99.

**The** *Brady* **Claims:** Bowling brings *Brady*-type challenges concerning three areas of evidence at trial.  To recall, those are: (1) Agent Havekost's CBLA testimony, *see* Section V.A *supra* (Claim 52 and amendments to the petition); (2) Timothy Chappell's testimony, *see* Sections VI.B.1–2 *supra* (Claims 18 and 45); and (3) the prosecution's alleged discovery violations, *see* Section III *supra* (Claim 13).  To determine their materiality, the Court must assess these claims "collectively, not item by item."  *Kyles*, 514 U.S. at 436.

According to Bowling, more scrupulous disclosure by the prosecution would have changed his trial in five ways.  *One:* Bowling would have had the 1991 study and other information about CBLA's limits in order to impeach Agent Havekost on cross examination (Claim 52 and amendments); *Two:* trial counsel would have had additional information, including the federal sentencing transcript, to use when impeaching Timothy Chappell (Claims 18 and 45); *Three:* the defense would have received the photograph of the revolver on Bowling's sink sooner (Claim 13, sub-claim one); *Four:* the defense would have received Sergeant Bickerstaff's handwritten report (Claim 13, sub-claim two); and *Five:* the defense

would have received more statements from Ora Lee Isaac (Claim 13, sub-claim three). The net effect of this suppressed evidence would not have shifted the balance of the evidence at trial so as to "have made a different result reasonably probable." *Kyles*, 514 U.S. at 441.

First, the evidence would not have appreciably improved the defense's case. As the Court already explained, Bowling never shows how earlier or fuller disclosure of Ora Lee Isaac statements (Claim 13) would have improved his defense. *See* Section III *supra*. So there is no effect from the evidence in Claim 13 to add to the cumulative analysis. And the remaining evidence impeaching CBLA (Claim 52) and Timothy Chappell (Claims 18 and 45) would not have strengthened Bowling's case significantly. While impeachment evidence is still "material" under the *Brady* doctrine, *see Strickler*, 527 U.S. at 281–82, it does not affect the balance of evidence as dramatically as exculpatory evidence normally would. Exculpatory evidence strikes a counterblow, and jurors must wrestle to reconcile it with the prosecution's proof. But impeachment evidence loses its effect when the prosecution has other un-impeached evidence that accomplishes the same effect as the impeached evidence. So while the 1991 study might have allowed the defense to cast greater doubt on Havekost's testimony, at least six other sources of evidence still connected Bowling to the Smith and Hensley murders, *see* Section V.A *supra*. Among them, the ballistics analyses from Officers Freels and Mitchell are most significant. Because they provide similar forensic evidence, they fill the same persuasive role that Agent Havekost's testimony would have played: providing a physical connection to the murders for the jury. Similarly, impeachment evidence does not strengthen the defense when it targets prosecution evidence that has already been discredited. *See Brooks*, 626 F.3d at 894. Here, the impeachment evidence for Chappell would not have significantly strengthened Bowling's defense because it was

cumulative of the evidence that had already thoroughly impeached Chappell.  *See* Section IV.B.1 *supra* (citing *Bell*, 512 F.3d at 237; *Brooks*, 626 F.3d at 894).

Second, even giving the fullest weight possible to this impeachment evidence, it would not have significantly shifted the overall balance of evidence.  The defense still would not have discredited the vast bulk of evidence that the prosecution stressed as proof of Bowling's guilt: (1) the traditional ballistics analysis by Officers Freels and Mitchell, 24 T.E. 3580–82, 3590–91; (2) the fact that the holster in Bowling's trailer conformed to the unusual deformity on the murder weapon's trigger guard, *id.* at 3594–95; (3) the fact that Bowling led officers on a high-speed chase after attempting to murder Ricky Smith, *id.* at 3587–88; (4) the fact that officers found the murder weapon lying on top of the snow along the highway where the police chased Bowling, *id.* at 3589; (5) the lead residue found on the gloves that officers saw Bowling throw from his car during the chase, *id.* at 3588–89; (6) testimony by Ricky Smith and Ora Lee that they saw Bowling with a revolver matching the murder weapon, *id.* at 3590; (7) the picture of a revolver in the Bowlings' trailer despite Bowling's claim that he did not own a revolver, *id*; and (8) the testimony by Ricky Smith that Bowling attempted to murder him at a similar time and location as the other murders, *id.* at 3584–86, 3589–90.  In light of all this proof, the suppression of this undisclosed evidence was not material.

***Ineffective Assistance Claims:***  As with *Brady* claims, courts must "evaluate the totality" of the effect that counsel's errors and omissions had under *Strickland*.  *Williams*, 529 U.S. at 397.  Bowling brings a host of ineffective of assistance claims; they can be classified by underlying issue.  Those are: (1) voir dire, *see* Section II.C *supra* (Claim 67); (2) Timothy Chappell's testimony, *see* Section VI.C *supra* (Claims 46 and 47); (3) Agent

Havekost's CBLA testimony, *see* Section V.B *supra* (Claim 51); (4) the Rockcastle County shooting evidence, *see* R. 245 at 90–92 (Claim 65); (5) Eugene Herren's testimony, *see* R. 245 at 87–90 (Claim 49); (6) alibi testimony from Randy Harris and April Lunsford, *see* Sections I.A–B *supra* (Claims 48 and 50); and (7) the expert evaluation and testimony regarding Bowling's alleged brain damage, *see* Section VII.A *supra* (Claims 53, 55, 58, 59, and 61). These seven categories can be further classified by the distinct trial stages that they fall under. The voir dire claim applies to the pretrial phase, the next five categories apply to the guilt phase, and the brain evidence claims apply to the penalty phase. Because each phase is a separate component of Bowling's trial, prejudice from one phase does not impact the next phase. For example, voir dire selection does not normally affect the evidence presented at the guilt phase of the trial. The Court therefore analyzes claims cumulatively within their respective phases of the trial.

Trial counsel's performance during voir dire did not prejudice Bowling. As explained, *see* Section II.C *supra*, the jurors who deliberated and delivered a verdict in Bowling's case were all impartial. And Bowling fails to identify any reason to suspect that there might have been a different outcome if trial counsel had exercised a peremptory strike on Juror Ena Siner. *See* Section II.C *supra* (quoting *Keith*, 455 F.3d at 677). So there is not a "substantial" likelihood, *Richter*, 131 S. Ct. at 792, that counsel's performance at voir dire affected the outcome of Bowling's trial.

Trial counsel's performance also did not prejudice Bowling at the guilt phase. First, counsel's failure to object to the Rockcastle County shooting evidence cannot count in the total prejudice calculation. As the Court previously explained, the Kentucky Supreme Court determined, twice, that the Rockcastle County evidence was admissible under Kentucky Rule

of Evidence 404(b), *see* Section IV.A *supra*.  Bowling therefore cannot claim any prejudice whatsoever from the Rockcastle evidence because he was not entitled to exclude it.  *Cf. Lafler*, 132 S. Ct. at 1387 (explaining that defendants cannot claim prejudice based on outcomes that that would require "the application of an incorrect legal principle or a defense strategy outside the law").  The evidence concerning Timothy Chappell's testimony and Agent Havekost's CBLA analysis, however, must be considered in the cumulative analysis.  But as the cumulative *Brady* analysis shows, more effective impeachments of that evidence would not have had an appreciable impact.  *See supra*.  Additional impeachment of Timothy Chappell was cumulative and the CBLA testimony merely corroborated forensic and circumstantial evidence linking Bowling to the murders.  *Id.*

Bowling might have gained a marginal benefit if his trial counsel had investigated and prepared Eugene Herren as Bowling claims counsel should have.  But the benefit would have been truly minimal.  As the Court explained in its previous opinion, R. 245 at 87–90, even if counsel had straightened Herren out on what date he overheard the two men talking in the bathroom at the Jones Chevron station, his testimony was not persuasive.  Herren could not identify the men, he could not definitively say that they were referring to Ronald Smith when they said "that M.F. is fried," there was no indication that they were planning on killing anyone at all, and no other testimony or evidence linked the men to Smith's murder.  *Id.* at 88, 90.  So while trial counsel might have prevented the prosecution's impeachment of Herren, the testimony still would not have been much to help Bowling.

As alibi witnesses, Randy Harris and April Lunsford require a slightly different analysis because their testimony could have potentially exculpated Bowling.  Initially, the fact that counsel performed reasonably with both witnesses means that neither witness need

be considered in a prejudice analysis, *see* Sections I.A–B *supra*.  In any case, neither witness had the kind of credibility that raises a "substantial" chance of a different outcome for Bowling.  *Richter*, 131 S. Ct. at 792.  As already explained, the prosecution could have thoroughly impeached both Harris and Lunsford even if the defense had followed the course that Bowling now claims trial counsel should have taken, *see* Sections I.A–B *supra*.  New testimony from a deeply flawed alibi witness (Harris), and slightly improved testimony from another deeply flawed alibi witness (Lunsford) does not present a substantial likelihood of turning the tide of forensic and circumstantial evidence establishing Bowling's guilt.

The sum of Bowling's guilt-phase claims does not present a substantial likelihood of a different verdict.  Had counsel conducted the guilt-phase defense according to Bowling's claims, the following would change: (1) the defense would impeach Chappell even more thoroughly; (2) the defense would qualify the CBLA evidence, making it less definitive but leaving the other forensic evidence largely untouched; (3) Eugene Herren would have offered testimony that was not significantly impeached but also did not offer proof of Bowling's innocence or bolster other defense evidence; and (4) Harris and Lunsford would offer testimony that was open to thorough impeachment by the prosecution.  Bowling would still have no exculpatory evidence approaching the persuasive force of the prosecution's inculpatory evidence, particularly Ricky Smith's testimony and the ballistics analyses.  And Bowling would still not have appreciably impeached the majority of the lines of evidence tying him to the murders, *see* Section V.A *supra*.  Thus, Bowling's ineffective-assistance claims do not raise a substantial likelihood of a different outcome at the guilt-phase.

Turning to Bowling's ineffective assistance claims based on his alleged brain damage, neither trial nor appellate counsel prejudiced Bowling by their approach (or lack thereof) to

Bowling's alleged brain damage.  Whether at the trial or appellate phase, Claims 53, 55, 58, 59, and 61 rest on the same basic theory: If counsel had been more effective or persistent in preparing and making the argument that Bowling deserved a neuropsychological evaluation, Bowling would have secured expert testimony that mitigated his culpability.  But that theory assumes that Kentucky law allowed for the possibility that an able argument could secure funding.  As the Court already explained, numerous prior decisions by the Kentucky Supreme Court had held that defendants in Bowling's position were not entitled to funding. *See* Section VII.A.3 *supra*.  Bowling's request was not for a guilt-phase defense, and he did not plan on using the evidence.  So no matter how admirably counsel investigated and argued at either the trial or appellate level, Bowling would not have been eligible for a neuropsychological evaluation.  Accordingly, Bowling was not prejudiced by either counsel's performance.  *Cf. Lafler*, 132 S. Ct. at 1387 (explaining that a defendant cannot claim prejudice based on the possibility of on an incorrect application of the law, but based only on what "others in his position would have received in the ordinary course").  Thus, a cumulative prejudice analysis confirms the Court's prior item-by-item assessment of Bowling's claims.

## X.    Evidentiary Motions

Bowling would like to procure additional evidence to support his habeas petition. Specifically, he seeks an evidentiary hearing, R. 118; R. 188; additional discovery, R. 120; and additional funds under 18 U.S.C. § 3599(f), R. 166.  While courts have discretion to grant such motions, Bowling fails to carry his burden on any of them.  Thus, they are denied.

A.      Motions Mooted by *Cullen v. Pinholster*

As an initial matter, *Cullen v. Pinholster*, 131 S. Ct. 1388, renders the majority of Bowling's motions moot.  In *Pinholster,* the Supreme Court held that § 2254(d)(1) review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Id* at 1398.  Why?  Because § 2254(d)(1) is "backward-looking."  *Id.*  The object of federal habeas review under § 2254(d)(1) is to review the "state-court decision at the time it was made" using "the record in existence at that same time i.e., the record before the state court." *Id.*

Bowling argues that *Pinholster* is inapplicable because *Pinholster,* as Bowling reads it, was a "narrow decision" that "does not apply to discovery," R. 120 at 11, and "should not apply to claims [where Bowling] was denied funding in state post-conviction proceedings." R. 188 at 5; *see also* R. 120 at 14; R. 118 at 5–6.  The Sixth Circuit, however, has held otherwise.  Federal courts must rely "on only the record that was before the state court in overcoming AEDPA's deference requirements."  *Fears v. Bagley*, 462 F. App'x 565, 568 (6th Cir. 2012) (citing *Pinholster*, 131 S. Ct. at 1400).  So petitioners have not been allowed to expand the record to include evidence of mental illness when the state court denied funding for expert testimony during post-conviction proceedings, *Strouth*, 680 F.3d at 603, or when the state court did not allow the petitioner to include evidence during the state collateral proceedings, *Fears*, 462 F. App'x at 574.  In short, absent a showing that Bowling's collateral review was defective under "clearly established federal law," a federal court "may not consider any [] evidence" that was not before the state court.  *Id.*

Bowling cites no Supreme Court decisions supporting his assertion that his state post-conviction proceedings were constitutionally defective.  The Supreme Court has never held

162

that prisoners must receive funding for expert witnesses in state post-conviction proceedings or that prisoners must receive discovery to develop their state habeas claims.  The two cases that Bowling does cite are inapplicable here.  Dicta in *Wellons v. Hall*, 130 S. Ct. 727 (2010), did address the question of "whether to permit discovery and an evidentiary hearing."  *Id.* at 731 n.3.  But the majority simply noted that federal courts should not be required to defer to state court findings of fact that were "made without *any* evidentiary record."  *Id.* (emphasis added).  In *Wellons*, the alleged misconduct by the judge, jurors, and bailiff took place entirely off the record and the state court never engaged in any fact-finding on the matter. *See id.* at 729.  Here, the trial errors Bowling challenges took place on the record—a record that the state courts relied on.  Additionally, the state habeas court allowed Bowling to submit affidavits as evidentiary support of his state habeas petition and held an evidentiary hearing on many of his claims where numerous witnesses testified.  While that hearing may not have been as long or as comprehensive a hearing as Bowling hoped for, this is not a case in which the state court's decision was "made without any evidentiary record."  *Id.* at 731 n.3.  And without Supreme Court precedent holding that it was defective, the permissible limitations Kentucky places on its state habeas proceedings do not justify additional evidentiary proceedings in federal court.  *See Strouth*, 680 F.3d at 603.

Similarly, Bowling gains no support from his citation to *Panetti v. Quarterman*, 551 U.S. 930 (2007).  *Panetti* held that § 2254(d) did not apply because the state court had not followed the specific procedural requirements for death penalty competency evaluations that the Supreme Court set out in *Ford v. Wainwright*.  *See* 551 U.S. at 953–54 (citing *Ford*, 477 U.S. 399 (1986)).  Bowling points to no such procedural improprieties here.  Thus, Bowling's repeated claim that he did not receive a "full and fair hearing" is unfounded.

*Compare* R. 118 at 8; R. 120 at 13; R. 188 at 5 (all asserting that Bowling should be granted an evidentiary hearing because of the limited nature of the state court post-conviction hearing), *with Blue v. Thaler*, 665 F.3d 647, 656 & n.28 (5th Cir. 2011) (holding that *Pinholster* bars additional evidence even where a prisoner did not receive a full and fair hearing in state post-conviction proceedings).  Consequently, the Court cannot second-guess the state court's adjudication of Bowling's claims based on evidence that was not before the state court.

Simply put, where *Pinholster* forbids the Court from considering additional evidence regarding a claim, it would be futile for the Court to grant additional evidentiary proceedings on that claim.  Accordingly, the Court denies Bowling's Motions for an Evidentiary Hearing, *see* R. 118; R. 188, his Motion for Additional Discovery, *see* R. 120, and his Motion for Funds under 18 U.S.C. § 3599(f), *see* R. 166, on the following claims.  Those are: Claim 2, *see* Section II.A *supra*, Claim 4, *see* Section VIII *supra*, Claim 15, *see* Section II.B *supra*, Claim 18, *see* Section VI.B.1 *supra*, the Leslie and Fayette County sub-claims in Claim 45, *see* Section VI.B.2 *supra*, Claim 47, *see* Section VI.C.2 *supra*, Claim 48, *see* Section I.A *supra*, Claim 50, *see* Section I.B *supra*, Claim 51, *see* Section V.B *supra*, Claim 52, *see* Section V.A *supra*,  Claim 53, *see* Section VII.A.1 *supra*, Claim 54, *see* Section VII.B.2 *supra*, Claim 55, *see* Section VII.A.2 *supra*, Claim 57, *see* Section VII.B.1 *supra*, Claim 58, *see* Section VII.A.1 *supra*, Claim 59, *see* Section VII.A.1 *supra*, Claim 60; *see* Section VII.B.3 *supra*, and Claim 67, *see* Section II.C *supra*.[8]

---

[8] Because Bowling has withdrawn Claims 7, 62, and 63, *see* R. 159 at 126, 276, his Motion for Additional Discovery on those claims, *see* R. 120, is moot independent of *Pinholster*.

Conversely, for the claims where § 2254(d) does not apply, *Pinholster* does not foreclose Bowling's motions for additional evidence on those claims. Thus, further consideration is required for Bowling's requests for an Evidentiary Hearing, *see* R. 118; R. 188, in support of Claim 61, *see* Section VII.A.3 *supra*, as well as the second and third amendments to Bowling's petition, *see* Section V.A *supra*. For the same reason, the Court must consider the showing Bowling makes in support of his Motion for Additional Discovery, *see* R. 120, for Claim 3, *see* Section IV.A *supra*, Claim 13, *see* Section III *supra*, Claim 19, *see* VI.A *supra*, Claim 20, *see* IV.B *supra*, the false-testimony sub-claim in Claim 45, *see* Section VI.B.2 *supra*, and Claim 46, *see* Section VI.C.2 *supra*, and the third amendment to Bowling's petition, *see* Section V.A *supra*.

## B. Burden for Motions

***Evidentiary Hearing Burden:*** Bowling has been diligent in seeking to develop his claims. As such, the Court has discretion in deciding his motion. *Robinson v. Howes*, 663 F.3d 819, 824 (6th Cir. 2011). But even death row inmates like Bowling must make certain showings before a hearing is held. *See Reynolds v. Bagley*, 498 F.3d 549, 555 (6th Cir. 2007). A district court "must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to habeas relief." *Schriro*, 550 U.S. at 474. The inverse is also true: if a review of the record demonstrates that a hearing could not yield a basis for habeas relief, an evidentiary hearing is unnecessary. *Id.* Accordingly, Bowling is not entitled to an evidentiary hearing under either of two scenarios: (1) he fails to show that an evidentiary hearing would yield facts that the Court could base his habeas relief on; (2) existing facts in the record, or the nature of the

state court's decision, preclude the possibility that the new facts he would develop in his evidentiary hearing would entitle him to relief.

*Discovery Request Burden:* The same basic principles apply to discovery requests. The decision to grant discovery under Rule 6 of the Rules Governing 28 U.S.C. § 2254 cases is left to the district court's discretion. But the district court cannot exercise that discretion until the petitioner makes "a fact specific showing of good cause under Rule 6." *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001) (citing *Bracy v. Gramley*, 520 U.S. 899 (1997) (additional citations omitted). Accordingly, Bowling has the burden to demonstrate "the materiality of the information requested" and show that the discovery he seeks "could entitle him to relief" by resolving specific factual disputes. *Id.* The Court is under no obligation to grant "a fishing expedition masquerading as discovery." *Id.* That requires making, not just a bare allegation, but a showing that discovery is likely to lead to further facts supporting his claim. *See Bracy*, 520 U.S. at 908–09 (finding that petitioner had "shown 'good cause' for discovery" where he provided evidence rebutting the "presum[ption] that public officials have properly discharged their official duties" (internal quotation marks omitted)). Accordingly, Bowling is not entitled to additional discovery under the same two scenarios: (1) if there is no showing that discovery will likely yield facts providing a basis for habeas relief, or (2) if the existing record nullifies the effect of any additional facts found through discovery.

### C.   Showing of Facts that Would Entitle Bowling to Relief

Bowling often asks for discovery from multiple sources of evidence in support of the same claim, and requests evidentiary hearings on the same claim in multiple motions.

Accordingly, the Court analyzes Bowling's motions in terms of the underlying claims rather than the individual motions.

### 1.    Motions for Evidentiary Hearings (Amends. to Petition, Claim 61)

Bowling seeks an evidentiary hearing in support of his claims: (1) that the prosecution suppressed *Brady* material for Agent Havekost's CLBA testimony, (Amends. to Petition), R. 118 at 2, 7–8; R. 188 at 7, and (2) that he received ineffective assistance of appellate counsel, (Claim 61), R. 118 at 3; R. 188 at 8.  He has not carried his burden of showing that a hearing on either claim could establish facts entitling him to habeas relief.  *See Schriro*, 550 U.S. at 474.

First, the evidence Bowling seeks to present on his CBLA claims would speak only to the reliability of CBLA.  *See* R. 188 at 6 (claiming that Bowling would present expert testimony criticizing CBLA testimony, national reports critiquing CBLA evidence, and testimony from Agent Havekost).  The Court has already determined that the CBLA evidence did not prejudice Bowling.  *See* Section V.A *supra*.  Additional evidence about CBLA's flaws or how it might have been impeached cannot affect the conclusion that there is no reasonable probability that the outcome of Bowling's trial hinged on the CBLA evidence.  The balance of the evidence weighs heavily in favor of the prosecution regardless of whether CBLA is factored in.  Similarly, the evidentiary hearing Bowling seeks for Claim 61 would speak only to the deficient performance prong of the *Strickland* test.  *See* R. 188 at 8.  It would leave the Court's determination that Bowling suffered no prejudice undisturbed, *see* Section V.A *supra*.  Consequently, an evidentiary hearing cannot establish facts that would entitle Bowling to relief on either claim.

Also, Bowling seeks an evidentiary hearing in support of his ineffective assistance of appellate counsel claim for just one reason: to establish that appellate counsel's omissions were not strategic. *See* R. 188 at 8. However, the Court assumed that counsel performed deficiently in addressing Claim 61 on the merits. *See* VII.A.3 *supra*. Bowling has therefore not made a "factual *showing*" that an evidentiary hearing would develop his claim. *Reynolds*, 498 F.3d at 555.

### 2.     Motion for Additional Discovery (Claims 3, 13, 19, 20, 45, 46)

Bowling seeks an evidentiary hearing in support of six claims. *See* R. 120 at 1–5. While Bowling requests different forms of discovery for various claims, all his requests share the same fundamental flaw: all of them lack "a fact specific showing of good cause." *Stanford*, 266 F.3d at 460. Instead, Bowling simply makes a bare request for a laundry list of potential evidentiary sources. For example, Bowling asks for:

> access to any and all notes, documents, memoranda, written information, taped information, or any other information pertaining to the investigation of the crime scenes in both the Laurel and Rockcastle County prosecutions of Bowling, including but not limited to other suspects and forensic evidence gathered [these claims are in section thirteen (13) of the habeas petition]

R. 120 at 5 ¶ 12. He makes no showing to rebut the presumption that the prosecution properly discharged its duty to disclose evidence to Bowling. *See Bracy*, 520 U.S. at 908– 09. He provides no evidence suggesting that any such information exists and has not already been provided to him, or that any such information would be helpful to his claim. *Compare* R. 120 at 5 ¶ 12 (making bare request for information), *with Bracy*, 520 U.S. at 905–08 (supporting discovery motion with evidence from court documents and news articles indicating that judge convicted of bribery handled defendant's case improperly). He therefore fails to establish the likely existence or the "materiality of the information

requested." *Stanford*, 266 F.3d at 460.  All of Bowling's discovery requests proceed in the same manner, *see* R. 120 at 1–5.  Thus, the Court denies them all for the same reason: lack of demonstrated good cause.

Additionally, Bowling's discovery requests falter because the he has not established the possibility that the discovery he seeks "could entitle him to relief" on any of the claims at issue here.  *Stanford*, 266 F.3d at 460.

***Claim 3 – Rockcastle:*** Bowling seeks additional discovery on his claim that the evidence of his attempted murder at the Rockcastle Sunoco Station violated his due process rights.  *See* R. 120 at 2.  In reviewing the underlying Claim, the Court determined that—as a matter of law—the testimony introduced at trial about the Rockcastle shooting was not "fundamentally unfair."  *See* Section IV *supra* (collecting Supreme Court cases).  Nothing in Bowling's motion suggests that the evidence he requests could disturb that legal conclusion.

***Claim 13 – Pretrial Disclosures:*** Bowling seeks additional discovery on his claim that the prosecution violated his due process rights by providing him with discovery that was either: late, incorrect, or incomplete.  R. 120 at 1.  The Court's review of Bowling's underlying claim revealed that none of the three non-disclosures at issue could—as a matter of law—amount to a Due Process violation.  *See* Section III *supra* (explaining that none of the non-disclosures were "favorable" to Bowling's claim (quoting *Strickler*, 527 U.S. at 281–82)).  Bowling does not give any reason to believe that additional discovery would reveal that the three disclosures at issue could have been used to either impeach the prosecution's case or exculpate Bowling.  *See id.* (explaining that evidence is only "favorable" if it falls into either of those categories (quoting *Strickler*, 527 U.S. at 281–82)).

***Claim 19 – Chappell's Status Under* Massiah*:*** Bowling also requests information in support of his claim that the government violated his Sixth Amendment rights by having Chappell work as a government informant.  *See* R. 120 at 4.  The evidence that Bowling offers in support of his own petition confirms that any information Chappell obtained about Bowling came before he contacted government officials.  *See* Section VI.A *supra* (citing 2 T.R. for Rule 11.42 Appeal 295–98 (affidavit of Chappell's defense attorney, Barbara Carnes); 4 T.R. for Rule 11.42 Appeal 502 (federal sentencing transcript)).  Therefore, "when reviewed in light of the recently examined record," Bowling's request "falls more in the category of a fishing expedition."  *Stanford*, 266 F.3d at 460.

***Claim 20 – Witness Opinion Testimony:*** Bowling requests information in support of his claim that various witnesses offered improper opinion testimony in violation of his due process rights.  *See* R. 120 at 5.  The Court has already determined—as a matter of law—that none of the opinion testimony at issue was "fundamentally unfair."  *See* Section IV *supra* (collecting Supreme Court cases).  Bowling offers no indication that discovery would yield facts that would change the nature of that testimony so that it would fit into the distinct category of "fundamentally unfair" evidence.  *See id.* (explaining that the Due Process Clause bars admission of only particular categories of evidence at trial).  The only relevant evidence for making that classification is already in the transcript of the trial testimony.  Thus, additional discovery could not entitle Bowling to relief.

***Claim 45 – Chappell's* Giglio *and* Brady *Material:*** Bowling seeks additional discovery in support of his claim that the prosecution violated his due process rights.  R. 120 at 4.  To recall, Claim 45 was really three sub-claims alleging that the prosecution: failed to correct allegedly false testimony by Chappell and Carnes, failed to disclose criminal charges

170

pending against Chappell in Leslie County, and failed to disclose criminal charges pending against Chappell in Fayette County. *See* Section VI.B.2 *supra*. The Court determined that none of Bowling's sub-claims offered a viable theory of prejudice because Chappell was thoroughly impeached without those records and was not a keystone of the prosecution's case. *See id.* The evidence he seeks through discovery here would not alter that determination. It would only offer additional evidence for impeaching Chappell. *See* Section VI.B.2 *supra* (finding that cumulative impeachment evidence makes no difference when a witness is already thoroughly impeached (citing *Heishman*, 621 F.3d at 1035)). Additionally, the Court's review of the record revealed that Bowling's sub-claim regarding the prosecution's failure to disclose the pending Fayette County charges could not be a due process violation as a matter of law. Because those charges were inadmissible under state law, they cannot be "material" under *Brady*. *See* Section VI.B.2 *supra* (citing *Bartholomew*, 516 U.S. at 6). Consequently, Bowling has not shown that discovery could yield facts that would entitle him to relief.

**Claim 46 – *Ineffective Assistance Regarding Chappell:*** Bowling seeks additional discovery on his claim that he was denied effective assistance of counsel by his trial attorney's failure to obtain Chappell's federal sentencing transcript. *See* R. 120 at 4. As with Claim 45, the Court has already determined that Bowling suffered no prejudice because Chappell's credibility was already thoroughly impeached and he was not a keystone of the prosecution case. *See* Section VI.C.1 *supra*. More evidence about how Chappell's credibility could have been impeached will not affect that analysis.

**CONCLUSION**

Accordingly, it is **ORDERED** that Bowling's petition for the writ of habeas corpus, R. 1, is **DENIED** for Claims 2, 3, 4, 13, 15, 18, 19, 20, 45, 46, 47, 48, 50, 51, 53, 54, 55, 57, 58, 59, 60, 61, and 67.  It is further **ORDERED** that Bowling's evidentiary motions, R. 118, R. 120, R. 166, and R. 188, are **DENIED**.

The Court will issue a separate order on the Certificate of Appealability.

This the 28th day of September, 2012.

**Signed By:**

**_Amul R. Thapar_**

**United States District Judge**